1 | **MICHAEL N. FEUER,** City Attorney (SBN 111529x)
2 | **JAMES P. CLARK,** Supervising/Managing Attorney (64780)
**CORY M. BRENTE,** Supervising Assistant City Attorney (SBN 115453)
3 | **ELIZABETH FITZGERALD,** Deputy City Attorney (SBN 158917)
**REBEKAH W. YOUNG,** Deputy City Attorney (SBN 214859)
4 | 200 N. Main Street, 6th Floor, City Hall East
Los Angeles, California 90012
5 | Phone: (213) 978-7560 / Fax: (213) 978-8785
6 | Email: elizabeth.fitzgerald@lacity.org
Email: rebekah.young@lacity.org
7 | *Attorneys for Defendants* **CITY OF LOS ANGELES, CHARLIE BECK, OSCAR
GAMINO and CARLA ZUNIGA**
8 |

9 | **UNITED STATES DISTRICT COURT**

10 | **CENTRAL DISTRICT OF CALIFORNIA**

11 |

12 | ARMAAN KARIM PREMJEE,

13 | Plaintiffs,

14 | vs.

15 | CITY OF LOS ANGELES, CHIEF
16 | CHARLIE BECK, DETECTIVE OSCAR
GAMINO, and DETECTIVE CARLA
17 | ZUNIGA,

18 | Defendants.

19 |

20 |

21 |

**Case No. CV18-04998 AB (ROA)**
*Hon Judge: Andre Birotte, Jr.; Crtm 7B*
*Hon Magistrate Judge: Rozella A. Oliver*

**DEFENDANTS' NOTICE OF
MOTION AND MOTION FOR
SUMMARY JUDGMENT;
MEMORANDUM OF POINTS
AND AUTHORITIES**

[Filed with Defendants' Statement of
Uncontroverted Facts and Conclusions of
Law; Declaration of Beth T. Fitzgerald
and Exhibits; Declaration of Oscar
Gamino and Exhibits; Proposed Order]

Hearing Date: September 13, 2019
Time: 9:00 a.m.
Court: 7B, 350 W. 1st Street

23 | **TO THE HONORABLE COURT AND TO PLAINTIFF ARMAAN KARIM**

24 | **PREMJEE AND HIS ATTORNEYS OF RECORD:**

25 | **PLEASE TAKE NOTICE** that on September 13, 2109 at 9:00 a.m. in Courtroom

26 | 7B of the United States District Court located at 350 W. 1st Street, Los Angeles, CA

27 | 90012, Defendants will move the Court, pursuant to Federal Rule of Civil Procedure 56,

28 | for summary judgment as to each and every claim. Defendants' motion for summary

1

judgment discusses the claims in the following order and contends that they must be dismissed on the following grounds:

(1)     Premjee cannot prevail on his first claim, which alleges he was arrested without probable cause, or his eighth claim, which alleges he was falsely arrested and/or falsely imprisoned, given that Premjee's arrest—and subsequent prosecution—were supported by probable cause.  Furthermore, the detectives who investigated the case and effectuated his arrest are entitled to qualified immunity.

(2)     Premjee cannot prevail on his fifth claim, which alleges malicious prosecution, given that his arrest and subsequent prosecution were supported by probable cause. Even assuming criminal charges were brought without probable cause, a related hurdle effectively ends Premjee's malicious prosecution claim—the rebuttable presumption that a prosecutor exercises independent judgment in deciding to file charges.  This presumption is not overcome where the plaintiff has adduced no evidence "that the district attorney was subjected to unreasonable pressure by the police officers, or that the officers knowingly withheld relevant information with the intent to harm [him], or that the officers knowingly supplied false information."  Smiddy v. Varney, 803 F.2d 1469, 1471 (9th Cir. 1986) (Smiddy II).  No such evidence was adduced here.

(3)     Premjee cannot prevail on his second claim, which alleges the fabrication and/or concealment of evidence, or his third claim, which alleges a Brady violation.  Premjee's second claim fails because his unsupported allegations cannot and do not provide a sufficient basis for this claim.  Premjee's third claim fails it is both precluded under Ninth Circuit case law and it fails on the merits.  District Courts in the Ninth Circuit generally hold that a conviction is necessary to establish prejudice for a Brady claim under 42 U.S.C. § 1983.  Given that the trial court dismissed Premjee's criminal case at the conclusion of the preliminary hearing, Premjee's Brady claim must fail for this reason alone.  Premjee's Brady claim also fails on the merits.  Premjee has failed to identify the evidence at issue in his Brady claim.  Assuming the claim relies upon evidence identified in other parts of the FAC, the cited evidence was not actually

withheld.  Furthermore, even if the evidence was not brought to the prosecutor's attention before she filed criminal charges, the allegedly suppressed evidence would not have produced a different result.  As the prosecutor has made clear, she still would have filed charges against Premjee.

(4)    Premjee cannot prevail on his fourth claim, which alleges a <u>Monell</u> violation.  "Only if a plaintiff shows that his injury resulted from a 'permanent and well settled' practice may liability attach for injury resulting from a local government custom."  <u>Thompson v. City of Los Angeles</u>, 885 F.2d 1439, 1444 (9th Cir. 1989).  Premjee has not, and cannot, make such a showing.

(5)    Premjee cannot prevail on his sixth claim, which alleges negligent training.  The FAC's allegations are unsupported by any competent evidence.  Furthermore, neither the detectives' alleged conduct, nor Chief Beck's, gives rise to a cause of action in this case.  Consequently, the City cannot be held vicariously liable here.

(6)    Premjee cannot prevail on his seventh claim, which alleges a violation of the Bane Act.  When based on a false arrest claim, the Bane Act require a specific intent to violate the arrestee's right to freedom from unreasonable seizure.  Premjee's arrest was supported by probable cause.  Because his false arrest claim must fail, so too must his Bane Act claim fail given that it is based on the same allegedly false arrest.  Premjee cannot prevail on his ninth claim, which alleges an intentional infliction of emotional distress claim.  Premjee's IIED claim is based on the detectives' alleged "outrageous conduct" which was "designed to ensure that [Premjee] be prosecuted for crimes he did not commit."  FAC ¶ 121.  Premjee's other, relevant claims fail on the merits—his arrest was supported by probable cause and the detectives neither fabricated nor concealed evidence from the prosecution, whether that evidence was exculpatory in nature or constituted impeachment material.   Given that the complained-of conduct did not in fact occur, no reasonable jury could find that the detectives' conduct was extreme and outrageous.  Thus, Premjee's IIED claim must fail.

This motion is based upon this Notice of Motion and Motion, the Memorandum of Points an Authorities in Support, the separate Statement of Uncontroverted Facts and Conclusions of Law, the Declaration of Beth T. Fitzgerald and attached Exhibits, the Declaration of Detective Oscar Gamino and attached Exhibits, as well as all the pleadings papers and records on file herein, and on such other matters as may properly come before this Court or at the hearing on this motion.

The parties met and conferred on July 10, 2019, prior to the filing of this motion pursuant to Local Rule 7-3, but were unable to resolve the issues set forth in this motion. On that same date, Defendants informed Plaintiff's counsel that the summary judgment motion was nearly complete, but that the motion would undoubtedly exceed the 25-page limit because it addressed all 9 claims alleged in Plaintiff's FAC and required a full recitation of the facts given that the FAC alleged insufficient probable cause supported Plaintiff's arrest. Plaintiff has not dismissed any of the 9 claims to date. On August 1, 2019, Defendants attempted to again meet and confer with Plaintiff's counsel regarding page limits and emailed counsel to again inform counsel that the motion was lengthy. Defendants thus respectfully requests leave to submit the summary judgment motion at its current length order to fully present a defense to Plaintiff's claims.

Dated: August 2, 2019

Respectfully submitted,

**MICHAEL N. FEUER**. City Attorney
**JAMES P. CLARK**, Supervising/Managing Attorney
**CORY M. BRENTE**, Supervising City Attorney

By: _/S/ Elizabeth Fitzgerald_
        **ELIZABETH FITZGERALD**
        Deputy City Attorney

*Attorneys for Defendants* **CITY OF LOS ANGELES, CHARLIE BECK, OSCAR GAMINO and CARLA ZUNIGA**

# TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES ............................................. 1

I. INTRODUCTION ............................................................................................. 1

II. STATEMENT OF FACTS ............................................................................... 3

    A.  Preliminary Hearing Witness Austin Ridgeway ................................ 3

    B.  Preliminary Hearing Witness Frank Aimetti ..................................... 4

    C.  Preliminary Hearing Witness Detective Gamino ............................... 5

III. MOTION FOR SUMMARY JUDGMENT LEGAL STANDARDS ................. 8

IV. PREMJEE'S FIRST AMENDED COMPLAINT .......................................... 10

V. FALSE ARREST / IMPRISONMENT (FIRST AND EIGHTH CLAIMS) ... 11

    A.  § 1983 Claim for Arrest Without Probable Cause .......................... 12

    B.  Qualified Immunity ......................................................................... 13

    C.  State Law Claim for False Arrest / False Imprisonment ................. 16

VI. MALICIOUS PROSECUTION CLAIM (FIFTH CLAIM) ........................... 17

VII. FABRICATION AND BRADY CLAIM (SECOND AND THIRD CLAIMS) 29

    A.  Fabrication / Concealment Claim .................................................... 29

    B.  Brady Claim .................................................................................... 31

VIII. MONELL CLAIM (FOURTH CLAIM) ...................................................... 33

IX. NEGLIGENT TRAINING CLAIM (SIXTH CLAIM) ................................. 35

X. BANE ACT CLAIM (SEVENTH CLAIM) .................................................. 37

XI. IIED CLAIM (NINTH CLAIM) .................................................................. 38

XII. CONCLUSION ............................................................................................ 40

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Allen v. McCoy,
    135 Cal. App. 500 (1933) .......................................................................... 16

American Int'l Group, Inc. v. American Int'l Bank,
    926 F.2d 829 (9th Cir. 1991) (Kozinski, J., dissenting) ............................... 10

Amylou R. v. County of Riverside,
    28 Cal.App.4th 1205 (1994) ...................................................................... 28

Anderson v. Creighton,
    483 U.S. 635 ............................................................................................. 15

Anderson v. Liberty Lobby, Inc.,
    477 U.S. 242 (1986) ......................................................................... *passim*

Asgari v. City of Los Angeles,
    15 Cal. 4th 744 ......................................................................................... 16

Awabdy v. City of Adelanto,
    368 F.3d 1062 (9th Cir. 2004) .............................................................. 17, 18

Aydin Corp. v. Loral Corp.,
    718 F.2d 897 (9th Cir. 1983) ..................................................................... 40

Barlow v. Ground,
    943 F.2d 1132 (9th Cir. 1991) ................................................................... 19

Bassett v. City of Burbank,
    2014 U.S. Dist. LEXIS 194692 (C.D. Cal. Sept. 11, 2014) ......................... 32

Beck v. Ohio,
    379 U.S. 89 (1964) ............................................................................... 12, 13

Blankenhorn v. City of Orange,
    485 F.3d 463 (9th Cir. 2007) ................................................................ 19, 27

Borunda v. Richmond,
    885 F.2d 1384 (9th Cir. 1988) ................................................................... 19

Brady v. Maryland,
    373 U.S. 83 (1963) ............................................................................*passim*

Cabrera v. City of Huntington Park,
    159 F.3d 374 (9th Cir. 1998)..................................................................... 11

Celotex Cop. v. Catrett,
    477 U.S. 317 (1986) ....................................................................... 8, 9, 10, 39

Chaudhry v. City of Los Angeles,
    751 F.3d 1096 (9th Cir. 2014).................................................................... 37

City of Los Angeles v. Heller,
    475 U.S. 796 (1986) ........................................................................... 34, 37

Cousins v. Lockyer,
    568 F.3d 1063 (9th Cir. 2009)..................................................................... 29

Devereaux v. Abbey,
    263 F.3d 1070 (9th Cir. 2001) (en banc)..................................................... 8, 9

Dinius v. Perdock,
    2012 U.S. Dist. LEXIS 72722 (N.D. Cal. May 24, 2012) ........................................... 32

Dougherty v. City of Covina,
    654 F.3d 892........................................................................................ 34

Echante v. Cnty of Mono,
    299 Fed. App'x 732 (9th Cir. 2008) (unpublished) ...................................... 15

Flores v. Satz,
    137 F.3d 1275 (11th Cir. 1998)................................................................... 31

Florida v. Harris,
    568 U.S. 237 (2013) ................................................................................. 12

Forte v. Merced County,
    2016 U.S. Dist. LEXIS 106561 (E.D. Cal. Aug. 11, 2016) ........................................ 32

Franklin v. Fox,
    312 F.3d 423 (9th Cir. 2002)....................................................................... 12

Garmon v. Cty. of Los Angeles,
    828 F.3d 837 (9th Cir. 2016)....................................................................... 28

iii

Giannis v. City and County of San Francisco,
    78 Cal. App. 3d 219 (1978)....................................................................................... 16

Gillan v. City of San Marino,
    147 Cal. App. 4th 1033 (2007)................................................................................. 12

Gutierrez v. Solano,
    862 F. Supp. 2d 1037 (C.D. Cal. 2012)................................................................... 32

Hamilton v. City of San Diego,
    217 Cal. App. 3d 838 (1990)..................................................................................... 16

High Tech Gays v. Defense Indus. Sec. Clearance Office,
    895 F.2d 563 (9th Cir. 1990)..................................................................................... 39

Hunter v. Bryant,
    502 U.S. 224 (1991) ................................................................................................... 15

Jaffe v. Brown,
    473 Fed. App'x. 557 (9th Cir. 2012) (unpublished) .............................................. 20

Jean v. Collins,
    221 F.3d 656 (4th Cir. 2000)..................................................................................... 31

Kemmerer v. Cnty. of Fresno,
    200 Cal.App.3d 1426 (1988)..................................................................................... 28

Luchtel v. Hagemann,
    623 F.3d 975 (9th Cir. 2010)..................................................................................... 12

Lujan v. National Wildlife Fed'n,
    497 U.S. 871 (1990) ..................................................................................................... 8

Lytle v. Carl,
    382 F.3d 978 (9th Cir. 2004)..................................................................................... 34

MacEachern v. City of Manhattan Beach,
    623 F. Supp. 2d 1092 (C.D. Cal. 2009)................................................................... 35

Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,
    475 U.S. 574 (1986) .......................................................................................... 8, 9, 10

McCune v. City of Grand Rapids,
    842 F.2d 903 (6th Cir. 1988)..................................................................................... 31

McDade v. West,
  223 F.3d 1135 (9th Cir. 2000).....................................................................35

McFarland v. City of Clovis,
  2017 U.S. Dist. LEXIS 54616 (E.D. Cal. April 10, 2017) ...........................39

Mendez v. Cty. of Los Angeles,
  897 F.3d 1067 (9th Cir. 2018).....................................................................28

Monell v. Dep't of Soc. Servs.,
  436 U.S. 658 (1978) ....................................................................................34

Moore v. City of Oakland,
  242 F. Supp. 3d 891 (N.D. Cal. 2017) .......................................................14

Morgan v. Gertz,
  166 F.3d 1307 (10th Cir. 1999)...................................................................31

Newell v. Sauser,
  79 F.3d 115 (9th Cir. 1996).........................................................................14

Newman v. County of Orange,
  457 F.3d 991 (9th Cir. 2006)..................................................................18, 19

Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.,
  210 F.3d 1099 (9th Cir. 2000).....................................................................39

Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.,
  18 F.3d 1468 (9th Cir. 1994)..........................................................................7

Pearson v. Callahan,
  555 U.S. 223 (2009) ....................................................................................13

Peng v. Mei Chin Penghu,
  335 F.3d 970 (9th Cir. 2003).......................................................................12

People v. Adair,
  29 Cal.4th 895 (2003)..................................................................................16

People v. Dancy,
  102 Cal.App.4th 21 (2002)...........................................................................22

People v. Edwards,
  57 Cal. 4th 658 (2013).................................................................................20

People v. Fischer,
   49 Cal. 2d 442 (1957)................................................................................ 16

People v. Giardino,
   82 Cal.App.4th 454 (2000)................................................................... 22, 33

People v. Linwood,
   105 Cal.App.4th 59 (2003).................................................................... 11

People v. Mower,
   28 Cal.4th 457 (2002)............................................................................ 16

Phillips v. City of Fairfield,
   406 F. Supp. 2d 1101 (E.D. Cal. 2005)................................................... 28

Potter v. Firestone Tire & Rubber Co.,
   6 Cal.4th 965 (1993).............................................................................. 38

Puccetti v. Spencer,
   476 Fed. App'x 658 (9th Cir. 2011) (unpublished) ............................... 31

Ram v. Rubin,
   118 F.3d 1306 (9th Cir. 1997)............................................................... 15

Redmond v. San Jose Police Dep't,
   2017 U.S. Dist. LEXIS 190087 (N.D. Cal. Nov. 16, 2017).................... 38

Reese v. Cty. of Sacramento,
   888 F.3d 1030 (9th Cir. 2018)............................................................... 37

Robinson v. Solano Cnty,
   278 F.3d 1007 (9th Cir. 2002)............................................................... 14

Rosenbaum v. Washoe County,
   663 F.3d 1071 (9th Cir. 2011)..................................................... 13, 14, 15

San Diego Branch of NAACP v. Cty. of San Diego,
   2018 U.S. Dist. LEXIS 44806 (S.D. Cal. Mar. 19, 2018) .................... 38

Sanchez v. City of Fresno,
   914 F. Supp. 2d 1079 (E.D. Cal. 2012).................................................. 38

Sangster v. Paetkau,
   68 Cal.App.4th 151 (1998)..................................................................... 17

Smiddy v. Varney (Smiddy I),
   665 F.2d 261 (9th Cir. 1981)................................................................. 18, 26

Smiddy v. Varney (Smiddy II),
   803 F.2d 1469 (9th Cir. 1986)...................................................................... 27

Smith v. Almada,
   640 F. 3d 931 (9th Cir. 2011)........................................................... 11, 31, 32

Strickler v. Greene,
   527 U.S. 263 (1999) ...................................................................................... 33

Sullivan v. County of Los Angeles,
   12 Cal.3d 710 (1974) .................................................................................... 16

Taylor v. List,
   880 F.2d 1040 (9th Cir. 1989).........................................................................9

Tennison v. City & County of San Francisco,
   570 F.3d 1078 (9th Cir. 2009)...................................................................... 31

Thigpen v. City of San Mateo,
   2005 U.S. Dist. LEXIS 49458 (N.D. Cal. Aug. 5, 2005)............................. 39

Thompson v. City of Los Angeles,
   885 F.2d 1439 (9th Cir.1989)....................................................................... 35

United States v. Payne,
   944 F.2d 1458 (9th Cir. 1991).........................................................................1

Usher v. Los Angeles,
   828 F.2d 556 (9th Cir. 1987)........................................................................ 17

Wagner v. Finneran,
   2008 U.S. Dist. LEXIS 120389 (C.D. Cal. April 10, 2008) ........................ 32

Ward v. City of Barstow,
   2017 U.S. Dist. LEXIS 178626 (C.D. Cal. June 27, 2017) ......................... 32

Warren v. City of Carlsbad,
   58 F.3d 439 (9th Cir. 1995)........................................................................ 10

Yousefian v. City of Glendale,
   779 F.3d 1010 (2015)................................................................................... 17

**Statutes**

42 U.S.C. § 1983 ............................................................................ *passim*

The Bane Act ........................................................................... 37, 38

Cal. Civil Code § 51 ....................................................................... 10

Cal. Civil Code § 52.1 ............................................................... 10, 37

Cal. Evid. Code §§ 1101(a), 1103, 782 and 352 ................................. 27

Cal. Gov. Code § 815(b) ................................................................ 14

Cal. Gov. Code § 815.2 ............................................................. 14, 29

Cal. Gov. Code § 815.2(a).................................................... 17, 35, 36

Cal. Gov. Code § 815.2(b) .............................................................. 14

Cal. Gov. Code § 821.6 ............................................................. 28, 29

Cal. Penal Code § 261(a)(1) ........................................................... 22

Cal. Penal Code § 261(a)(3) ...................................... 11, 12, 21, 22, 30

Cal. Penal Code § 261(a)(4) ........................................................... 22

Cal. Penal Code § 289(e)................................................................ 21

Cal. Penal Code § 847(b)........................................................... 16, 17

**Other Authorities**

Fed. R. Civ. P. 56(a) ....................................................................... 7

Fed. R. Civ. P. 56(e) ....................................................................... 8

Intoxicating Encounters: Allocating Responsibility in the Law of Rape,
40 Cal. W. L. Rev. 407, 415 (2004) ................................................. 22

Rule 56..................................................................................... 8, 9, 10

Rule 56(c) .................................................................................... 39

www.lapdonline.org/lapd_manual ................................................... 36

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION[1]

Late in the evening, on Friday, March 31, 2017, an intoxicated USC college student (Arshia S.) went to Banditos, a nearby college bar, and consumed additional shots of alcohol.  The next morning, Arshia awoke in a hospital room—two detectives from the LAPD's Special Assault Section by her side, bruises on her face and body, and little to no memory of what had taken place after she had arrived at the bar just hours before.  All Arshia could recall was feeling suffocated and unable to breathe.  4/12/17 Report at 1-2.  (UF #3)

Arshia, who had a .32 blood alcohol content when admitted into the hospital, was being treated for alcohol poisoning.  4/12/17 Report at 2.  (UF #3)  Arshia soon learned she had left the bar with a fellow USC student, Armaan Premjee (Premjee), and had accompanied him to his fraternity house.  The two then went to Fluor Tower—Arshia's on-campus dorm—and had sexual intercourse on the floor in a common area of the dorm.  (UF #12)  Arshia also learned she had lapsed into unconscious by the time her dormmates approached her—which was almost immediately after the intercourse had ended—and that they had called for an ambulance after spending 45 minutes trying to awaken her without success.  (UF #13, 16)  Arshia's dormmates also angrily spoke with Premjee as he headed out.

---

[1]    Because Premjee's chief claim is that the police did not have probable cause to arrest him, the facts in this motion have been taken from the preliminary hearing testimony, the deposition testimony of the investigating detectives (Detectives Gamino and Zuniga), and the police reports generated during the criminal case.  The issue is not whether these particular facts are true, but when they were presented to the prosecutor and whether they would have affected the prosecutor's charging decision.  Thus, the statements are not hearsay and are admissible here.  See United States v. Payne, 944 F.2d 1458, 1472 (9th Cir. 1991) (statement offered only to show effect on the listener rather than to prove its truth may be properly considered as non-hearsay).  Relevant portions of the preliminary hearing and deposition transcripts are attached to this motion as are the police reports.

4/12/17 Report at 2-3. (UF #15)  Arshia was still unconscious when paramedics arrived. She was unable to speak and displayed signs of shock.  10/16/17 Report at 3.  (UF #13)

Premjee sent a text message to a friend as soon as he left the dorm, asking whether the encounter with Arshia qualified as a sexual assault.  (UF #17)  "Bro, I fucked up," he began.  "Or at least I think I did."  (UF #18)  In the message, Premjee admitted Arshia was "blackout drunk" when she met him and was "still blackout drunk" when they had sex. (UF#19)  "She couldn't walk straight," Premjee said.  (UF #20)  "Even during sex," he added, "she was sloppy and all over the place."  (UF #21)  Premjee also admitted he had lied to Arshia's dormmates, telling them that he was also extremely drunk when in fact he was only "mildly drunk."  (UF #22)  Premjee's friend responded: "Technically, it's wrong, as her decision making would be hazed."  (UF #23)  The friend also advised Premjee to "[m]aintain that you were … as drunk as her if not worse.  That way, you cannot be blamed."  4/12/17 Report at 4-5.  (UF #24)

Premjee was interviewed by detectives on April 1, 2017.  He was arrested on April 11, 2017 and released later that same day.  The Los Angeles County District Attorney's office formally filed rape charges against Premjee on May 2, 2017, and he was arraigned on that day.  (UF #26) The trial court subsequently dismissed the charge at the end of Premjee's preliminary hearing, finding that the prosecution failed to establish penetration had occurred.[2]  (UF #27)  The trial court also found there was no indication of any withdrawal of consent by Arshia.  Prelim Transcript Vol. 2 at 306.

This lawsuit followed.

---

[2]  It is unclear why the trial court focused on this particular issue given that Premjee never disputed penetration had occurred.  Indeed, at least three witnesses saw and heard Premjee and Arshia having sex, Premjee admitted having sex with Arshia, and officers found a used condom in a nearby trash can, which Premjee later admitted was his.  See Gamino Depo at 25; 4/1/17 Report at 1-4; 4/12/17 Report at 2-3.

2

## II.    STATEMENT OF FACTS

### A.    Preliminary Hearing Witness Austin Ridgeway

Austin Ridgway was at the Kappa Sigma fraternity house on April 1, 2017 at approximately 1:00 a.m.  Ridgeway witnessed an Uber pull up in front of the house.  A young woman (Arshia) stumbled out of the vehicle.  (UF #6)  She almost fell in the street and one her shoes fell off.[3]  Prelim Transcript Vol. 1 at 21.  Premjee got out of the car and picked up Arshia to carry her into the fraternity house.  Id. at 21-22.  (UF #6)  Ridgeway and another man repeatedly asked Premjee if his companion was okay.  Premjee smiled, winked and said: "Yeah, she's fine."  Id. at 22.  Premjee and Arshia entered the fraternity house.  Ridgeway and another man later found Arshia in a wandering in a hallway.  She was "stumbling around walls" and trying to get into a locked closet, under the mistaken impression that it was a bathroom.  They told Arshia several times that it was a closet.  They asked for her name and asked where Premjee was, but Arshia was "largely incoherent."  Id. at 22-23.  When Premjee reappeared, Ridgeway said that Arshia should not spend the night at the fraternity house.  Id. at 23.  They told Premjee he needed to call an Uber.  (UF #7)  Although Premjee then fiddled with his phone, and appeared to be leaving the fraternity house with Arshia, the two soon reappeared in the hallway.  Id. at 23-24.  The two men again told Premjee that Arshia could not stay the night.  (UF #7, 8)  Premjee countered: "She is blacked.  She is going to sleep it off here."  Id. at 24.  (UF #7)  By this time, Premjee and Arshia were in Premjee's room.  One of them tried to close the door, but Ridgeway held it open.  Premjee was instructed once again that Arshia would not be able to stay.  Id. at 25.  This was because Arshia "was very clearly intoxicated, and for her own safety we wanted to make sure she got back to campus where they [had] security measures in place."  Id.  (UF #6)  Ridgeway and another man stood in the doorway and told Premjee that Arshia

---

[3]    Although Ridgeway did not use the woman's name when testifying, it is undisputed that this was Arshia.

needed to get home and he needed to call an Uber.  This time, the two watched Premjee to make sure he called an Uber on his phone.  Id. (UF #9)  They also watched to make sure Premjee and Arshia left the fraternity house.  When the Uber arrived, Premjee had to help Arshia both open the door and get into the car.  Id. at 26.  Ridgeway told Premjee not to get into the car and that if he did get in the car, he had to come back that night.  See 4/12/17 Report at 7.  (UF #10)  Ridgeway was concerned enough about what he had witnessed that he reported the incident to the university and the Title IX coordinator the next day.  Id.

### B.      Preliminary Hearing Witness Frank Aimetti

Frank Aimetti was also at the Kappa Sigma fraternity house on April 1, 2017 at approximately 1:00 a.m. Prelim Transcript Vol. 1 at 34.  He saw Premjee, who did not appear intoxicated, and Arshia, who "was very, very intoxicated." Id. at 35-36.  (UF #6)  Arshia "couldn't hold herself up." Id. at 36.  "She was falling into one wall and would try to overcompensate and fall into the other wall … She had to lean on something to be able to stand up." Id.  "For example, she was knocking on the door and also leaning on the door as she was knocking on it." Id. (UF #6)  Aimetti and Ridgeway tried talking to Arshia but she could not understand what they were saying. Id. at 37.  "It was like I was talking *at* somebody and not *to* somebody," Aimetti noted.  4/12/17 Report at 7 (emphasis added); see Prelim Transcript Vol. 1 at 42.  Aimetti and Ridgeway asked Arshia: "Can we call you an Uber to get you home?  Can we get you home?  It is not safe or okay for you to be here." Prelim Transcript Vol. 1 at 37.  (UF #7)  In response, Arshia knocked on a closet door and said: "Let me in."  Although they tried telling Arshia this was not a door to a room, she did not appear to understand what they were saying. Id.  When Premjee reappeared, Aimetti told him that Arshia was too intoxicated to stay at the fraternity house.  Premjee agreed that she was "very drunk." Id. at 38-39.  (UF #6)  Premjee appeared to call an Uber on his phone.  At this point, Arshia "couldn't really walk [and] … was being supported almost entirely by [Premjee]." Id. at 39.  Although Aimetti had told Premjee to call an Uber and get Arshia home, Premjee

instead remained in his room with Arshia. (UF#8) When Premjee closed the door to his room, Aimetti opened the door, held it open, and this time watched to make sure Premjee called an Uber on his phone. Id. at 40. (UF #9) Aimetti noted that when Premjee and Arshia walked to the Uber that was eventually called, Arshia could not stand up without support. Arshia was almost entirely leaning on Premjee and Premjee had to help her get into the car. Id. at 40-41. In short, Aimetti said, Arshia "was in no state to take care of herself." Id. at 45. (UF #6)

## C.   Preliminary Hearing Witness Detective Gamino

Detective Gamino and his partner, Detective Zuniga, began their investigation on the morning of April 1, 2017. Prelim Transcript Vol. 1 at 51. (UF #2) Detective Gamino spoke with witness Tanika Mehra (Tanika), who walked in on Arshia and Premjee as they had sex. Id. at 51, 55-56. Tanika woke up her roommate, Ceci, and they both witnessed Premjee having sex with Arshia. Id. at 57. (UF #15) When they approached Arshia, Premjee was gone and Arshia was lying across an air mattress, naked, and "basically passed out." Id. at 58. (UF #13) Premjee then returned to the common area. He was wearing a t-shirt with no pants. Tamika confronted him, asking, "What are you doing? Can't you see she is drunk and passed out?" (UF #15) Premjee said that they were both "wasted and fucked up" and apologized for the noise. Id. (UF #22) Premjee then put on his pants and left. Id. at 60. Immediately after Premjee left, Tanika and Ceci tried to wake up Arshia by shaking her numerous times but she was totally unresponsive and appeared to be dead. Id. at 60-61. They spent 45 minutes trying to awaken Arshia before calling a resident assistant who was also unable to awaken Arshia. See Zuniga Depo at 28; 4/12/17 Report at 6. Tanika and Ceci went to Arshia's room to grab clothes for her to wear. When they came back, Arshia had managed to stand up and fall face first onto the floor. Arshia tried to get up a second time and fell once again. They ultimately called an ambulance for Arshia. Prelim Transcript Vol. 1 at 62. (UF #16)

5

Detectives Gamino and Zuniga arrived at the hospital at about 11:00 a.m. on April 1, 2017. (UF #2)  Arshia had no idea why she was at the hospital. (UF #2, 25)  Her last memory was being at Banditos bar. Id. at 63-64. (UF#2)  She had smoked marijuana earlier that day and went to "the row" that evening, which is where the school's fraternities and sororities are located.  She had three shots of alcohol while at the row. She then went to Banditos bar, where she had additional shots of alcohol. Id. at 64-65, 71.  Arshia's next memory was waking up in the hospital. Id. at 71.  Arshia was suffering from alcohol poisoning.[4]  Prelim Transcript Vol. 2 at 207. (UF #3)  At the hospital, Arshia told the detectives: "I think it is unfair that someone would do that to me when I was in that state." Id. at 203.  (UF #2, 3)

Detective Gamino subsequently obtained and reviewed security video from Banditos.  Prelim Transcript Vol. 1 at 72.  Part of the video depicted Arshia, her friend Kaavya, and Premjee as they stood outside the bar.  As Premjee stood with his back turned to Arshia, she twice made an intercourse gesture to Kaavya.  Premjee never saw the gesture.[5]  Id. at 74-75. (UF #5)  On the afternoon of April 1, 2017, Arshia received a message from Premjee regarding her purse and jacket.  Arshia responded: "Hey dude … I was told that I was with you Friday night.  I was also told that we fucked.  I do not remember because I was very out of it.  Obviously out of it."[6]  Id. at 81. (UF #25)  The detectives also interviewed Premjee on April 1, 2017. Id. at 113.  Premjee admitted that when they got to the fraternity house, some of his fraternity brothers were upset he had

---

[4]   The attending doctor at the hospital said Arshia was in an "altered state" upon arrival.  Arshia had vomited several times on her way to the hospital and had to be intubated because her level of intoxication put her at risk of asphyxiation.  Arshia could not speak or answer any of the doctor's questions.  According to the doctor, she only moaned. 10/16/17 Report at 5.

[5]   When Detective Gamino showed the video to Arshia a few days before the preliminary hearing, Arshia said she had no memory of making the gesture.  Prelim Transcript Vol. 1 at 75.

[6]   According to Premjee, these messages were sent via Facebook.  See FAC ¶ 33.

1  brought an intoxicated woman back to the house. (UF #22) Premjee also admitted he

2  had been reluctant, at one point, to have sex with Arshia given her intoxicated state. Id.

3  at 114. (UF #22) The detectives subsequently located and interviewed the Uber driver

4  who took Premjee and Arshia from Banditos to the fraternity house. Id. at 105.

5  According to the driver, Arshia jumped into Premjee's lap during the ride and straddled

6  him in a sexual manner. Id. The detectives also located the Uber driver who then took

7  Premjee and Arshia from the fraternity house to her dorm. He did not remember the two,

8  however. Id. at 106.

9        Detective Gamino also interviewed Arshia's friend, Tanika, who had found Arshia

10  after she had sex with Premjee. Prelim Transcript Vol. 2 at 191. When first contacted

11  by the police, Tanika said she had heard a man and a woman moaning, seeming to enjoy

12  the act. Id. at 191-192. Tanika said she was concerned about Arshia's alcohol and

13  marijuana use and that she'd had to look after Arshia from time to time. Id. at 193.

14  While Detective Gamino was on the stand, Premjee's counsel played portions of the

15  security video from Banditos. Id. at 213-214. Premjee and Arshia could be seen

16  hugging each other on the video. Id. at 222. Premjee then placed her on the bar's

17  counter. Id. at 223. Later, Arshia could be seen taking Premjee's hand as she made her

18  way through the bar. Id. at 224. The two were later spotted outside the bar, along with

19  Arshia's friend Kaavya. At this point, Arshia made the sexual intercourse sign to

20  Kaavya. Id. at 226-227. Premjee's counsel also played portions of the security video

21  from the lobby at Arshia's dorm. Id. at 228-229. Arshia was visibly swaying as she and

22  Premjee made their way to the elevator. Id. at 230. At some point between 1:04 a.m.

23  and 1:28 a.m., the two had sex in the common area on Arshia's dorm floor. Gamino

24  Depo at 69. (UF #12) Arshia's dormmates approached her and found that she was

25  unconscious almost immediately after the sex with Premjee had ended. See 4/1/17

26  Report at 3; 4/12/17 Report at 6.

27

28

III.   **MOTION FOR SUMMARY JUDGMENT LEGAL STANDARDS**

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment avoids unnecessary trials in cases in which the parties do not dispute the facts relevant to the determination of the issues in the case, or in which there is insufficient evidence for a jury to determine those facts in favor of the nonmovant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-50 (1986); Nw. Motorcycle Ass'n v U.S. Dep't of Agric., 18 F.3d 1468, 1471-72 (9th Cir. 1994). In short, a summary judgment motion asks whether the evidence presents a sufficient disagreement to require submission to a jury.

The principal purpose of Rule 56 is to isolate and dispose of factually unsupported claims or defenses. Celotex Cop. v. Catrett, 477 U.S. 317, 323-24 (1986). Thus, the rule functions to "'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments). Procedurally, under summary judgment practice, the moving party bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323; Devereaux v. Abbey, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). If the moving party meets its burden with a properly supported motion, the burden then shifts to the opposing party to present specific facts that show there is a genuine issue for trial. Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 248; Auvil v. CBS "60 Minutes," 67 F.3d 816, 819 (9th Cir. 1995).

Further, the party seeking summary judgment does not necessarily need to submit any evidence of its own. When the opposing party would have the burden of proof on a dispositive issue at trial, the moving party need not produce evidence which negates the opponent's claim. See e.g., Lujan v. National Wildlife Fed'n, 497 U.S. 871, 885 (1990).

Rather, the moving party need only point to matters which demonstrate the absence of a genuine material factual issue. See Celotex, 477 U.S. at 323-24 ("[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'")  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  See id. at 322.  In such a circumstance, summary judgment must be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment … is satisfied." Id. at 323.

In order to defeat summary judgment, the opposing party must establish a genuine dispute as to a material issue of fact.  This entails two requirements.  First, the dispute must be over a fact(s) that is material, i.e., one that makes a difference in the outcome of the case.  Anderson, 477 U.S. at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.")  Whether a factual dispute is material is determined by the substantive law applicable for the claim in question.  Id.  If the opposing party is unable to produce evidence sufficient to establish a required element of its claim that party fails in opposing summary judgment.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 322.  Second, the dispute must be genuine.  Where the party opposing summary judgment would bear the burden of proof at trial on the factual issue in dispute, that party must produce evidence sufficient to support its factual claim. Conclusory allegations, unsupported by evidence are insufficient to defeat the motion. Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989).  Rather, the opposing party must, by affidavit or as otherwise provided by Rule 56, designate specific facts that show there is a genuine issue for trial.  Anderson, 477 U.S. at 249; Devereaux, 263 F.3d at 1076.

1  More significantly, to demonstrate a genuine factual dispute the evidence relied on by
2  the opposing party must be such that a fair-minded jury "could return a verdict for [him]
3  on the evidence presented." Anderson, 477 U.S. at 248, 252.  Absent any such evidence
4  there simply is no reason for trial.

5      In deciding a summary judgment motion, the court does not determine witness
6  credibility.  It believes the opposing party's evidence, and draws inferences most
7  favorably for the opposing party.  See Matsushita, 475 U.S. at 587.  Inferences, however,
8  are not drawn out of "thin air," and the proponent must adduce evidence of a factual
9  predicate from which to draw inferences.  American Int'l Group, Inc. v. American Int'l
10 Bank, 926 F.2d 829, 836 (9th Cir. 1991) (Kozinski, J., dissenting) (citing Celotex, 477
11 U.S. at 322).  If reasonable minds could differ on material facts at issue, summary
12 judgment is inappropriate.  See Warren v. City of Carlsbad, 58 F.3d 439, 441 (9th Cir.
13 1995).  On the other hand, "[w]here the record taken as a whole could not lead a rational
14 trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"
15 Matsushita, 475 U.S. at 587 (citation omitted); Celotex, 477 U.S. at 323.  Thus, Rule 56
16 screens out cases lacking any genuine dispute over an issue that is determinative of the
17 outcome of the case.

18 **IV.   PREMJEE'S FIRST AMENDED COMPLAINT**

19     Premjee's First Amended Complaint (FAC) alleges nine causes of action: (1)
20 Deprivation of Civil Rights—Arrest Without Probable Cause (42 U.S.C. § 1983); (2)
21 Deprivation of Civil Rights—Fabrication and Concealment of Evidence Violations (42
22 U.S.C. § 1983); (3) Deprivation of Civil Rights—Brady Violations (42 U.S.C. § 1983);
23 (4) Deprivation of Civil Rights—Monell Violations (42 U.S.C. § 1983); (5) Malicious
24 Prosecution (California Common Law and 42 U.S.C. § 1983); (6) Negligence/Negligent
25 Training and Supervision; (7) Bane Act Violation—Civil Code §§ 51, 52.1; (8) False
26 Arrest/False Imprisonment; and (9) Intentional Infliction of Emotional Distress.  FAC at
27 1-2.  Detectives Gamino and Zuniga are named as defendants in all but the fourth cause
28 of action (the Monell claim).  The City of Los Angeles is named as a defendant in the

1    fourth through ninth causes of action.  Former LAPD Chief of Police Charlie Beck is

2    named as a defendant in the sixth cause of action (the Negligent Training and

3    Supervision claim) although, according to Premjee's counsel, he will be likely

4    dismissed.  See FAC at 19-36.  If any claims are duplicative or based on the same

5    alleged conduct, they are addressed together below.

6    **V.    FALSE ARREST / IMPRISONMENT (FIRST AND EIGHTH CLAIMS)**

7            Premjee was charged with violating California Penal Code § 261(a)(3), which

8    provides that: "Rape is an act of sexual intercourse accomplished with a person not the

9    spouse of the perpetrator … [w]here a person is prevented from resisting by any

10   intoxicating or anesthetic substance, or any controlled substance, and this condition was

11   known, or reasonably should have been known by the accused."  Constructive

12   knowledge will satisfy the knowledge requirement of § 261(a)(3).  People v. Linwood,

13   105 Cal.App.4th 59, 68-72 (2003).  Constructive knowledge is determined under an

14   objective test using the reasonable person standard.  Id.  To enable a reasonable person

15   to determine if another no longer has the ability to resist, "[t]here are commonly

16   recognizable indications of a person's intoxication, including an odor of alcohol, slurring

17   of speech and unsteadiness."  Id. at 70.  Premjee has alleged both a § 1983 claim and a

18   state law claim based on his purportedly false arrest for violating § 261(a)(3).  As

19   discussed below, however, a reasonable person would have known that Arshia was too

20   intoxicated to exercise the judgment required to give legal consent to sexual intercourse.

21   Indeed, several such people made this determination on that night.  Further,

22   overwhelming evidence, including Premjee's own admissions, supported the

23   determination that Premjee had actual knowledge that Arshia was too intoxicated to

24   exercise the judgment required to give legal consent to sexual intercourse.  Therefore,

25   Premjee's arrest was supported by probable cause and the detectives who investigated

26   the case and effectuated the arrest are entitled to qualified immunity.  Consequently,

27   summary judgment is appropriate here.

28

**A.      § 1983 Claim for Arrest Without Probable Cause**

In order to prevail on a false arrest claim, Premjee must demonstrate that no probable cause existed to arrest him.  See Cabrera v. City of Huntington Park, 159 F.3d 374, 380 (9th Cir. 1998).  In other words, probable cause is an absolute defense to a claim of false arrest.  See Smith v. Almada, 640 F. 3d 931, 944 (9th Cir. 2011).  An arrest is supported by probable cause if, under the totality of the circumstances, a prudent person would have concluded that there was a fair probability the suspect had committed a crime.  See Beck v. Ohio, 379 U.S. 89, 91 (1964); Luchtel v. Hagemann, 623 F.3d 975, 979 (9th Cir. 2010); see also Gillan v. City of San Marino, 147 Cal. App. 4th 1033, 1044 (2007) ("Probable cause exists when the facts known to the arresting officer would persuade someone of 'reasonable caution' that the person to be arrested has committed a crime.")  Nevertheless, probable cause is not "reducible to precise definition or quantification.  Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence … have no place in the [probable cause] decision."  Florida v. Harris, 568 U.S. 237, 243-44 (2013) (internal quotation marks and citations omitted).

In short, when determining whether probable cause exits, the U.S. Supreme Court has "rejected rigid rules, bright-line tests, and mechanistic inquiries in favor of a more flexible, all-things-considered approach." Id. at 244.  Notably, however, "[t]he evidence need support only the probability, and not a prima facie showing, of criminal activity." Franklin v. Fox, 312 F.3d 423, 438 (9th Cir. 2002) (citation and internal quotation marks omitted).  Thus, for probable cause to exist, it is not necessary that the crime actually have occurred.  See Peng v. Mei Chin Penghu, 335 F.3d 970, 976 (9th Cir. 2003) (observing that, under California law, a police officer may make a warrantless arrest when the officer has probable cause to believe that the person to be arrested has committed a felony, whether or not a felony, in fact, has been committed.)

Here, the detectives clearly had probable cause to arrest Premjee for violating Penal Code § 261(a)(3).  Indeed, there was no real debate whether Premjee and Arshia

had sexual intercourse or if Arshia was intoxicated and on the verge of unconsciousness at the time of the act.  The only element at issue was whether Arshia's condition was known, or reasonably should have been known by Premjee.  However, Arshia's nearly-debilitating level of intoxication was plainly apparent to all who came into contact with her that evening, including Premjee's fraternity brothers, an Uber driver, and Arshia's dormmates.  Premjee himself later admitted Arshia was "blackout drunk" during their time together, and that she was still in that state when they had sex.  He admitted Arshia was unable to disrobe on her own and he had removed her pants for her.[7]  4/12/17 Report at 3.  In an act further revealing his consciousness of guilt, Premjee lied to Arshia's dormmates and said he was intoxicated as Arshia.  4/12/17 Report at 5.  Although, in an attempt to exculpate himself, Premjee told detectives he repeatedly tried to get out of having sex with Arshia due to her intoxicated state, see 4/12/17 Report at 2-3, this admission, along with the panicked text message Premjee sent to a friend when leaving the dorm, shows he was well aware that Arshia was incapable of consent—yet proceeded to have sex with her regardless.  When taken together, a prudent person would have concluded that there was a fair probability Premjee had committed a crime.  See Beck, 379 U.S. at 91.

## B.   Qualified Immunity

Although a person acting "under the color of state law and authority" can be held liable for a constitutional violation under § 1983, such a claim cannot stand against an individual with qualified immunity.  The purpose of qualified immunity is to "shield an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law."  Pearson v. Callahan, 555 U.S. 223, 244 (2009).  With respect to an allegedly unlawful arrest, an officer who makes an arrest without probable cause may still be entitled to qualified immunity if it was "reasonably arguable" that

---

[7]   According to one of the responding patrol officers, Arshia's pants were inside out with the underwear exposed and it looked like someone had grabbed them and pulled them off.  10/16/17 Report at 4.

13

1  probable cause to arrest existed.  Rosenbaum v. Washoe County, 663 F.3d 1071, 1076

2  (9th Cir. 2011).  The two prongs of the qualified immunity analysis in the context of an

3  unlawful arrest are: "(1) whether there was probable cause for the arrest; and (2) whether

4  it is reasonably arguable that there was probable cause for arrest—that is, whether

5  reasonable officers could disagree as to the legality of the arrest such that the arresting

6  officer is entitled to qualified immunity."  Id.  The relevant inquiry is whether, given the

7  specific circumstances, a reasonable officer would believe the conduct was lawful, not

8  whether the end result of those actions was or was not a constitutional violation.  See

9  Newell v. Sauser, 79 F.3d 115, 118 (9th Cir. 1996) ("Even if a constitutional violation

10  has occurred, an officer will be immune from suit if he objectively could have believed

11  that his conduct was lawful") (citation and internal quotation marks omitted.)  "Whether

12  or not a reasonable officer would have known that his or her conduct violated clearly

13  established law is not itself a factual issue that can preclude summary judgment."  Id.

14  (citation and internal quotation marks omitted).[8]

15      Here, based upon the facts alleged in the FAC and drawing all reasonable

16  inferences in Premjee's favor, it was objectively reasonable for Detectives Gamino and

17  Zuniga to conclude there was probable cause to arrest Premjee.[9]  The claim fails for this

18  reason alone.  See, e.g., Echante v. Cnty of Mono, 299 Fed. App'x 732, 733-34 (9th Cir.

19

---

20  [8]    In addition, "[t]he liability of a public entity … is subject to any immunity of the

21  public entity provided by statute, including this part, and is subject to any defenses that
    would be available to the public entity if it were a private person."  Cal. Gov. Code §

22  815(b).  The public entity is not liable for the acts or omissions for which its employee is

23  immune.  See Cal. Gov. Code § 815.2(b) ("Except as otherwise provided by statute, a
    public entity is not liable for an injury resulting from an act or omission of an employee

24  of the public entity where the employee is immune from liability"); Robinson v. Solano

25  Cnty, 278 F.3d 1007, 1016 (9th Cir. 2002) ("California … imposes liability on counties
    under the doctrine of respondeat superior for acts of county employees; it [also] grants

26  immunity to counties only where the public employee would also be immune") (relying

27  on Cal. Gov. Code § 815.2).

28  [9]    "This standard is difficult to detangle from the probable cause inquiry, which
    itself turns on whether the circumstances would lead a reasonable officer to conclude

14

2008) (unpublished) (false arrest, imprisonment and malicious prosecution claims were all properly dismissed "because probable cause supported the arrest").  As discussed above, the only element at issue was whether Arshia's condition was known, or reasonably should have been known by Premjee and there was ample evidence that Premjee knew of her condition when he decided to engage in sexual intercourse.

"Even law enforcement officials who 'reasonably but mistakenly conclude that probable cause is present' are entitled to immunity."  Hunter v. Bryant, 502 U.S. 224, 227 (1991) (citation omitted).  "The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law."  Id. at 229 (citation and internal quotation marks omitted). In other words, an officer "may still be immune from suit if it was objectively reasonable for him to *believe* that he had probable cause."  Rosenbaum, 663 F.3d at 1078 (emphasis in original) (citation omitted).  "The linchpin of the qualified immunity analysis is the reasonableness of the officer's conduct in the particular case at hand."  Id. (citation omitted).

In sum, "it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and … in such cases those officials—like other officials who act in ways they reasonably believe to be lawful—should not be held personally liable."  Anderson v. Creighton, 483 U.S. 635, 641 (1987).  Whether defendants are entitled to a qualified immunity defense requires a two-part analysis: Was the law governing the police officer's conduct clearly established?  Under that law, could a reasonable officer have believed the conduct was lawful?  See Ram v. Rubin, 118 F.3d 1306, 1309 (9th Cir. 1997).  Given the witness statements gathered prior to arrest, the physical evidence corroborating those statements,

---

that the suspect has committed a crime; the difference is that the probable cause inquiry is about whether the officer's belief is 'objectively reasonable' … whereas in the qualified immunity context it need only be 'reasonably arguable' that the officer has that objective belief."  Moore v. City of Oakland, 242 F. Supp. 3d 891, 909 (N.D. Cal. 2017)

1   and Premjee's ultimately inculpatory admissions, a reasonable officer could, and did,

2   believe the arrest was lawful.  Thus, Detectives Gamino and Zuniga are entitled to

3   qualified immunity here.

4       **C.**   **State Law Claim for False Arrest / False Imprisonment**

5       Under California law, false arrest and false imprisonment are not separate torts;

6   "[f]alse arrest is but one way of committing a false imprisonment." Asgari v. City of

7   Los Angeles, 15 Cal. 4th 744, 753 fn. 3 (citation omitted).  "An officer is not liable for

8   false imprisonment for the arrest without a warrant of a person whom he has reasonable

9   grounds to believe is guilty of a crime. The question of the existence of probable cause

10  to believe that one is guilty of a crime must be determined as a matter of law from the

11  facts and circumstances of the case." Allen v. McCoy, 135 Cal. App. 500, 507 (1933).

12  "The existence of probable cause depends upon facts known by the arresting officer at

13  the time of the arrest." Hamilton v. City of San Diego, 217 Cal. App. 3d 838, 844

14  (1990).  The California Supreme Court has long held that "[p]robable cause for an arrest

15  is shown if a man of ordinary caution or prudence would be led to believe and

16  conscientiously entertain a strong suspicion of the guilt of the accused," even if "there

17  may be some room for doubt." People v. Fischer, 49 Cal. 2d 442, 446 (1957).

18      Under California law, a police officer is not granted governmental immunity for

19  false arrest and imprisonment. Asgari, 15 Cal.4th at 752; see Sullivan v. County of Los

20  Angeles, 12 Cal.3d 710, 719 (1974).  However, Penal Code § 847(b) contains principles

21  that parallel the immunity analysis.  Under § 847(b), officers acting within the scope of

22  their authority are immune from false arrest or false imprisonment claims if the "arrest

23  was lawful, or the peace officer, at the time of the arrest, had reasonable cause to believe

24  the arrest was lawful." Cal. Penal Code § 847(b)(1); see Hamilton, 217 Cal. App. 3d at

25  845.  Reasonable cause to arrest exists when the facts known to the arresting officer

26  would lead a reasonable person to have a strong suspicion of the arrestee's guilt. People

27  v. Mower, 28 Cal.4th 457, 473 (2002).  This is an objective standard. People v. Adair,

28  29 Cal.4th 895, 904–905 (2003).  Where the facts are undisputed, the issue of reasonable

cause for an arrest is a question of law.  Giannis v. City and County of San Francisco, 78 Cal. App. 3d 219, 224-25 (1978).  Here, as discussed above, it was objectively reasonable for Detectives Gamino and Zuniga to conclude there was probable cause to arrest Premjee.  Thus, they are entitled to immunity pursuant to Penal Code § 847(b).  Because the detectives' conduct does not gives rise to a cause of action in this case, the City cannot be held vicariously liable here.  See Cal. Gov. Code § 815.2(a).

## VI.   MALICIOUS PROSECUTION CLAIM (FIFTH CLAIM)

In general, "a claim of malicious prosecution is not cognizable under 42 U.S.C. § 1983 if process is available within the state judicial system to provide a remedy.  However, an exception exists to the general rule when a malicious prosecution is conducted with the intent to deprive a person of equal protection of the laws or is otherwise intended to subject a person to a denial of constitutional rights."  Usher v. Los Angeles, 828 F.2d 556, 561-62 (9th Cir. 1987) (citations and quotations omitted).  Here, Premjee contends that the detectives intended to deprive him of his constitutional rights under the Fourth, Sixth and Fourteenth Amendments.  FAC ¶ 94.  Malicious prosecution actions are not limited to suits against prosecutors but may be brought against other persons alleged to have wrongfully caused criminal charges to be filed.  See Awabdy v. City of Adelanto, 368 F.3d 1062, 1066 (9th Cir. 2004).

A malicious prosecution claim brought under § 1983 incorporates state law.  See Usher, 828 F.3d at 561-62.  Under California's malicious prosecution law, a plaintiff must prove that the underlying prosecution: "(1) was commenced by or at the direction of the defendant and was pursued to a legal termination in his, plaintiff's, favor; (2) was brought without probable cause; and (3) was initiated with malice."  Conrad v. United States, 447 F.3d 760, 767 (9th Cir. 2006) (citation omitted); see also Yousefian v. City of Glendale, 779 F.3d 1010, 1014 (2015) (holding that the absence of probable cause is a necessary element of § 1983 false arrest and malicious prosecution claims).  As discussed above, Premjee's arrest and subsequent prosecution were supported by

probable cause.[10]  Even assuming criminal charges were brought without probable cause, a related hurdle effectively ends Premjee's malicious prosecution claim—namely, the rebuttable presumption that a prosecutor exercises independent judgment in deciding to file charges.  That presumption, if not rebutted, protects officers for malicious prosecution claims because of the "intervening fault of [the prosecutors] in the chain."  Smiddy v. Varney, 665 F.2d 261, 267 (9th Cir. 1981) (Smiddy I); see also Newman v. County of Orange, 457 F.3d 991, 995 (9th Cir. 2006) ("If charges are filed, Smiddy protects the officers unless such evidence shows that officers interfered with the prosecutor's judgment in some way, by omitting relevant information, by including false information, or by pressuring the prosecutor to file charges.")

Indeed, in reviewing malicious prosecution claims, the Ninth Circuit has long recognized that filing a criminal complaint immunizes investigating officers from damages suffered thereafter because it is presumed that the prosecutor filing the complaint exercised independent judgment in determining that probable cause for the accused's arrest existed at that time.  See Newman, 457 F.3d at 993.  Nevertheless, as noted above, "the presumption of prosecutorial independence does not bar a subsequent § 1983 claim against state or local officials who improperly exerted pressure on the prosecutor, knowingly provided misinformation to him, concealed exculpatory evidence, or otherwise engaged in wrongful or bad faith conduct that was actively instrumental in causing the initiation of legal proceedings."  Awabdy, 368 F.3d at 1067.  However, "where police officers do not act maliciously or with reckless disregard for the rights of an arrested person, they are not liable for damages suffered by the arrested person after a

---

[10]    A defendant may lack probable cause where "he relies upon facts which he has no reasonable cause to believe to be true."  Sangster v. Paetkau, 68 Cal.App.4th 151, 164 (1998).  The standard is objective, see id., and, "[i]n making its determination whether the prior action was legally tenable, the trial court must construe the allegations of the underlying complaint liberally in a light most favorable to the malicious prosecution defendant."  Id. at 165 (citation omitted).

district attorney files charges unless the presumption of independent judgment by the district attorney is rebutted." Smiddy I, 665 F.2d at 267. "The plaintiff bears the burden of producing evidence to rebut such presumption." Newman, 457 F.3d at 993.

In Smiddy v. Varney, 803 F.2d 1469, 1471 (9th Cir. 1986) (Smiddy II), the Ninth Circuit found that the presumption of prosecutorial independence is not overcome where the plaintiff has adduced no evidence "that the district attorney was subjected to unreasonable pressure by the police officers, or that the officers knowingly withheld relevant information with the intent to harm [him], or that the officers knowingly supplied false information." Subsequent Ninth Circuit cases have further explained the type of evidence that will suffice to overcome the presumption. In Borunda v. Richmond, 885 F.2d 1384 (9th Cir. 1988), for example, the Ninth Circuit found that the plaintiff had rebutted the presumption of independent judgment where the defendant officers "procured the filing of the criminal complaint by making misrepresentations to the prosecuting attorney." Id. at 1390; see Blankenhorn v. City of Orange, 485 F.3d 463, 483-84 (9th Cir. 2007) (finding summary judgment improper where evidence demonstrated that prosecutor had not viewed a key videotape prior to filing charges and other evidence demonstrated that the officers' reports were false and misleading); Newman, 457 F.3d at 995 ("Because Sloman had no evidence of material omissions, or inconsistent police or eyewitness accounts, he could not demonstrate a genuine issue of material fact as to whether the prosecutor exercised independent judgment. Summary judgment for the defendant officers was therefore appropriate," citing Sloman v. Tadlock, 21 F.3d 1462, 1474 (9th Cir. 1994)); Barlow v. Ground, 943 F.2d 1132, 1136-37 (9th Cir. 1991) (plaintiff overcame presumption of prosecutorial independence because prosecutor relied solely on arresting officers' reports, which omitted critical information, an independent witness corroborated at least part of plaintiff's version of events, and the officers' accounts varied). In short, a prosecutor's judgment will be deemed not independent if they were misled by material omissions or false information given by the arresting officers. Barlow, 943 F.2d at 1136; Borunda, 885 F.2d at 1390.

19

Here, Premjee appears to proceed under the material omission prong, alleging that the detectives failed to include the following information in their written reports: (1) that the Banditos security video depicted Arshia making a sexual intercourse gesture as she stood behind Premjee (FAC ¶ 30); (2) that Arshia was sexually aggressive with Premjee as they rode in the back of an Uber after leaving Banditos (FAC ¶ 21); (3) that, when re-interviewed by detectives, roommate Tanika Mehra said she had yelled at Arshia for having sex with Premjee in the dorm's common area and opined that Arshia was extremely irresponsible, smoked marijuana more than she drank alcohol, and had previously blacked out from excessive alcohol consumption (FAC ¶ 31); (4) that Arshia sent Premjee a Facebook message the day after the assault, in which she stated: "Hey dude … I heard we fucked" or words to that effect (FAC ¶ 33); and (5) that Arshia, when subsequently interviewed by detectives about the Banditos video, said that although she did not remember making the gesture, it was "obvious" it meant she wanted to have sex with Premjee, and also told the detectives: "I wasn't completely drunk in the video, I was able to walk, I just blacked out for some reason."[11] FAC ¶ 38.

According to Premjee this additional exculpatory information was not presented to the prosecutor in a timely manner, thus leading to his "highly publicized" criminal prosecution for rape.[12] FAC ¶ 40. Premjee does not dispute he had this evidence in his

[11]   Blackouts have been referred to as "anterograde amnesia," which means that from the time the drug or alcohol use begins until the effect of the drug or alcohol wears off, there is no recording in memory of the events that happened during that time. In moderate blackouts, individuals wake up the next day and cannot remember what they did the previous day. See People v. Edwards, 57 Cal. 4th 658, 695-696 (2013). Here, Arshia's last memory before the assault was drinking at the Banditos bar. Her next memory was waking up in the hospital. Prelim Transcript Vol. 1 at 64, 71.

[12]   Although there is no evidence that the detectives or the prosecutor ever spoke to the press, Premjee has since admitted that he personally spoke with multiple media outlets during his criminal case, including conducting on-camera interviews with television reporters. See Premjee Depo at 123 (Premjee spoke to Fox News, the L.A. Times, the New York Times, ABC, Inside Edition, KTLA, and the Daily Trojan).

possession prior to his preliminary hearing.[13]  Indeed, it is uncontested that Premjee's criminal attorney cross-examined Detective Gamino extensively while citing this very material.  Instead, Premjee contends that had the prosecutor received the material at some earlier time, she never would have filed charges in the first place.  FAC ¶ 40; see FAC ¶¶ 57, 66, 76.  Thus, the questions presented by Premjee's malicious prosecution claim are as follows: (1) whether this additional information was indeed exculpatory; (2) whether the detectives had this evidence in their possession before criminal charges were filed; (3) if so, whether the detectives failed to provide this evidence to the prosecutor in *any* form before she filed charges; and (4) if so, whether the prosecutor would have declined to file charges had she been provided with this additional material.  Every question must be answered in the affirmative for the malicious prosecution claim to succeed.

Here, the detectives provided much of the material to the prosecutor before she filed charges in Premjee's criminal case.[14]  Indeed, the initial report submitted by the responding patrol officers contained several items of exculpatory information—including information Premjee now contends was withheld from the prosecutor prior to filing.  For example, as noted in the initial report, a witness interviewed by the patrol officers stated that Arshia had smoked marijuana all day before the assault that night.  4/1/17 Report at 2.  Another witness said that Arshia was flirting with Premjee when they arrived back at the dorm and was also "hanging into him and hugging him" at that

---

[13]  Notably, neither the U.S. Supreme Court nor the Ninth Circuit have held that the prosecution must disclose exculpatory evidence to a defendant in advance of a preliminary hearing.  See, e.g., <u>Jaffe v. Brown</u>, 473 Fed. App'x. 557, 559 (9th Cir. 2012) (unpublished).

[14]  The detectives interviewed Premjee on April 1, 2017, within hours of the assault, but did not arrest him until April 11, 2017.  Premjee posted bond and was released that same day. On April 13, 2017, the detectives submitted the case to the prosecutor for filing consideration. See 4/12/17 Report at 9.  On May 2, 2017, the prosecutor filed Penal Code §§ 261(a)(3) and 289(e) charges against Premjee. See 5/16/17 Report at 1.  The preliminary hearing took place from July 24, 2017 through July 26, 2017.  (The prosecutor dismissed the § 289(e) charge before the preliminary hearing.)

time.[15]  Id.  The witness described Arshia and Premjee as a "happy couple" and said she

had a pleasant conversation with the two.  In addition, several witnesses said they

interpreted the moaning sounds later emitted by Arshia and Premjee as "the sound of a

man and a woman enjoying sex."  Id. at 3.  Another witness described the scene as "a

man with a dark complexion kneeling on the bed with a woman's legs wrapped around

his back."  Id.  Thus, contrary to Premjee's current claim, see FAC ¶ 18, the police

reports did in fact include evidence that arguably established consent to sex by Arshia.[16]

---

[15]    As later noted by Detective Zuniga: "When I look at the video, [Arshia] was very
intoxicated.  I mean, she was stumbling all over.  Yes, they were hugging.  But it was
more he was holding her up to keep her from falling."  Zuniga Depo at 45.

[16]    According to Premjee, Arshia "knew what she wanted and she got it."  Premjee
Depo at 94.  Contrary to Premjee's mistaken belief, however, consent is *not* an issue in a
§ 261(a)(3) case.  This is because California's rape statute assigns responsibility to the
man when there is an allegation of nonconsensual sexual intercourse with an intoxicated
woman.  See Intoxicating Encounters: Allocating Responsibility in the Law of Rape, 40
Cal. W. L. Rev. 407, 415 (2004).  Thus, although the FAC devotes an entire section to
the evidence allegedly establishing consent, see FAC at 7-9, and repeatedly cloaks
Premjee's offense in the language of consent, whether it be Arshia's purported consent
to sex, or the lack of evidence establishing Arshia's revocation of that claimed consent,
see, e.g., FAC ¶ 18, 24, 38, 57, 66, 76, 93, 103, consent is not an issue in intoxication
rape cases.  Indeed, "if the charge is that the victim lacked the capacity to give legal
consent ... then actual consent is *irrelevant*[.]"  People v. Giardino, 82 Cal.App.4th 454,
461 (2000) (emphasis added).  In other words, if the victim lacks capacity to give legal
consent, any purported consent the victim may have expressed, harbored, or intended to
express is ineffective. This is because the law prohibits a defendant from engaging in
sexual intercourse where the victim is unable to exercise reasonable judgment about
participating in the act, including when the defendant knew or should have known the
victim suffered a severe mental disability (Penal Code § 261(a)(1)), was too intoxicated
to consent (§ 261(a)(3)) or was unconscious or asleep (§ 261(a)(4)(A).  See Giardino, 82
Cal.App.4th at 460-462 & 461, fn. 4.  In the case of rape by intoxication, the "issue is
not whether the victim actually consented to sexual intercourse, but whether he or she
was capable of exercising the degree of judgment a person must have in order to give
legally cognizable consent."  Id. at 462; see also People v. Dancy, 102 Cal.App.4th 21,
37 (2002) (noting that "neither a woman's actual 'advance consent' nor a man's belief in
'advance consent'" is a defense where the woman later lacks capacity to consent).
Section 261(a)(3) does not "require the victims to be so intoxicated that they are
physically incapable of either speaking or otherwise manifesting a refusal to give actual

A follow-up report by the investigating detectives also noted Arshia's marijuana use. 4/12/17 Report at 1, 8.[17]  The report also noted that Tanika had yelled at Arshia after witnessing Arshia and Premjee having sex.[18]  Id. at 6.  Moreover, according to the follow-up report, a witness who had heard Arshia's moans (Ceci Wilfert), stated she could differentiate between "consensual moaning" and "get off of me moaning" and that, in her opinion, Arshia had engaged in "conscious sex" with Premjee.[19]  Id.

---

consent.  Instead, the statute requires only that the level of intoxication be such that the victim is incapable of exercising the judgment required to decide whether to consent to intercourse."  Giardino, 82 Cal.App.4th at 464.  In short, if an alleged victim becomes too intoxicated (i.e. does not have the legal capacity to consent), and the accused knows or reasonably should have known that the alleged victim is too intoxicated at the time of the alleged sexual act, then the prior consent is not a defense to the charge of unlawful sexual act by intoxication.  See id. at 459.  Therefore, although Premjee claimed that Arshia had consented to sex, and Arshia had no memory of either providing or withdrawing her consent, see e.g., Prelim Transcript Vol. 2 at 200, the issue of consent was in fact *immaterial* in this case, as was any alleged manifestation of Arshia's prior consent, such as the sexually suggestive gesture depicted on the Banditos video— especially given that Premjee never saw that gesture.

[17]   Although this particular report was dated April 12, 2017, it describes events and interviews that took place from April 1, 2017 through April 11, 2017.

[18]   Although Premjee construes this particular bit of information as exculpatory evidence, see FAC ¶ 31, the report makes clear it was far more incriminating.  When Tanika opened her suite door a few moments after the sex had concluded, she saw Arshia lying naked on the mattress, unconscious.  Premjee was not there.  Tanika yelled at Arshia to wake up and began shaking her to wake her.  Tanika then yelled at her: "What the fuck are you doing?  Are you drunk?"  Arshia did not respond and was completely unresponsive.  4/12/17 Report at 6.

[19]   However, Ceci added, Arshia did not appear "with it" and passed out shortly thereafter.  Indeed, Ceci said, it appeared that Arshia could not understand what Ceci was saying to her at all.  4/12/17 Report at 8.  Furthermore, another witness (Madison Seeley) took issue with her prior statements as set out by the patrol officers in their April 1, 2017 report.  Contrary to this initial report, Seeley said she did not observe Arshia's legs wrapped around Premjee's back, an act which implied there was "some element of consciousness and autonomy" on Arshia's part.  4/12/17 Report at 9.  Instead, Arshia's legs lay flat on the air mattress during the assault.  Id.  Seeley also said there was no indication whether Arshia's moans were the result of a consensual interaction and she felt it was an unfair judgment for her to make.  When Seeley initially heard the moans,

23

With respect to the security video collected in this case, Detective Gamino viewed the video from Arshia's dorm (USC's Fluor Tower) on April 20, 2017.  Detective's Case Progress Log at 8.  As for the video from Banditos, Detective Gamino said he likely viewed portions of this video between April 6, 2017, when he first obtained the video, and April 17, 2017.  Prelim Transcript Vol. 2 at 179, 182.  However, the detective was certain he reviewed the entire video from April 25, 2017 through April 27, 2017, and discussed it with the prosecutor soon thereafter.[20]  Prelim Transcript Vol. 1 at 73, 83-84;

---

she wrote them off as "sex moans" but now believed they were less "pleasure" and more like just "noise."  Id.; see Gamino Depo at 121 (noting that drugged or heavily intoxicated victims may make moaning sounds during sex but this is "noise" rather than an indication of consent or pleasure); 10/16/17 Report at 5 (according to admitting doctor at hospital, Arshia could not speak or answer any of the doctor's questions and instead could only moan); Kim Depo at 62 (forensic nurse informed her that a person can moan while unconscious).  Although Premjee ascribes ulterior motives to Seeley's revised description, see FAC ¶ 22, Detective Zuniga later noted that: "[T]he reports that are taken during the preliminary investigation are very brief.  The officers that are taking the statements aren't as experienced in interviewing techniques ... [M]ost of the time when we go back as detectives ... [t]here is always additional information, obviously more detail most of the time and that's based on our questioning.  And sometimes it's different [than] what was initially written in that police report."  Zuniga Depo at 13; see Gamino Depo at 115, 117.

[20]   Although the prosecutor had not viewed this particular video before filing charges, it is undisputed that the prosecutor and Premjee's criminal attorney had both received and viewed the video by the July 24, 2017 preliminary hearing.  See Kim Depo at 46, 106.  The detectives also discussed the video in their reports.  In their May 31, 2017 report, the detectives noted that the video showed Premjee and Arshia entering an Uber as they left Banditos at about 12:39 a.m. on April 1, 2017.  See 5/31/17 Report at 1.  In their July 19, 2017 report, the detectives described the sexually suggestive gesture Arshia had made as she stood behind Premjee outside of Banditos.  (The detectives described the gesture in this report because the report documented Arshia's reaction to this portion of the video.)  After viewing the video, Arshia said she had no memory of making the gesture depicted in the video.  7/19/17 Report at 1.  Although the report did not note that, according to Arshia, it was "obvious" it meant she wanted to have sex with Premjee, or that Arshia told the detectives: "I wasn't completely drunk in the video, I was able to walk, I just blacked out for some reason," see FAC ¶ 38, Premjee's criminal attorney had a transcript of the detectives' interview with Arshia and, in fact, used it to cross-examine Detective Gamino at the preliminary hearing.  Prelim Transcript Vol. 2 at

24

1   Gamino Depo at 57, 58-59, 91.  (The prosecutor had been assigned to the case within a

2   day or two of the assault, and the detectives updated her on developments in the case

3   soon thereafter.  See Zuniga Depo at 21-22.)  Although Premjee's criminal attorney

4   questioned the detective's decision to discuss the Banditos video with the prosecutor

5   instead of generating a standalone report describing its contents, see Prelim Transcript

6   Vol. 1 at 84, there is simply no requirement that police officers create a separate, discrete

7   report for every item of evidence they collect—especially when, as here, it is undisputed

8   that the evidence was provided to all parties well before the preliminary hearing.  As

9   noted by Detective Zuniga, "in regards to writing a follow-up report, there's no

10  requirement ... that that be done in two days, one week, two weeks.  The only thing

11  that's necessary for [the prosecutor] to look at is, number one, a preliminary

12  investigation report, that would be already initially done, an arrest report if there is

13  [one].  And then we would go in person and explain to her what the case was about,

14  what the evidence entailed, and what we were planning on doing to further the

15  investigation."  Id. at 22.  In other words, "if it was something that I felt [the prosecutor]

16  needed to see sooner, then I may just take that report, piece of evidence, picture,

17  photograph, whatever it is, I would take that to them … [i]f it's something that I think is

18

_____

19  186-190.  Furthermore, Detective Gamino clearly contested counsel's description of

20  Arshia's statements.  According to the detective, the gesture was *not* an obvious
    expression of consent.  Rather, Arshia only meant it was obvious that she had made the

21  gesture.  Prelim Transcript Vol. 2 at 188; Gamino Depo at 164.  (Indeed, because the

22  gesture was made Premjee's back, Premjee could not have possibly believed that the
    motion signaled Arshia's consent.)  Finally, Arshia's description of her level of

23  intoxication while with Premjee—that she was not "completely drunk"—was belied by

24  her hospitalization for alcohol poisoning shortly after the alleged assault, which revealed
    she had a .32 blood alcohol content.  See 4/12/17 Report at 1.  Later analysis determined

25  that Arshia's blood alcohol content was between .30 and .34 near the time of the assault.
    Detective's Case Progress Log at 21.  Indeed, even after receiving a steady intravenous

26  supply of fluids after being admitted into the hospital, a subsequent blood draw revealed

27  that Arshia's blood alcohol content was still a .05 nearly 15 hours after the assault.  See
    Gamino Declaration at 2.

28

1 significant, I'll automatically make a phone call." Id. at 48. Indeed, other aspects of an
2 investigation necessarily take precedence over describing the contents of a video, such
3 as locating witnesses whose memories may fade with the passage of time. See Gamino
4 Depo at 88.

5 Furthermore, the prosecutor exercised independent judgment in deciding to file
6 charges. See Smiddy I, 665 F.2d at 267. Indeed, on April 11, 2017—before Premjee's
7 arrest later that day and well before charges were filed on May 2, 2017—the prosecutor
8 personally interviewed both Arshia and her roommate, Tanika. 4/12/17 Report at 9;
9 Zuniga Depo at 22. Thus, the prosecutor could, and did, test the veracity and
10 consistency of Arshia's account while personally viewing Arshia's demeanor and
11 judging her responsiveness at that time. Moreover, when interviewed by LAPD as part
12 of their internal investigation into Premjee's claim, the prosecutor expressly stated that:
13 "All this evidence that [Premjee] is claiming is quote unquote proof of innocence, that's
14 a fact to be determined by a court, and I reviewed this evidence, including the ... sexual
15 gesture [that Arshia made] an hour and half before [the assault], and the way she walked
16 into her dorm room, and I still would have proceeded with the case, I mean, I still *did*
17 proceed with the case even knowing all of that, and knowing about the Facebook
18 messages, and I disagreed with the judge's [preliminary hearing] ruling. That's what it
19 comes down to."[21] Kim Interview at 20. The prosecutor emphasized this point again
20 and again when deposed by Premjee's counsel, explicitly stating that even if she had
21 viewed the Fluor Tower and Banditos videos immediately after the assault, she still
22 would have filed the case—especially given that the videos were not in fact exculpatory.

23

24 [21] On April 1, 2017, in the afternoon, Premjee messaged over Facebook Arshia
25 about her purse and jacket. Arshia responded the next day: "I was told that I was with
   you Friday night. I was also told that we fucked ... I do not remember because I was
26 very out of it. Obviously out of it." Prelim Transcript Vol. 1 at 80-81. Given that
27 Arshia's statements confirm her blacked out state during the assault, this exchange
   cannot constitute exculpatory evidence.
28

See, e.g., Kim Depo at 50, 51, 59, 116, 118, 119.  Indeed, when specifically asked: "If you had received the [Banditos] video within 24 hours of the assault and you had popped that thumb drive into your computer and had gone through all the hours of video that you had at your disposal and … you saw that gesture immediately, would that have changed your filing decision in this case?" the prosecutor stated: "Absolutely not … [b]ecause, one, consent is not the issue in this case; two, even assuming consent was the issue, the defendant never saw that [gesture]; three, even assuming that there was consent, consent can always be withdrawn, so even if I had seen that video at the time of filing, I still would have filed this case based on all the other evidence that I had."[22]  Kim Depo at 116.  Thus, the presumption of prosecutorial independence has not been overcome here.  Indeed, as the prosecutor expressly testified, the detectives neither subjected her to unreasonable pressure nor knowingly withheld relevant information from her or supplied her with false information.  See Kim Depo at 112; see also Smiddy II, 803 F.3d at 1471.

Therefore, the evidence cited by Premjee was either immaterial or inadmissible under California Evidence Code §§ 1101(a), 1103, 782 and 352 (Arshia was considered "extremely irresponsible" and had previously blacked out from excessive alcohol use) or was in fact contained in pre-filing reports (Arshia used marijuana more than alcohol, Tanika had yelled at Arshia after discovering her having sex with Premjee) or would not have—and did not—change the prosecutor's decision to file charges against Premjee (Arshia made a sexually suggestive gesture as she stood behind Premjee at Banditos and exchanged a Facebook message with Premjee after the assault).[23]  In short, the

---

[22]   As a result, Blankenhorn, 485 F.3d at 483-84, is distinguishable.  While the prosecutor in Blankenhorn had not viewed a key videotape prior to filing charges, additional evidence revealed that the officers' reports were false and misleading.  Thus, summary judgment in favor of the officers as to the malicious prosecution claim was improper.  Here, there is no evidence that the detectives' reports were false or misleading.

[23]   Premjee also cites the detectives' failure to generate a report after interviewing an

1   prosecutor either had this evidence in her possession before filing charges or, if it was

2   provided to her after charges had been filed, it did not change her initial determination

3   that the charges against Premjee were supported by probable cause.  Consequently,

4   Premjee's malicious prosecution claim fails on the merits.[24]

5

6   Uber driver.  FAC ¶ 21.  On April 17, 2017, the detectives interviewed the Uber driver

7   who drove Premjee and Arshia from Banditos to Premjee's fraternity and set out the

8   driver's statements in their May 31, 2017 report.  See 5/31/17 Report at 2.  Although

    Detective Gamino was later asked when he wrote this particular report, and questioned

9   in great detail about the report's contents, see Gamino Depo at 101-104, Premjee's

10  counsel did *not* ask the detective if he had discussed the Uber driver's statements with

11  the prosecutor before she filed charges on May 2, 2017, see id. at 104, even though this

    was the only issue relevant to the malicious prosecution claim.  Nor is the allegedly

12  exculpatory nature of the evidence readily apparent.  Although the Uber driver said

13  Premjee and Arshia kissed aggressively while in his car, and that Arshia straddled

    Premjee at one point, the driver also noted that Arshia, whose speech was slurred and

14  who smelled of alcohol, "seemed way more intoxicated" than Premjee.  5/31/17 Report

15  at 2.  Indeed, according to the Uber driver, Premjee had to assist Arshia out of the

    vehicle and physically help her walk once they arrived at the drop off location.  Id.

16  [24]      Premjee has brought his malicious prosecution claim under both § 1983 and
    California common law.  As discussed above, the claim fails under § 1983 on the merits.
17  The claim also fails under California law based on the detectives' statutory immunity.
18  California Government Code § 821.6 provides that "[a] public employee is not liable for
    injury caused by his instituting or prosecuting any judicial or administrative proceeding
19  within the scope of his employment, even if he acts maliciously and without probable
20  cause."  Immunity under § 821.6 is limited to malicious prosecution claims.  See
    Garmon v. Cty. of Los Angeles, 828 F.3d 837, 847 (9th Cir. 2016); Mendez v. Cty. of
21  Los Angeles, 897 F.3d 1067, 1083 (9th Cir. 2018).  Although § 821.6 is primarily
22  applied to immunize prosecuting attorneys and related personnel, it applies to all
    employees of government entities.  Kemmerer v. Cnty. of Fresno, 200 Cal.App.3d 1426,
23  1436, (1988).  As applied to police conduct, § 821.6 is limited to actions taken in the
24  course or as a consequence of an investigation.  See, e.g., Phillips v. City of Fairfield,
    406 F. Supp. 2d 1101, 1118 (E.D. Cal. 2005); Amylou R. v. County of Riverside, 28
25  Cal.App.4th 1205, 1209-10 (1994) (§ 821.6 immunizes not only the act of filing or
26  prosecuting a judicial or administrative complaint, but also extends to actions taken in
    preparation for such formal proceedings.)  The detectives' conduct cited by Premjee
27  clearly was taken in the course or as a consequence of an investigation.  See Cousins v.
28  Lockyer, 568 F.3d 1063, 1068 (9th Cir. 2009) (conduct is investigative in nature if it
    involves "performing the evidence gathering and witness interviewing function normally

28

## VII.   FABRICATION AND __BRADY__ CLAIMS (SECOND AND THIRD CLAIMS)

Given that Premjee cannot satisfy the requirements necessary for a malicious prosecution claim, he can no longer sustain his fabrication / concealment claim or his Brady claim.  Indeed, these two claims essentially repeat the allegations contained in Premjee's malicious prosecution claim and fail for many of the same reasons.

### A.   Fabrication / Concealment Claim

According to Premjee's fabrication / concealment claim, Detectives Gamino and Zuniga had exculpatory evidence establishing consent to the sex between Premjee and Arshia, which they did not document or share with prosecutor.  FAC ¶ 66.  "No reasonable district attorney would have brought charges against Mr. Premjee with this information," the FAC continues.  "This set into motion his criminal prosecution." Id.  In this claim, Premjee again cites the Banditos security video and argues that the detectives "made no effort" to notify the prosecutor as to the video's existence or contents. Id.  However, as noted above, Detective Gamino reviewed the video from April 25, 2017 through April 27, 2017 and discussed it with the prosecutor shortly thereafter.  Prelim Transcript Vol. 1 at 83-84; Gamino Depo at 57, 58-59, 91.  Even if the prosecutor did not personally view the video or focus on the Banditos bar gesture until later on in the case, the following points must be made: (1) because consent is not an issue in intoxication rape cases, the video was not, in fact, exculpatory; (2) it is undisputed that before the preliminary hearing took place, all the parties had received and viewed the video and the detectives had written a report describing its' contents; (3) the prosecutor has since explicitly stated that even if she had viewed the Banditos video within 24 hours of Premjee's arrest, she still would have charged Premjee with § 261(a)(3).  Kim Depo at 116 ("Because, one, consent is not the issue in this case; two, even assuming consent was the issue, the defendant never saw that [gesture]; three, even assuming that

performed by a detective or police officer").  Thus, § 821.6 bars Premjee's malicious prosecution claim as alleged against the detectives and, as a result, the City is also immune from liability with respect to this claim.  See Cal. Gov. Code § 815.2.

1   there was consent, consent can always be withdrawn, so even if I had seen that video at
2   the time of filing, I still would have filed this case based on all the other evidence that I
3   had.")

4         Although Premjee's criticizes Detective Gamino's decision not to generate a
5   standalone report describing the video's contents until showing the video to Arshia
6   several days before the preliminary hearing, Premjee cites no rule or regulation
7   mandating that the detective write a separate report documenting his—or anyone's—
8   reaction to the video when it was first acquired.  Premjee also alleges that the detectives
9   "caused the fabrication of police reports that were incomplete or contained material
10  omissions."  FAC ¶ 67.  However, as discussed above, the initial police report, as well as
11  the follow-up reports written by the detectives, did in fact contain the allegedly
12  exculpatory material previously cited by Premjee or the information was relayed to the
13  prosecutor before she filed charges.

14        Lastly, Premjee alleges that the detectives used "suggestive questioning
15  techniques" to get witnesses to change their original statements.  FAC ¶ 68.  Premjee
16  cites no evidence in support of his claim.  One witness—Madison Seeley—took issue
17  with her prior statements as set out by the patrol officers in their April 1, 2017 report.
18  Contrary to this initial report, Seeley said she did not observe Arshia's legs wrapped
19  around Premjee's back, an act which implied there was "some element of consciousness
20  and autonomy" on Arshia's part.  4/12/17 Report at 9.  Instead, Seeley told detectives,
21  Arshia's legs lay flat on the air mattress during the assault.  Id.  Seeley also said there
22  was no indication whether Arshia's moans were the result of a consensual interaction
23  and she felt it was an unfair judgment for her to make.  Id.  However, as discussed
24  above, when deposed by Premjee, Detective Zuniga noted that: "[T]he reports that are
25  taken during the preliminary investigation are very brief.  The officers that are taking the
26  statements aren't as experienced in interviewing techniques … And sometimes—most of
27  the time when we go back as detectives … [t]here is always additional information,
28  obviously more detail most of the time and that's based on our questioning.  And

1    sometimes it's different [than] what was initially written in that police report." Zuniga

2    Depo at 13.  Detective Gamino, who like Detective Zuniga, had decades of experience

3    interviewing witnesses, concurred with this observation.  See Gamino Depo at 115, 117.

4    Thus, Premjee's unsupported allegations cannot and do not provide a sufficient basis for

5    his second claim.

6        **B.    Brady Claim**

7        Premjee's third claim, his Brady claim, must be dismissed for two reasons—it is

8    both precluded under Ninth Circuit case law and it fails on the merits.  It is undisputed

9    that Brady v. Maryland, 373 U.S. 83 (1963) requires both prosecutors and police

10   investigators to disclose exculpatory evidence to criminal defendants.  See Tennison v.

11   City & County of San Francisco, 570 F.3d 1078, 1087 (9th Cir. 2009) (allowing § 1983

12   Brady claim against law enforcement officers).  However, such claims are subject to

13   dismissal where the plaintiff was not ultimately convicted of a crime.  A majority of

14   federal circuit courts have held that a conviction is required to establish prejudice for a §

15   1983 claim based on a Brady violation.  See, e.g., Jean v. Collins, 221 F.3d 656, 663 (4th

16   Cir. 2000); Morgan v. Gertz, 166 F.3d 1307, 1310 (10th Cir. 1999); Flores v. Satz, 137

17   F.3d 1275, 1278 (11th Cir. 1998); McCune v. City of Grand Rapids, 842 F.2d 903, 907

18   (6th Cir. 1988).  The Ninth Circuit has indicated agreement with this position, although

19   not in a published opinion.  See Puccetti v. Spencer, 476 Fed. App'x 658, 660 (9th Cir.

20   2011) (unpublished) ("[B]ecause plaintiffs' criminal charges were dismissed, the

21   plaintiffs cannot show that any suppressed evidence could have produced a different

22   result at trial … Our sister courts have adopted identical reasoning in denying Brady

23   claims when the plaintiff was never convicted"); Smith, 640 F.3d at 941-45 (special

24   concurrence finding, in the alternative, that plaintiff bring a Brady claim because there

25   had been no conviction, and discussing case law from other circuits so holding).

26       In short, as noted in the Smith v. Almada special concurrence: "Recognizing

27   Brady as a post-conviction right does not foreclose all constitutional remedies where a

28   defendant has been tried but not convicted.  Where a criminal defendant believes that

                                              31

withheld exculpatory evidence has caused charges to be brought and maintained against him, but no conviction has resulted, his remedy would flow from a false arrest or malicious prosecution claim, and not from Brady." Smith, 640 F.3d at 944. Following these Ninth Circuit decisions and the other federal circuits that have examined the issue, district courts in this circuit generally hold that a conviction is necessary to establish prejudice for a Brady claim under § 1983. See, e.g., Dinius v. Perdock, 2012 U.S. Dist. LEXIS 72722 at *16-17 (N.D. Cal. May 24, 2012) (dismissing Brady claim where plaintiff was acquitted in underlying criminal matter); Wagner v. Finneran, 2008 U.S. Dist. LEXIS 120389 at *11 (C.D. Cal. April 10, 2008) (dismissing Brady claim where criminal charges were dropped); Bassett v. City of Burbank, 2014 U.S. Dist. LEXIS 194692 at *6 (C.D. Cal. Sept. 11, 2014) (dismissing Brady claim where criminal charges were dropped); Forte v. Merced County, 2016 U.S. Dist. LEXIS 106561 at *15-15 (E.D. Cal. Aug. 11, 2016); Ward v. City of Barstow, 2017 U.S. Dist. LEXIS 178626 at *43 (C.D. Cal. June 27, 2017). But see Gutierrez v. Solano, 862 F. Supp. 2d 1037, 1042-43 (C.D. Cal. 2012) (agreeing with Smith v. Almada dissent and declining to dismiss Brady claim). Given that the trial court dismissed Premjee's criminal case at the conclusion of the preliminary hearing, Premjee's Brady claim must fail.

Premjee's Brady claim also fails on the merits. In this claim, Premjee alleges that the detectives failed to provide the prosecutor with exculpatory material as well as impeachment evidence. FAC ¶ 75. Premjee does not identify the material at issue in this particular claim. However, as discussed in detail above, the detectives provided the prosecutor with allegedly exculpatory material identified elsewhere in the FAC. Nevertheless, according to Premjee, "[t]here is a reasonable probability that had the evidence been disclosed or had the original statements of the witnesses not been recast by [the detectives] undue influence or unduly suggestive questioning techniques," the prosecutor never would have filed charges against Premjee. FAC ¶ 76. Although not specified in this claim, it appears that Premjee is referring to Madison Seeley's revised statement. However, criminal charges were not filed until May 2, 2017. Thus, well

before filing charges, the prosecutor had at her disposal both the initial April 1, 2017 police report and the detectives' April 12, 2017 follow up report, which documented Seeley's original statement to the responding patrol officers as well as her subsequent dispute with the patrol officers' description of that statement.  In other words, the prosecutor possessed the very evidence Premjee maintains detectives had concealed— and still chose to file charges against Premjee on May 2, 2017.[25]

In order to state a claim under Brady, the plaintiff must allege that (1) the withheld evidence was favorable either because it was exculpatory or could be used to impeach, (2) the evidence was suppressed by the government, and (3) the nondisclosure prejudiced the plaintiff.  Strickler v. Greene, 527 U.S. 263, 281-82, (1999).  As to the prejudice prong, the Supreme Court has stated that "strictly speaking, there is never a real 'Brady violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different [result]."  Id. at 281.  Here, Premjee has failed to identify the evidence at issue in his Brady claim. Assuming the claim relies upon evidence identified in other parts of the FAC, the cited evidence was not actually withheld.  Furthermore, even if the evidence was not brought to the prosecutor's attention before she filed criminal charges, the allegedly suppressed evidence would not have produced a different result.  As the prosecutor has made clear, she still would have—and did—file charges against Premjee.  See Kim Interview at 20. Thus, any alleged nondisclosure did not prejudice Premjee and, as a result, he cannot sustain a Brady claim.

## VIII.  MONELL CLAIM (FOURTH CLAIM)

"A government entity may not be held liable under 42 U.S.C. § 1983, unless a policy, practice, or custom of the entity can be shown to be a moving force behind a

---

[25]   According to Premjee, the detectives knew there was no evidence Arshia had revoked her purported consent to sex.  FAC ¶ 76.  As discussed above, where, as here, the charge is that the victim lacked the capacity to give legal consent, actual consent is irrelevant.  See Giardino, 82 Cal.App.4th at 461.

1   violation of constitutional rights." Dougherty v. City of Covina, 654 F.3d 892, 900 (9th

2   Cir. 2011) (citing Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978).  In order to

3   establish liability for governmental entities under Monell, a plaintiff must prove (1) that

4   the plaintiff possessed a constitutional right of which he was deprived; (2) that the

5   municipality had a policy; (3) that this policy amounts to deliberate indifference to the

6   plaintiff's constitutional right; and, (4) that the policy is the moving force behind the

7   constitutional violation. Id.  Alternatively, "[a] municipality may be held liable for a

8   constitutional violation if a final policymaker ratifies a subordinate's actions." Lytle v.

9   Carl, 382 F.3d 978, 987 (9th Cir. 2004).  "To show ratification, a plaintiff must show

10  that the authorized policymakers approve a subordinate's decision and the basis for it."

11  Id. (internal quotation marks and citation omitted).  The policymaker must have actual

12  knowledge of the constitutional violation and affirmatively approve of it—a failure to

13  overrule a subordinate's actions is insufficient to support a § 1983 claim. Id.

14        Here, Premjee has proceeded under the policy prong.  In this claim, Premjee again

15  cites the same laundry list of alleged misconduct by the detectives, including

16  concealment of material evidence, suggestive re-interviews of witnesses, and failing to

17  provide exculpatory evidence to prosecutors.  FAC ¶ 84.  According to Premjee, the

18  detectives "acted pursuant to an expressly adopted official policy or longstanding

19  practice or custom" of the City and other unnamed policymakers.  FAC ¶ 83.  As

20  discussed throughout this motion, however, the complained-of conduct is unsupported

21  by the evidence in the record.  If a court grants summary judgment on the grounds that

22  police officers did not violate federal law, then there is no basis for a Monell claim for

23  the same underlying conduct.  See City of Los Angeles v. Heller, 475 U.S. 796, 799

24  (1986) ("If a person has suffered no constitutional injury at the hands of the individual

25  police officer, the fact that the departmental regulations might have authorized the use of

26  constitutionally excessive force is quite beside the point").  Moreover, evidence of the

27  alleged unconstitutional conduct by the individual officers is not sufficient to establish

28  that the City had an unconstitutional policy.  "A plaintiff cannot demonstrate the

34

1  existence of a municipal policy or custom based solely on a single occurrence of
2  unconstitutional action by a non-policymaking employee." McDade v. West, 223 F.3d
3  1135, 1141 (9th Cir. 2000) (citation omitted); see also MacEachern v. City of Manhattan
4  Beach, 623 F. Supp. 2d 1092, 1106 (C.D. Cal. 2009) (collecting cases). "Only if a
5  plaintiff shows that his injury resulted from a 'permanent and well settled' practice may
6  liability attach for injury resulting from a local government custom." Thompson v. City
7  of Los Angeles, 885 F.2d 1439, 1444 (9th Cir.1989). Premjee has not, and cannot, make
8  such a showing.

9  ## IX.   NEGLIGENT TRAINING CLAIM (SIXTH CLAIM)

10       In this claim, Premjee again alleges that the detectives arrested him without
11  probable cause, used improper, suggestive, or coercive techniques to procure changes in
12  prior statements, failed to disclose exculpatory evidence to the prosecutor in a timely
13  manner, caused Premjee's wrongful arrest and prosecution, and publicized the arrest and
14  falsely labeled him as a rapist. FAC ¶ 102. According to Premjee, then-LAPD Chief
15  Charlie Beck failed to properly hire, train, and supervise police officer employees,
16  including Detectives Gamino and Zuniga, which would have prevented Premjee's arrest
17  and prosecution. FAC ¶ 104. Lastly, Premjee alleges, the City is vicariously liable for
18  the wrongful acts of Chief Beck, Detective Gamino and Detective Zuniga pursuant to
19  California Government Code § 815.2(a). FAC ¶ 105.

20       All that is necessary for Premjee's claim to survive is sufficient evidence
21  supporting the asserted factual dispute that requires a jury or judge to resolve the parties'
22  differing versions of the truth at trial. See Anderson, 477 U.S. at 248-49. However, the
23  FAC's allegations in this instance are unsupported by any competent evidence. For
24  example, Premjee requested and received the LAPD training manual provided to officer
25  who investigate sex crimes.[26] Not a single sentence in the manual condones any of the
26
27  [26]  The general LAPD training manual is at www.lapdonline.org/lapd_manual.
28

conduct alleged to have occurred in this case. Indeed, evidence produced during the discovery process helped *disprove* this particular claim. For example, when asked if, based on her training, she generally understood her discovery obligations while investigating a case, Detective Zuniga replied: "[E]verything has to be turned over, obviously, 30 days before for a trial ... But I always try to make it a point to turn things over as I would receive them." However, the detective added, "if the arrest has already been made and we're waiting to go to court, then I would probably wait until my follow up was done to turn all that over." Nevertheless, "if it was something that I felt [the DA] needed to see sooner, then I may just take that report, piece of evidence, picture, photograph, whatever it is, I would take that to them. It's always my practice to tell [the DA] about anything that—that I discover that is important in the case, regardless if it's—if it's good for one side or the other being exculpatory or other. But if it's something that I think is significant, I'll automatically make a phone call." Zuniga Depo at 48, see also Gamino Depo at 21 (noting that "every detective knows" they must turn over exculpatory evidence).

As for the City's alleged liability, Government Code § 815.2(a) provides that: "A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative." However, as discussed above, Premjee's arrest was supported by probable cause, there is no evidence that the detectives used improper, suggestive or coercive technique to procure Madison Seeley's revised statement, the detectives timely provided the prosecutor with the exculpatory evidence cited elsewhere in the FAC, and there is no evidence that the detectives publicized Premjee's arrest. Thus, neither the detectives' alleged conduct, nor Chief Beck's, gives rise to a cause of action in this case. Consequently, the City cannot be held vicariously liable here.[27]

---

[27] Premjee also has failed to provide any evidence of a policy or custom attributable to the City that caused the alleged constitutional deprivations. Further, Premjee has no

## X.   BANE ACT CLAIM (SEVENTH CLAIM)

The Tom Bane Civil Rights Act, now codified at California Civil Code § 52.1, was enacted in 1987 to address hate crimes.  The Bane Act civilly protects individuals from conduct aimed at interfering with rights that are secured by federal or state law, where the interference is carried out "by threats, intimidation or coercion."  See Reese v. Cty. of Sacramento, 888 F.3d 1030, 1040 (9th Cir. 2018) (citation omitted).  In other words, § 52.1 "provides a cause of action for violations of a plaintiff's state or federal civil rights committed by 'threats, intimidation, or coercion.'"  Chaudhry v. City of Los Angeles, 751 F.3d 1096, 1105 (9th Cir. 2014) (quoting Cal. Civ. Code § 52.1).  Section 52.1 claims may be brought against public officials who are alleged to interfere with protected rights, and qualified immunity is not available for those claims.  See Reese, 888 F.3d at 1040-41 (citation omitted).

The Bane Act does not require the "threat, intimidation or coercion" element of the claim to be transactionally independent from the constitutional violation alleged. Nevertheless, when based on a false arrest claim, the Bane Act require "a specific intent to violate the arrestee's right to freedom from unreasonable seizure."  See id. at 1043. As discussed above, Premjee's arrest was supported by probable cause.  Because his false arrest claim must fail, so too must Premjee's Bane Act claim fail given that it is based on the same allegedly false arrest.  See FAC ¶ 110.  Although the Bane Act provides a civil remedy for persons whose exercise of constitutional rights has been interfered with by threats, intimidation or coercion, it does not make actionable otherwise lawful conduct, such as a lawful arrest or detention.  See Venegas v. County of Los Angeles, 153 Cal.App.4th 1230, 1239-40 & fn. 15, 1247-48 (2007); Ritschel v. City of Fountain Valley, 137 Cal.App.4th 107, 123-25 (2006).  Thus, neither Detective

---

evidence that the City was the moving force behind the alleged injuries.  In addition, because the individual police officers are not liable under § 1983, the municipal entity cannot be liable.  See Heller, 475 U.S. at 799.

Gamino nor Detective Zuniga can be held liable under the Bane Act.[28]

## XI.   IIED CLAIM (NINTH CLAIM)

With his final cause of action, Premjee asserts a claim for intentional infliction of emotional distress (IIED). In order to recover on an IIED claim, a plaintiff must prove that: (1) the defendant committed extreme and outrageous conduct with the intention of causing, or with the reckless disregard for the probability of causing, emotional distress; (2) the plaintiff suffers from severe or extreme emotional distress; and (3) the defendant's conduct actually and proximately caused the distress.  See, e.g., Potter v. Firestone Tire & Rubber Co., 6 Cal.4th 965, 1001 (1993).  Premjee's IIED claim is based on the detectives' alleged "outrageous conduct" which was "designed to ensure that [Premjee] be prosecuted for crimes he did not commit." FAC ¶ 121.  As discussed above, Premjee's other, relevant claims fail on the merits—Premjee's arrest was supported by probable cause and the detectives neither fabricated nor concealed evidence from the prosecution, whether that evidence was exculpatory in nature or constituted impeachment material.  Moreover, in order to qualify as extreme and outrageous, a defendant's conduct must be "so extreme as to exceed all bounds of that usually tolerated by a civilized community." Id.  Whether a defendant's conduct rises to the level of extreme and outrageous ordinarily is a jury question.  Consequently, this Court may grant summary judgment only if no reasonable jury could find the detectives' conduct to have been so extreme and outrageous as to warrant recovery.  See Trerice v.

---

[28]  Although the City is also named as a defendant in Premjee's Bane Act claim, federal district courts have declined to extend supervisory liability to the Bane Act.  See, e.g., San Diego Branch of NAACP v. Cty. of San Diego, 2018 U.S. Dist. LEXIS 44806 at * 18 (S.D. Cal. Mar. 19, 2018); Redmond v. San Jose Police Dep't, 2017 U.S. Dist. LEXIS 190087 at *94 (N.D. Cal. Nov. 16, 2017) (holding that supervisory liability should not be extended to the Bane Act); Sanchez v. City of Fresno, 914 F. Supp. 2d 1079, 1119 n.19 (E.D. Cal. 2012) (holding that "no case has actually applied supervisor liability a Bane Act claim and this federal Court is loathe to expand the reach of Bane Act liability").

1   Blue Cross of Cal., 209 Cal.App.3d 878, 883 (1989).  In this case, however, no

2   reasonable jury could find that the detectives' conduct was extreme and outrageous

3   given that the complained-of conduct did not in fact occur.  See, e.g., McFarland v. City

4   of Clovis, 2017 U.S. Dist. LEXIS 54616 at *47-48 (E.D. Cal. April 10, 2017) ("An

5   arrest that is supported by probable cause is not a 'false arrest' and it is not extreme and

6   outrageous.  Therefore, summary judgment on [plaintiff's] IIED claim that is based on

7   an arrest without probable cause is appropriate"); Thigpen v. City of San Mateo, 2005

8   U.S. Dist. LEXIS 49458 at *30 (N.D. Cal. Aug. 5, 2005) ("[S]ummary judgment is

9   appropriate.  First, while Plaintiff alleges that Defendants intentionally concocted

10  evidence to obtain an unlawful arrest, there is no evidence of this before the Court.

11  Second, for the reasons discussed above, Plaintiff's 'arrest' was lawful.  Third, Plaintiff

12  has not shown that Defendants' conduct rises to the level of outrageous, nor has he

13  offered any psychological or medical evidence showing distress in support of his IIED

14  claim").

15      To carry its burden of production on summary judgment, a moving party "must

16  either produce evidence negating an essential element of the nonmoving party's claim or

17  defense or show that the nonmoving party does not have enough evidence of an essential

18  element to carry its ultimate burden of persuasion at trial." Nissan Fire & Marine Ins.

19  Co. v. Fritz Companies, Inc., 210 F.3d 1099, 1102 (9th Cir. 2000); see High Tech Gays

20  v. Defense Indus. Sec. Clearance Office, 895 F.2d 563, 574 (9th Cir. 1990). As

21  demonstrated throughout this motion, Premjee has failed to present sufficient evidence

22  that the detectives committed extreme and outrageous conduct—an essential element of

23  his IIED claim.  Where, as here, the nonmoving party fails to produce enough evidence

24  to create a genuine issue of material fact, the moving party wins the motion for summary

25  judgment. Nissan Fire, 210 F.3d at 1103; see Celotex, 477 U.S. at 322 ("Rule 56(c)

26  mandates the entry of summary judgment, after adequate time for discovery and upon

27  motion, against a party who fails to make the showing sufficient to establish the

28  existence of an element essential to that party's case, and on which that party will bear

the burden of proof at trial").  Importantly, "[t]he amount of evidence necessary to raise a genuine issue of material fact is enough to require a jury or judge to resolve the parties' differing versions of the truth at trial."  Aydin Corp. v. Loral Corp., 718 F.2d 897, 902 (9th Cir. 1983) (citation and internal quotation marks omitted).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient."  Anderson, 477 U.S. at 252.  Given the dearth of evidence at the Court's disposal with respect to the IIED cause of action, this claim must fail as well.

## XII.  CONCLUSION

In light of the foregoing argument and the Defendants' Statement of Undisputed Facts, and the supporting attached declarations and exhibits, the case should be dismissed in its entirety.

Dated: August 2, 2019

Respectfully submitted,

**MICHAEL N. FEUER**, City Attorney
**JAMES P. CLARK**, Supervising/Managing Attorney
**CORY M. BRENTE**, Supervising City Attorney

By: _/S/Elizabeth Fitzgerald_
  **ELIZABETH FITZGERALD**
  Deputy City Attorney

_Attorneys for Defendants_ **CITY OF LOS ANGELES, CHARLIE BECK, OSCAR GAMINO and CARLA ZUNIGA**

40