# EXHIBIT B

(Police Reports)

**Los Angeles Police Department**
**INVESTIGATIVE REPORT**

Page 1 of 6   03.01.00 (08/16)

UCR CODE CC: 121

REPORT OF: SEXUAL ASSAULT

INVEST DIV SOU   INC # 170V0100099   DR# 1703-00655

**CASE SCREENING FACTOR(S)**
- SUSPECT/VEHICLE NOT SEEN
- [X] PRINTS OR OTHER EVIDENCE NOT PRESENT
- [X] MO NOT DISTINCT
- [X] PROPERTY LOSS LESS THAN $5,000
- [X] NO SERIOUS INJURY TO VICTIM
- [X] ONLY ONE VICTIM INVOLVED

VICTIM
LAST NAME, FIRST, MIDDLE (OR NAME OF BUSINESS): ARSHA S.
ADDRESS R- CONFIDENTIAL
E-MAIL ADDRESS

PREMISES (SPECIFIC TYPE): Dorm Room   [ ] ATM

DR. LIC. NO. ( IF NONE, OTHER ID & NO.)   FOREIGN LANGUAGE SPOKEN   OCCUPATION

ENTRY 459/BFV POINT OF ENTRY   POINT OF EXIT
[ ] FRONT [ ] REAR [ ] SIDE [ ] ROOF [ ] FLOOR [ ] OTHER
METHOD
INSTRUMENT/TOOL USED

LOCATION OF OCCURRENCE   SAME AS V/S [ ] RES. [ ] BUS.   R.D. 0358
DATE & TIME OF OCCURRENCE 04-1-17, 0400
DATE & TIME REPORTED TO PD 04-1-17, 0415
PRINTS BY PREL INV. ATTEMPT [ ]Y [ ]N OBTAINED [ ]Y [ ]N

TYPE PROPERTY STOLEN/LOST/DAMAGED   03.04.00 GIVEN   STOLEN/LOST   RECOVERED   EST. DAMAGED ARSON/VAND.

VICT'S VEH. (IF INVOLVED) YEAR, MAKE, TYPE, COLOR, LIC. NO.   NOTIFICATION(S) (PERSON & DIVISION)   CONNECTED REPORT(S) (TYPE & DR #)

MO: SUSP HAD SEXUAL INTERCORSS W/ VICT WHO WAS SO INTOXICATED SHE WAS UNABLE TO GIVE CONSENT

MANDATORY MARSY'S RIGHTS CARD PROVIDED TO THE VICTIM   MOTIVATED BY HATRED/PREJUDICE   DOMESTIC VIOLENCE   OR RECEIVED BY PHONE

REPORTING EMPLOYEE(S): INITIALS, LAST NAME MERAZ   SERIAL NO. 41745   DIV/DETAIL 50W   ZAMORA 3A1
PERSON REPORTING   SIGNATURE

SUSP'S VEHICLE   YEAR   MAKE   MODEL   TYPE   INTERIOR COLOR:
COLOR(S)   VEH. LIC. NO.   STATE

S-1 SEX M   DESC O   HAIR BLK   EYES BRO   HEIGHT 600   WEIGHT 175   AGE 19   CLOTHING   NAME, ADDRESS, DOB, IF KNOWN; NAME, BKG. NO., CHARGE, IF ARRESTED. PREMJEE, ARMAAN 928 W. 28 St. 3/14/97
PERSONAL ODDITIES: NONE   WEAPON BODILY FORCE

S-2 SEX   DESC   HAIR   EYES   HEIGHT   WEIGHT   AGE   CLOTHING
PERSONAL ODDITIES   WEAPON

INVOLVED PERSON(S)  W - WITNESS;  R - PERSON RPTG.;  S - PERSON SECURING (459);  D - PERSON DISCOVERING (459);  P - PARENT;

1. NAME NAYAR, KAVYA   SEX F   DESC O   DOB 1/16/98   ADDRESS R-1027 W. 34 St   CITY LA   ZIP 90007   PHONE 818-619-5541

2. NAME STARNAFRZLOW, RONNILCIA   SEX F   DESC O   DOB 11/30/96   ADDRESS R-1027 W 34St   CITY LA   ZIP 90007   PHONE 323-261-4072
DR. LIC. NO. F7916355

3. NAME MEHRA, TANIKA   SEX F   DESC Z   DOB 10/08/97   ADDRESS R-1024 W. 34 St #708B   CITY LA   ZIP 90007   PHONE 213-715-2800

COMBINED EVID. RPT.   ITEM/QUAN./ARTICLE   SEE PROPERTY REPORT

NARRATIVE

APPROVAL AND REVIEW: SLT R35710   SERIAL NO. B505   DIVISION SW
DATE & TIME REPRODUCED 040117 2130   CLERK   DIVISION 03

**CONTINUATION SHEET**

Los Angeles Police Department

| PAGE NO. 2 | TYPE OF REPORT *Sexual Assault* | | | | BOOKING NO. | OR NO. 170300605 |
|---|---|---|---|---|---|---|
| ITEM NO. | QU AN. | ARTICLE | SERIAL NO | BRAND | MODEL NO. | MISC DESCRIPTION (EG. COLOR, SIZE, INSCRIPTIONS, CALIBER, REVOLVER, ETC) | DOLLAR VALUE |

Suspect: Premjee, Armaan (M/I/DOB: 02/14/97)          Charge:

Witness 1:  Nayar, Kavya (F/O/DOB: 01/06/98)
            1027 W 34ᵗʰ St #302, LA CA 90007
            (818)619-5941

Witness 2:  Stringfrilow, Ronniecia (F/B/DOB: 11/30/96)
            CalOp# F7916355
            (323)251-4072

Witness 3:  Mehra, Tanika (F/I/DOB: 10/08/97)
            1024 W 34ᵗʰ St #708 B, LA CA 90007
            (213)713-2800

Witness 4:  Wilfert, Celine Chloe (F/W/DOB: 01/21/98)
            1024 W 34ᵗʰ St #708B, LA CA 90007
            (415)936-5508

Witness 5:  Madison, Seeley (F/W/DOB: 04/14/98)
            1024 W 34ᵗʰ St #708C, LA CA 9007

**Source of Activity:** On 4/1/17, at approximately 0400 hrs, my partner Officer Zamora #42454 and I, Officer Meraz #41745 were working Southwest Division watch 3, assigned patrol car 3A1. We were in a marked black and white police vehicle, wearing full uniform. We were tasked by 3L90 to meet USC DPS Officer Trevino #274709 for an attack investigation. **LAPD Inc# 170401000799.**

**Investigation:** We arrived at scene and met Officer Trevino who informed us a man had sex with an intoxicated woman in dorm room, both USC students, and the woman was so intoxicated she was unconscious and had to be hospitalized for alcohol poisoning. The man was the identified as Mr. Armaan Parjeem (Suspect), per visitor registration records at the dorm and his facebook profile, as identified by witnesses. The woman was identified by witnesses. Officer Trevino directed us to Victim's dorm room.

We arrived at Victim's dorm and met with witnesses. I observed an air mattress in the middle of the living room with female clothing littered over it. Witnesses directed us to a used condom in the trash can. While there, I took pictures of the scene and evidence items and we interviewed witnesses.

I interviewed Witness 1 and her statements are as follows: Witness 1 and Victim are friends, university mates, but not roommates. On 03/31/17 Witness 1 observed Victim "smoking weed all day." In the evening, Witness 1 and Victim went to a USC fraternity party at 720 W 28ᵗʰ St. Later in the evening, Witness 1 and Victim went to Banditos Bar, near King Bl and Menlo. Near midnight, Witness 1 observed Victim hanging out with friends from Bombay, India, where Victim is from. Witness 1 stated Victim seemed happy and was socializing. Witness 1 left to her dorm without Victim. Witness 1 didn't see Victim again.

I interviewed Witness 2 and her statements are as follows: On 04/01/17 at approximately 0105 hours Witness 2 was working dorm security at Victim's dorm. She observed Victim and Suspect arrive. Victim was "flirting" with Suspect, hanging onto him and hugging him. Witness 2 described Suspect and Victim as a "happy couple," stating she even had a

CONTINUATION SHEET

Los Angeles Police Department

| PAGE NO. | TYPE OF REPORT | | | | BOOKING NO. | DR NO. |
|---|---|---|---|---|---|---|
| 3 | Sexual Assault | | | | | 170300655 |

| ITEM NO | QU AN | ARTICLE | SERIAL NO | BRAND | MODEL NO. | MISC DESCRIPTION (EG, COLOR, SIZE, INSCRIPTIONS, CALIBER, REVOLVER, ETC) | DOLLAR VALUE |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

pleasant conversation with them. Victim registered Suspect as her guest and Witness 2 observed Victim and Suspect go to the elevators.

I interviewed Witness 3 and her statements are as follows: On 04/01/17 at approximately 0115 hours, Witness 3 arrived at her dorm, where she lives with Victim and Witnesses 4 and 5. Witness walked in and observed a "big brown butt" laying on a mattress in the middle of the living room. She was surprised and perturbed by the exposed "big brown butt" and immediately ran into her room, which she shares with Witness 4. She woke Witness 4 and both, informed and asked her about the "big brown butt" in the middle of the living room, laying on the air mattress. Witness 4 informed Witness 3 did not know anything about the guest in the living room. Witness 3, along with Witness 4, then heard moaning noises coming from the living room. The moaning was both male and female and they interpreted as the sound of a man and a woman ejoying sex. Witness 3 observed Witness 4 text Witness 5, their fourth roommate, and was informed by Witness 5 that a man was in the living room having sex. Witness 3, along with Witness 4 heard the moaning stop and walked out into the living room. Immediately, Witness 3 observed Victim laying nude on the air mattress and she was alone. Witness 3 tried to wake up Victim, but Victim was passed out, breathing heavily and not responding. Witness 3 observed Suspect come out of the bathroom. Suspect was polite and wearing only a t-shirt. Suspect stated, "I'm sorry, I didn't mean to wake anybody." Suspect put on his pants and shoes and left the scene.

Witness 3 showed us Suspect's facebook profile and I observed a picture of the fraternity house Kappa Sigma. I asked Officer Trevino where that was located and Officer Trevino informed us Kappa Sigma was located at 928 W 28th St.

I interviewed Witness 4 and her statements are summarized as follows: On 04/01/17 she was sleeping in her dorm room when Witness 3 woke her up to inform her of a "big brown naked butt" laying on the air mattress in the living room. Witness 4 was confused and then, along with Witness 3, heard moaning coming from the living room. According to the Witness 4, the moaning resembled a man and a woman enjoying sex. Witness 4 heard the moaning stop and, along with Witness 3 went to the living room to investigate. Witness 4 observed Victim laying nude on the air mattress. Witness 3 attempted to wake Victim but was unsuccessful. Suspect came out of the restroom wearing only a shirt and put his pants on. Witness 4 asked Suspect was happened and Suspect replied, "We are wasted and she was all over me last night." Suspect was polite and left. Witness 4 along with 3 attempted to wake up Victim. They got her to stand, but she collapsed on the floor. This occurred several times before Witness 4 dialed for an ambulance at approximately 0223 hours.

I interviewed Witness 5 and her statements are summarized as follows: On 04/01/17 at approximately 0120 hours, Witness 5 was in her dorm. She woke up to use the restroom. As she proceeded from her room to the restroom, she observed a couple having a sex on the air mattress in the living room. She described the scene as a man with dark complexion kneeling on the bed with a womans legs wrapped around his back. Witness 5 did not see who the woman was as she was in front of the man, but remembers her legs were also dark complexion. Witness 5 did not see the man, only his bare back, as he was facing away from her. Witness 5 went to far stall in the restroom, where she received a text message from Witness 4, inquiring about the sex occurring in the living room. Witness 5 then heard someone enter the restroom and sit in the stall next to her. Witness 5 did not see the person, only a foot wearing a sock. Witness 5 felt uncomfortable and waited for the man to leave the dorm before coming out of the restroom. When she came out, she saw Victim was unconscious and Witness 3 and 4 were attempting to wake her, without success.

My partner and I notified SOW Division Watch 3 Watchcommander, Sgt II Cervantez and SOW Sex Crimes Detective Orta. We were advised by USC DPS Officer Trevino, Victim was transported by FD RA 25 to California hospital.

My partner and I conducted a follow up to Suspect's residence at the Sigma Kappa fraternity house, located at 928 W 28th Street. We requested an additional unit and supervisor. 3A1, Watch 2, Officers Castañeda #42620 and Whiteman #39471, and 3L80 responded.

**CONTINUATION SHEET**

Los Angeles Police Department

| PAGE NO. | TYPE OF REPORT | | | | BOOKING NO. | DR NO. |
|---|---|---|---|---|---|---|
| 4 | SEXUAL ASSAULT | | | | | 1030655 |

| ITEM NO. | QU AN | ARTICLE | SERIAL NO | BRAND | MODEL NO. | MISC DESCRIPTION (EG. COLOR, SIZE, INSCRIPTIONS, CALIBER, REVOLVER, ETC) | DOLLAR VALUE |
|---|---|---|---|---|---|---|---|

We door knocked Suspect's room and he answered. Suspect was taken into custody without further incident and we transported him to Southwest Station.

**Photos, Recordings, Videos, DICV, and Digital Imaging:** I, Ofcr Meraz #41745, took (13) photographs of dorm room and evidence collected. Images were saved to disc and sealed in envelope assigned D# 0566120.

**Evidence:** My partner, Officer Zamora recovered the evidence items from Victim's dorm room after Officer Meraz took photographs.

Bed sheets and pillow cases were recovered from the air mattress in the middle of the living room.

A used condom and condom wrapper was recovered from the trash can located immediately outside of bedroom "C."

Victim's clothes were identified by Witness 3 and 4 and were recovered from the air mattress.

**Additional:** Evidence items and this portion of the report was left with RHD detectives by Officer Meraz #41745, at 1145 hours on 04/01/17.

**Canvassing:** None.

**Court Information:** Witness and Officers can testify to the statements in this report.

Los Angeles Police Department
**PROPERTY REPORT**

Page 5 of 6

IF EVIDENCE CONT., COMPLETE SHADED AREAS ONLY.  IF NOT EVID. CONT., COMPLETE ENTIRE FORM.

| | TOTAL U.S. CURR. BKD. | EVID ☑ | NON-EVID ☐ | IF RELATED TO PREV BKD EVID. USE THAT DR |
|---|---|---|---|---|
| NARC ☐ FIREARM ☐ SEARCH ☐ MONEY ☐ | | ONLY 1 CATEGORY PER REPORT | | DR 17-0300655 |

| DATE AND TIME OF THIS REPORT | DATE PROPERTY BKD. | IF RELATED TO PREVIOUSLY BOOKED EVIDENCE, ORIG. EVID. BKD. TO (IN THIS CASE COMPLETE ENTIRE REPORT) | DATE ORIG. EVID. TAKEN INTO CUSTODY |
|---|---|---|---|

| RESIDENCE ADDRESS        CA | ARRESTEE ☐ EVID. CONT. OF ARREST REPORT | DOB | CHARGE BKD. DR |
|---|---|---|---|
| | | | BKG. # |

| RESIDENCE ADDRESS (BUS. ADDRESS IF VICT. IS BUSINESS) | VICTIM ☑ EVID. CONT. OF PIR (IF NO ARRESTEE)  Arshia | | R - |
|---|---|---|---|
| | | | B - |

| RESIDENCE ADDRESS | ☐ OWNER OR IF UNKNOWN ☐ FINDER/POSSESSOR | | R - |
|---|---|---|---|
| | | | B - |

| AREA OR CITY, & DATE CRIME OCCUR. | TYPE OF PREMISES | DEPT. EMPLOYEE IF BOOKED TO | SERIAL NO. | DIVISION | IF FIREARM, CRT CHECKS: |
|---|---|---|---|---|---|
| | | | | | AFS  NCIC |

| IS THIS STOLEN PROPERTY? ☐YES ☑NO | PROBABLE CRIME 261 PC | ☑FELONY ☐MISD. | DATE & TIME PROP. FOUND TAKEN INTO POLICE CUSTODY - LOCATION - 04/01/2017   4:00   1027 W34 st #708 | | R.D. OR CITY IF OUTSIDE 0358 |
|---|---|---|---|---|---|
| IS THIS FOUND PROPERTY? ☐YES ☑NO | DATE & TIME FOUND PROPERTY DISCOVERED | | -LOCATION DISCOVERED- | | R.D. OR CITY IF OUTSIDE |

| INVESTIGATIVE UNIT 3A63 | PROP. BKD. AT SouthWest | NOTIFICATIONS - PERSONS & UNITS | CONNECTING REPORTS - TYPE & DR |
|---|---|---|---|

**Use of Evidence Continuation:** Use only with Arrest Report or, if no Arrest Report, with PIR. Do not use if evidence is related to previously booked evidence. To book evidence, staple this page on top of Arrest Face Sheet (or PIR Face Sheet, if no arrest) and forward with evidence.

1. CIRCUMSTANCES (WHERE FOUND, BY WHOM, HOW MARKED, ETC.) EXPLAIN IF 10.10.00 NOT ISSUED. GIVE RESULTS OF CRT CHECKS ON FIREARMS
2. ITEMIZE PROPERTY (LIST NARCOTICS FIRST, THEN MONEY, FIREARMS, PROPERTY WITH SERIAL NUMBERS, AND OTHER PROPERTY. IF RELATED TO PREVIOUSLY BKD. EVIDENCE, START WITH NEXT SEQUENTIAL ITEM NUMBER).
3. IS PROPERTY ELIGIBLE FOR IMMEDIATE DISPOSAL? YES ☐ NO ☑  IF YES LIST ITEM #'S _____ ENSURE AN EXTRA COPY IS FORWARDED TO THE PROPERTY DISPOSITION COORDINATOR (PDC) FOR INPUT INTO APIMS. IF PROPERTY IS ELIGIBLE FOR RELEASE, COMPLETE A PROPERTY DISPOSITION UPDATE REQUEST, FORM 10.06.00, AND FORWARD IT TO THE PDC FOR INPUT INTO APIMS.

| ITEM NO. | QUANT. | ARTICLE | SERIAL NO./TYPE TEST OF DRUG | BRAND/DRUG WEIGHT, UNITS | MODEL NO./DRUG TEST RESULT | MISC.-COLOR, SIZE, INSCRIPTION, CALIBER, ETC. IF MULT. ARREST-INCL. NAME/BKG. # FROM WHOM TAKEN |
|---|---|---|---|---|---|---|
| | | The Below listed Items were recovered from RHD Detectives and Booked Into SouthWest Property by Officers McMichael #41810 and Chavez #36761 | | | | |
| 1 | 1 | Bed sheet | | | | Blue bed sheet |
| 2 | 1 | Used Condom | Trojan | | | Used Trojan condom |
| 3 | 1 | Condom Wrapper | Trojan | | | Trojan condom wrapper |
| 4 | 1 | Blue Jeans | | | | Blue Jeans |
| 5 | 1 | Bra | | | | Red Bra |
| 6 | 1 | Blk Underwear | | | | Blk Underwear |
| 7 | 1 | Bro Tank Top | | | | Bro Tank Top |
| 8 | 1 | Papper bag | Target | | | Papper bag used to recover Items 2 & 3 |
| 9 | 1 | SART Kit | | | | SART Kit |
| 10 | 1 | Pink shirt | | | | Pink shirt |

| Preliminary Drug Test | SUPERVISOR/INVESTIGATING OFFICER TESTING | SERIAL NO. | WITNESSING OFFICER | SERIAL NO. |
|---|---|---|---|---|
| Search Warrant Info | DATE | | ISSUED BY JUDGE | COURT NO. |

| SUPERVISOR APPROVING SLT Cebios (Rwy?)... | SERIAL NO. | 10.10.00 ISSUED? YES ☑ NO ☐ | REPORTING EMPLOYEE(S) McMichael | SERIAL NO. 41810 | DIV. SoW | DETAIL 3A63 | PERSON REPORTING (SIGNATURE) |
|---|---|---|---|---|---|---|---|
| DATE & TIME REPRODUCED 040117  2130 | DIVISION 03 | CLERK | Chavez | 36761 | SoW | 3A63 | X |

10.01.00 (03/12)                 INC #  170401000799

Page 6 of 6

# PROPERTY REPORT

DR NO. 170360655

| ITEM NO. | QUANT. | ARTICLE | SERIAL NO./TYPE TEST OF DRUG | BRAND/DRUG WEIGHT, UNITS | MODEL NO./DRUG TEST RESULT | MISC.-COLOR, SIZE, INSCRIPTION, CALIBER, ETC. IF MULT. ARREST, INCL. NAME/BKG. # FROM WHOM TAKEN |
|---|---|---|---|---|---|---|
| 11 | 1 | Blk shorts | | | | Blk Shorts |
| 12 | 1 | Green Boxershorts | | | | Green Boxershorts |

FOLLOW-UP INVESTIGATION   RHD - SAS HANDLING   SUPPLEMENT 2   MULTIPLE

| DATE THIS REPORT 4/12/2017 | DATE ORIGINAL RPT. 4/1/2017 | CRIME TYPE OR CLASSIFICATION (ADW, TV, EVID., ARREST/BURG., ETC.) Rape | | RD 0358 | DR NO. 17-0300655 |
|---|---|---|---|---|---|
| VICTIM BOOKED / ARRESTEE (AS ON ORIGINAL REPORT) Arshia S. (Confidential) | | IF RECLASSIFYING TO HOMICIDE SEX / DESCENT / AGE VICT'S | BKG NO. (SUPPL TO ARREST) | | WORK FOLDER PERIOD ORIG RPT / INDEX NO. 1704 35M15 001 |

CASE STATUS:  1 ☒ CLEARED BY ARREST    2 ☐ CLEARED OTHER    3 ☐ REPORT UNFOUNDED    4 ☐ INVESTIGATION CONTINUED

| S. | SEX | DESC | HAIR | EYES | HEIGHT | WEIGHT | DOB | AGE | NAME & ADDRESS (OR NAME & CHARGE, IF ARRESTED) |
|---|---|---|---|---|---|---|---|---|---|
| 1 | M | IND | BLK | BRN | 6'0 | 175 | 2/14/1997 | 20 | Premjee, Armaan 2718 Kenwood Ave, Los Angeles, CA, 90007 ACTION TAKEN Submitted to DA for filing consideration.   A35812276 |
| 2 | SEX | DESC | HAIR | EYES | HEIGHT | WEIGHT | DOB | AGE | NAME & ADDRESS / ACTION TAKEN |
| 3 | SEX | DESC | HAIR | EYES | HEIGHT | WEIGHT | DOB | AGE | NAME & ADDRESS / ACTION TAKEN |

**NARRATIVE** (USE BELOW COLUMNS FOR MULTIPLE REPORTS ONLY)

Pursuant to Government Code Section 6254, the victim in this case requested confidentiality and that their name not become a matter of public record.

## INVESTIGATION

On April 1, 2017, at 0540 hours, Detective Carla Zuniga, Serial No. 25634, Robbery-Homicide Division, (RHD), Special Assault Section (SAS), was notified of a sexual assault investigation at the University of Southern California (USC). At 0800 hours, Zuniga and I, Detective Oscar Gamino, Serial No. 31053, RHD, SAS, were directed to respond to the scene and assume the investigation.

We responded to Southwest Station where we met with Southwest Detectives Elena Orta, Serial No. 31514 and Manny Segura, Serial No. 32218, Southwest Detectives. They briefed us on the case. We were advised that the victim was transported from USC, to California Hospital Emergency Room, and was transferred to the Intensive Care Unit (ICU). The Suspect, who was identified as Armaan Premjee, was detained and taken to the Santa Monica Rape Treatment Center for a sexual assault exam.

Zuniga and I responded to the hospital and contacted the nurse in the ICU. She advised the victim was sedated and intubated, and lab tests were done. The test results showed a blood alcohol level of .325.30, and positive for Cannabinoids. All other drug screens were negative. Her diagnosis was alcohol poisoning.

At approximately 1100 hours, Zuniga and I met with the victim in the ICU. She was just waking up and was very groggy and disoriented. She was visibly upset and crying, and asking how she got to the hospital. She was also concerned about the bruises on her face and lip. She had no recollection of what happened to her.

The victim recalled on Friday night, she went to "The Row" at around 2330 with her best friend Kavya. They were bored, so they got an Uber and went to Banditos Bar. She bought two tequila shots directly from the bartender, and drank both shots. That was the last thing she remembered. She had a slight recollection of

| WAS PROPERTY BOOKED IN CONJUNCTION WITH THIS REPORT OR INCIDENT? ☐ NO ☒ YES | IF YES, HAS 10.06.00 BEEN COMPLETED? ☐ NO ☒ YES | | |
|---|---|---|---|
| SUPERVISOR APPROVING [signature] | SERIAL NO. 26570 | REPORTING OFFICER(S) O. GAMINO | SERIAL NO. 31053 | DIVISION RHD |
| DATE & TIME REPRODUCED   DIVISION   CLERK | | REPORTING OFFICER(S) C. ZUNIGA | SERIAL NO. 25634 | DIVISION RHD |

feeling suffocated and unable to breathe. She had no memory of anything else.

We told her what the witnesses reported and some of what we learned through the investigation. We also asked her if she knew the suspect by giving her his name. She said no. She cried and said, "It was unfair that someone did that to me when I was in that state." She further stated that nothing like that has ever happened to her. She described having no memory at all, a "complete black-out."

On April 1, 2017, at 1300 hours, the suspect was transported back to Southwest Station for further investigation. At 1340 hours, Zuniga and I interviewed Armaan. The interview was digitally recorded. I read Armaan his Miranda Rights and he agreed to provide a statement. Armaan was very cooperative and provided the following information.

Armaan is a sophomore at USC, and lives at the Cappa Sigma Fraternity house. On March 31, 2017, he spent the day with friends at his house and then went to a sorority house for a fund-raising event. At 8 pm he went to the Mosque for evening prayers, and then returned home. He made plans to go out with friends. Before leaving his house, he drank vodka. At approximately 1030 pm, he ordered an Uber and went to Banditos Bar with his friend AJ Mojan. When they arrived at the bar, they met their friend Tyler Tornetta.

They danced and Armaan drank one "AMF" (Adios Mother Fucker). The drink was strong because it had three types of liquor. Sometime around midnight, he met the victim and her friend. He recalled her name was "Anisha." She seemed fine when he first met her, and she didn't drink alcohol when she was with him. They talked about being from the same hometown in India, and danced. She put her arms around his neck and started kissing his neck. They "made out" and about ten minutes later, he asked her if she wanted to go back to his place. They left with the intention of having sex. He recalled that at some point he asked her if she wanted to have sex. She agreed, and he called an Uber.

She told her friend she was leaving with him, and asked him to take a picture of her and her friend. He agreed and used her phone to take a picture. He put the picture on his Snapchat. They got into the Uber with two other people to go to his house. While in the rear seat of the Uber, she kissed him and bit his neck. He described her behavior as "violent" and told her to "take it easy." He squirmed a little bit and told her to stop. She didn't listen and kept going. Her behavior made him uncomfortable. The Uber driver laughed. Armaan described her as "pretty drunk."

After 5-10 minutes, they arrived at his Frat house. She was unable to walk straight, so he decided it would be easier to carry her upstairs to his room. When he took her to his room, he was going to put her to bed and go meet his friends at Banditos, and let her "rest it out." But she was persistent, and based on her body language, it was obvious she wanted to have sex. He described the victim as "aggressive," and that she was biting him and couldn't kiss properly. When she bit his neck, he said "This is not a good idea." He explained that when they left the Uber, she seemed very drunk, and he was "Iffy about having to do it."

When they arrived in his room, she told him her shoes had fallen off. He left her in the room, and went back outside to find the shoes. He found one shoe and went back to the room. The victim was outside of the room taking to two of the Fraternity members; Austin and Frank. One of the guys had her other shoe. One of the guys said "Armaan, she is drunk, this is a risk to our house, you should take her back to her place." She (the victim), agreed and he (Armaan), called an Uber. The Uber took them to Flour Tower where the victim lived. The dorm security lady asked for the victim's ID, but she didn't have it. She saw that the victim was drunk, so she let her in. He gave the security his USC ID, and the security gave him a guest pass.

They went into the building to the dorm room. While they walked, Armaan told her, "You're very drunk. I don't want to do anything with you tonight. I don't want you to make a decision tonight that you will regret morrow. But if you still want to, go ahead."

We shouldn't do it tonight, we should do it tomorrow." The victim replied, "Why are you being such a good boy? Be a bad boy." Armaan said, "No, this is a bad idea." He told her, "You look very drunk, I'll give you my number. If you want to do it tomorrow sober, call me."

They entered the apartment into her suite. Her suitemate was sleeping and the lights were off. The victim did not want to disturb her roommate, so they left the suite and went to a bed in the front room. Armaan said he was just going to leave her there and leave, but she grabbed his shirt and pulled him onto the bed. She was very persuasive and they started kissing. She told him "No, no, stay, don't go anywhere." She couldn't take her pants off, so he helped her. One thing led to another and they had sex. Prior to intercourse, he put his fingers in her vagina and she moaned. During the sex, he heard a roommate make a noise, it sounded like a doorknob being turned. He couldn't see the door because it was behind him. After the sex, he removed the condom, threw it in the trash, and went into the rest room. After he urinated and washed his hands, he walked out of the restroom and two of the roommates came out of the room and said, "This is disturbing, you just did it in the living room!" The girls expressed discomfort, and gave him dirty looks. He saw the victim passed out naked on the bed, covered partially with a blanket. He believed that when he went to the restroom, she passed out because she was awake during the sex. He put on his pants and went downstairs where he checked out with the dorm security. He returned the guest pass for his USC ID.

He called an Uber and met his friends at Banditos Bar. After that, they went to McDonalds and ate, and then walked home around 0400 hours. When he returned to his room, he put a new condom in his wallet.

Armaan said the intention to have sex was understood and there was no confusion. There was 100% consent on her part. He admitted that he wasn't sure how he felt ethically.

The next day, he sent a snapchat message to her that said, "Are you okay? I have your jacket."

The interview ended and we asked Armaan if he would sign a consent for us to search his cell phone. Armaan provided his written and verbal consent, and signed the form. He also provided the pass code. The verbal consent was recorded. Zuniga gave him a receipt for his phone, and we drove him back to his residence.

At approximately 1445 hours, Zuniga and I were back at the ICU when we met Witness Tanika Mehra. She approached us and told us she was the victim's friend and roommate. She also said that she had already been interviewed by the patrol officers, but had additional information. Tanika showed us a screenshot of a picture that was posted on the victim's Snapchat account. The picture depicted the victim and Witness Kavya. The picture was taken at the Banditos Bar on April 1, 2017, at 0039 hours. Tanika was very concerned about the victim's health because she said the victim smoked marijuana every day and drank a lot of alcohol. The victim often "cross-faded," which she explained meant smoking marijuana and drinking alcohol simultaneously. Tanika advised us that she planned to stay with the victim overnight in the hospital.

ollowing clearance from the medical staff, and the victim's consent, Zuniga contacted the San Gabriel Valley Rape Treatment Center, and requested a nurse respond to California Hospital to conduct a sexual assault exam. Registered Nurse A. Murray responded at 1445 hours, and conducted the exam.

She collected a Sexual Assault Evidence Kit (SAEK), and documented her findings on a report. The nurse noted the exam was consistent with the history provided.

The findings included multiple lacerations to the fossa navicularis area of the vagina, and abrasions to the face, right wrist, and left knee. She also had abrasions on her mid-upper back, and bruises on her face. The nurse gave me the SAEK, and I later booked it into evidence.

On April 3, 2017, a Forensic Extraction of phone was completed. During a query of Premjee's cellular phone, I discovered the following text messages dated April 1, 2017, that Premjee sent to Harsh Godwhani through the "WhatsApp phone application."

Premjee:

| | |
|---|---|
| Bro I fucked up | 1:29am |
| Or at least I think I did | 1:29am |
| I need your opinion | 1:29am |
| I don't know if this qualifies as sexual | |
| assault or not: this girl was blackout | |
| drunk but really wanted me to fuck her. | |
| Initially I said no way because she was | |
| so drunk and I didn't want her to make a | |
| decision that she would regret the next | |
| day. After constant persuasion by her, I | |
| finally agreed. | 1:30am |
| And even during sex, she was sloppy | |
| and all over the place | 1:31am |
| But I did it anyways. And I feel so bad | 1:31am |
| When she met me she was blackout | |
| drunk, when we had sex she  was still | |
| blackout drunk. She could not walk | |
| straight | 1:46am |
| When we were doing it, her | |
| roommates (2 girls) both walked out of | |
| their rooms and were like that is pathetic | |

and we're super pissed.

The first question they asked me: are you drunk

too? And I was like yeah, I'm super

fucked up even though I was only mildly

drunk                                        1:47am

Godhwani:

Technically it's wrong, as her decision

making would be hazed, you should be

really really careful, it could so easily

have spiraled out of control           6:48am

Maintain that you were totally fucked    6:48am

As drunk as her if not worse             6:48am

That way, you cannot be blamed,

f you both were intoxicated and decided

to do it, then it can't be the fault of one

of y'll                                   6:49am

Next time, take the girl to your room,

sober her up, chill & talk, drink lemonade

and eventually she'll get sober, you two

will enjoy it more when sober too        6:50am

Bro                                        1:59pm

Are you alright?                          1:59pm

Talk to me                                1:59pm

This is April fools, right....           12:54am

On April 4, 2017, we drove to Armaan's house, and returned his cell phone.

On April 4, 2017, at 1300 hours, Zuniga and I conducted a follow-up interview with the victim. She stayed the same information reiterating she had no recollection of anything after ordering and drinking the tequila shots at Banditos Bar. She paid for the drinks and recalled she had three instead of two. She also said she drank two Fireball shots at the "Row." We told her what her friends said about how they found her in the dorm room, and that they saw her fall twice on her face. Although she could not remember falling, she assumed she sustained the bruises and injury to her lip from the two falls. She still had no memory of leaving the Banditos Bar or the having any contact with the suspect.

She described the entire incident as a "Black-out." She provided her credit card receipts from her email, but could not locate the paper receipts because she lost her purse and phone sometime during the black out. The victim was released from the hospital on the morning of April 2, 2017.

On April 4, 2017, at 1517 hours, Detective Zuniga and I, met with Tanika for a follow-up interview. The interview was recorded, and Tanika relayed the following information.

On April 1, 2017, Tanika arrived home to her dorm and walked in the front door. The lights were on and she saw a naked male on the mattress in the common room. She described his exposed "big brown butt" which shocked and upset her, and she ran into her adjacent suite and closed the door. Tanika woke up her suite mate "Ceci" (witness Celine Wilfert), and told her there was a naked man having sex on the mattress. Ceci woke up and Tanika opened the door slightly just enough to look out. Ceci told her "Your right!" and they closed the door. Neither one of them knew who was underneath the male having sex with him. They then heard their roommate Witness Madison Seeley walking outside their suite door. They recognized her footsteps.

They texted her phone and asked her about the two people having sex in the common room. Madison was in the bathroom and told them she saw two people having sex. Tanika and Ceci stayed in their suite and heard a male and female voice moaning. Tanika recognized the female voice as the victim; Arshia.

She waited a few moments and opened the suite door. She saw Arshia laying naked on the mattress unconscious. The male was not there. Tanika yelled at Arshia to wake up and physically began shaking her to wake her. Tanika yelled at her and said, "What the fuck are you doing? Are you drunk? " Arshia did not respond and was completely unresponsive. The male then exited the bathroom stall when Tanika asked him "Can't you see she's fuckin drunk?" and the male replied "Yes." Tanika asked him, "Are you drunk?" and he replied, "Yes, we are both wasted, she's been coming on to me all night, I'm sorry for waking you up." The male asked for his pants and Tanika kicked some pants over to him. He put on the pants and left the dorm.

Tanika covered Arshia with a blanket and her and Ceci continued to try and wake her up. Tanika poured a cup of water on Arshia's face, but she remained passed out. Tanika and Ceci continued to shake her to wake her, but nothing worked. At one point, Arshia grunted and moved her head slightly. Her eyes were half opened, but she remained unresponsive. Ceci tried to pick her up to get her to the bathroom, but she dropped her on the mattress because she was dead weight. They went to the closet to get Arshia some clothes, when Arshia stood up and then collapsed falling face first on the wood floor. They tried to dress her, but were unable. Arshia tried to stand up again, and fell face first on the floor. Tanika went downstairs to find Witness Kavya to ask her if Arshia had taken anything with the alcohol, but Kavya was not in her dorm. Tanika then called Kavya and she came to the room. They continued to try and wake up Arshia, but nothing worked. Tanika noticed that Arshia was breathing heavily, but unresponsive, so they decided to call the resident Assistant (RA), for help. The RA came to their room and tried to wake up Arshia, but nothing worked. She advised everyone it was better to call the Department of Public Safety (DPS). The DPS arrived and someone called a rescue ambulance. Fire Department personnel arrived and wrapped Arshia's naked body in a blanket. They transported her to California Hospital Emergency room.

Tanika stayed at the dorm and was interviewed by DPS and LAPD.

On April 5, 2017, at approximately 1130 hours, my partner Detective Zuniga, and I, conducted a telephonic interview of witness Austin Ridgeway. The following is a summary of his recorded statement. Ridgeway stated he observed Armaan arrive at the house between 1230 and 0100 hours on Saturday, April 1, 2017. Ridgeway was on the balcony with Eric listening to music when Armaan arrived in an Uber with a girl. The girl stumbled onto the street when she got out of the car and lost a shoe. Ridgeway leaned down and asked Armaan if she was okay, but he looked up and replied that he was fine. The shoe was left in street. He thought something was wrong so he ran down and grabbed the shoe and ran back upstairs. He grabbed Frank Aimetti and told him what was going on. They both headed towards the back and found the girl in the hallway. She was trying to open a closet door. He asked her where Armaan was because we wanted to make sure she was okay.

She kind of stumbled into the door Armaan came out of, and Armaan tried to take her into the room. Ridgeway told Armaan that she had to go home because she was intoxicated. They didn't want her to be there, and felt it was not a good situation for her to be in his room.

When Armaan confirmed she lived on campus, they told him to get an Uber and take her back to campus. Armaan "made" like he called an Uber when Josh Linares came out of his room. Armaan and the girl left towards the front. Ridgeway walked into Josh's room because Josh wanted to know what happened. When they walked out, they saw Armaan taking the girl back into his room. Armaan told Ridgeway that she was too drunk and was just going to have her spend the night. They both tried to close the door on Ridgeway and Aimetti. Ridgeway held the door open and prevented Armaan from shutting it. They made sure Armaan called an Uber. Armaan tried to say she was okay to spend the night. Ridgeway and Aimetti wanted her back on campus so Public Safety could see that she was intoxicated and check their identifications. When the Uber arrived, they watched Armaan walk her downstairs to the car. They told him not to get into the car and if he did, he had to come back that night. Armaan got in the Uber and left with the girl. Ridgeway went back to the balcony where he stayed until 0330 hours. He never saw Armaan return. Ridgeway described the girl as being "pesty." He believes it was from the alcohol. Based on her stumbling in the street, losing her shoe, fumbling with a door, and because she had trouble making a coherent statement, Ridgeway believed she was drunk. The following day, Ridgeway reported the incident to the university and the Title IX coordinator.

On Wednesday, April 5, 2017, at approximately 1210 hours, my partner Detective Zuniga, and I, met with witness Frank Aimetti. The following is a summary of his recorded statement. Frank told me that in the early morning of Saturday, April 1, 2017, he was in a room watching television with a few guys when Austin Ridgeway knocked on the door and opened it. Austin told him they needed to talk right away. Frank did not know what was going on and noticed Austin holding a girls shoe. When he asked why he had a shoe in his hand, Austin told Frank that while he was on the balcony, he saw Armaan arrive with a girl. Austin told Frank the girl was stumbling and drunk. Frank looked down the corridor and saw the figure of a girl bumping into the walls and a garbage can. She could not stand and was falling over. Frank sprinted down the hallway to help her. When Armaan came out of his room, Frank told Armaan to get her home and call an Uber. Armaan attempted to reassure them that everything was fine and sort of swept her into his room. Armaan closed the door and Frank opened the door. He held the door open and told Armaan she had to leave. A few minutes later Armaan called an Uber. Frank told me the woman was very incoherent and extremely drunk. He said "It was like I was talking at somebody and not to somebody." It appeared to him that she could not understand anything he said.

Frank stated he pledged with Armaan the year prior and stated Armaan was "weird." They had complaints that he was "awkward and weird with women." He added that following the incident, the Fraternity expelled Armaan from the Fraternity, and ordered him to move out of the house by Monday.

On Thursday, April 6, 2017, at approximately 1530 hours, my partner Detective Reyes, Serial No. 30444, and I, conducted a telephonic interview of Witness Kavya Nayar. The following is a summary of her recorded statement. Nayar stated she was with victim Arshia on Friday, March 31, 2017, at around 9pm. They were at a fraternity house. It was empty and they called a few friends to go to Banditos. She stated they didn't drink much. Arshia told her she smoked marijuana during the day. Arshia drank Fireball with her at the fraternity before Banditos. They left around 11pm to Banditos. Nayar saw Arshia take a tequila shot at Banditos and last saw her outside with a few girls. She remembered the picture she took with Arshia for Snapchat. Kavya stated Arshia looked "tipsy" and her speech was slurred. Nayar could not remember who took their photograph or if she left with someone. Nayar has no idea what happened to Arshia's purse or cell phone. Nayar stated Arshia doesn't do anything harder than marijuana. Arshia's roommate called her later that morning and told her what happened. She went up to Arshia's room but the ambulance had already taken Arshia to the hospital. Nayar could not provide any further information.

On Thursday, April 6, 2017, at approximately 1700 hours, I conducted a telephonic interview of witness Celine Wilfert (Ceci.) The following is a summary of her recorded statement. Ceci stated she was awakened by her roommate Tanika Mehra. Mehra told Ceci that two people were having sex in the common room. Mehra did not know who they were and opened the door for Ceci to see. Ceci saw two people having sex in the common room, but could not tell who the woman was. When Ceci heard moaning, she recognized one of the moans to that of her friend Arshia, but still claimed she was not positive. Ceci heard her Madison Seeley walk past the door and into the bathroom.

When Ceci and Mehra stepped out of their room, they saw Arshia laying across the bed. She didn't think much at first, until Arshia did not respond. Ceci looked at Arshia who had " lazy and darting eyes." She had a smile on her face, and then passed out. When Ceci initially heard the moans, she was trying to determine if it was Arshia. Ceci stated that there is a difference between "consensual moaning" and "get of of me moaning." She felt Arshia was having conscious sex, but she also stated that when she approached Arshia, that Arshia could not tell that Ceci was yelling at her. Ceci stated Arshia had "drunk eyes" and was visibly "not with it" before she passed out. Ceci went on to state that Arshia was just smiling as if she was drunk, but would not respond verbally. It appeared to Ceci that Arshia could not understand at all what she was saying to her.

Ceci stated that her first reaction was to get Arshia medical attention because she was drunk. She didn't realize Arshia was sexually assaulted. She thought the guy was an "asshole" because he just got up and left.

On April 10, 2017, at approximately 1920 hours, I conducted a telephonic interview of witness Madison Seeley. The following is a summary of her recorded statement. Seeley stated that she went out that night and returned to her dorm room at between 1250 and 0100 hours. She was in her room getting ready for bed. Her door was closed. She went to the bathroom and opened her door. As she walked towards the bathroom, she noticed that there were people having sex on an air mattress in the common room. She only saw the back side of a male and some girl's feet. When she entered the bathroom, she received a text message from Witness Celine Wilfert (Ceci), asking if she was awake. Seeley responded that she was in the bathroom, when an unknown man got in the stall next to her. She told Ceci that the man was in the bathroom. Seeley felt it was weird for him to be in the bathroom and waited. When the man left the bathroom, she heard Tanika Mehra yell out "Do you understand how wasted she is?" She overheard the man reply something along the lines of "We're both wasted." She finished brushing her teeth and walked out of the bathroom. By this time the man was gone. She never heard him leave. Seeley stated Tanika and Ceci were yelling at Arshia who was lying face down. She appeared to be asleep, but also "dead." She believed Arshia was excessively intoxicated.

Seeley told Ceci that she did not want to get involved and went back to bed. At approximately 4am, she woke up and went outside where she found Ceci and Tanika. Seeley provided a statement to the police but was unsure what entity they belonged to.

I then told Seeley that I wanted to review her statement that she provided to the officers who took the police report. Seeley stated the reason that Tanika and Ceci called Public Safety Police was because Arshia kept collapsing when they tried to lift her. When I asked Seeley if she ever saw Arshia's legs wrapped around the man's back (as stated in the IR), she stated no. She never used that description. She said she saw "legs" on the bed and stated "wrapped around implies that there is some element of consciousness and autonomy." She stated she did not see Arshia's legs wrapped around the man's back. She stated she observed him between Arshia's legs and that her legs, were flat on the air mattress.

Seeley went on to state that what the officers wrote down, was not part of her initial statement. She also stated the officers asked her if she could describe whether the moans sounded consensual. Seeley told me that that was a very difficult distinction to make. When she initially heard the moans, she rode them off as "sex moans," but now that she understood the situation, she stated they were less "pleasure" and more like just "noise." Seeley stated there was no indication, if the moans alone were from a consensual interaction. She felt it was an unfair judgement for her to make.

On April 11, 2017, at approximately 0930 hours, Detective Esther Reyes, Serial No. 30444, RHD, and I, Detective Zuniga, Serial No. 25634, RHD, SAS, took Victim Arshia and Witness Taneka to the District Attorney's Office for a pre-filing interview. Deputy District Attorney Lana Kim interviewed both Arshia and Taneka separately. Victim Advocate Rosario Mariscal was present during the interviews.

Arshia was interviewed and provided the same information she told Zuniga and Gamino. She only added that she recalled seeing her friend "Jazz" at the Banditos Bar when she arrived with Kavya. Jazz also visited her at the hospital. After that, she reiterated that she had no memory. She also said she had one "black-out," at USC, prior to this incident. Arshia mentioned that her mother; who lives in India, received a call from the suspect's mother who also resides in India. The suspect's mother said she was worried about her son. The suspect's sister who lives in India contacted the victim's sister in India. She asked about the victim's wellbeing. I asked the victim if anyone from the suspect's family offered her or her family money, or if they were threatened about the case. The victim said no. I advised the victim about the crime of witness intimidation, and told her to report any additional incidents to me.

At approximately 1100 hours, Detective Vargas, Serial No. 30444, and Detective Gonzalez, Serial No. 32274, RHD, SAS, went to 2718 Kenwood Avenue, in Los Angeles, and arrested Armaan Premjee for Rape.

Premjee was transported to the Metropolitan Detention Center, and booked for 261(A)(4) PC.
Note: The correct booking code should reflect 261(A)(3) PC.

On April 13, 2017, this case was presented to DDA Lana Kim for filing consideration.

CASE STATUS: This case is CLEARED BY ARREST.

**FOLLOW-UP INVESTIGATION**                                                                                    MULTIPLE

| DATE THIS REPORT | DATE ORIGINAL RPT. | SPECIFIC TYPE OF ORIGINAL RPT. (ADW, TFV, EVID., ARREST/BURG., ETC.) | | RD | DR NO. |
|---|---|---|---|---|---|
| 5/16/2017 | 4/1/2017 | Rape | | 0358 | 17-0300655 |

| VICTIM BOOKED TO / ARRESTEE (AS ON ORIGINAL REPORT) | IF RECLASSIFYING TO HOMICIDE SEX / DESCENT / AGE | BKG NO. (SUPPL. TO ARREST) | WORK FOLDER PERIOD ORIG. RPT / INDEX NO. |
|---|---|---|---|
| Arshia S. (Confidential) | VICT'S | | 1704 35M15 001 |

SE STATUS   1 ☒ CLEARED BY ARREST      2 ☐ CLEARED OTHER      3 ☐ REPORT UNFOUNDED      4 ☐ INVESTIGATION CONTINUED

Use this section only to add or correct info - do not repeat info from previous reports.  Exception: Complete entire suspect info if making final disposition.

| DATE OCCURRED | CHANGE TO - ON OR BETWEEN MO DAY YEAR TIME | & | MO DAY YEAR TIME | TYPE ORIGINAL REPORT - CHANGE TO | RD- CHG. TO | DR NO. CHG. TO | INV DIV CHG TO |
|---|---|---|---|---|---|---|---|
| | | | | | | | RHD |

| PROPERTY VALUE | ADDITIONAL LOSS | PARTIAL RECOVERY | TOTAL RECOVERY | DELETED FROM ORIG. RPT. | DESCRIPTION CHANGE ☐ | ITEM NOS. RECOVERED/DELETED (ON MULTI. RPTS. USE NARRATIVE) |
|---|---|---|---|---|---|---|
| | | | | | | |

| | SEX | DESC | HAIR | EYES | HEIGHT | WEIGHT | DOB | AGE | NAME & ADDRESS (OR NAME & CHARGE, IF ARRESTED) |
|---|---|---|---|---|---|---|---|---|---|
| S-1 | M | IND | BLK | BRN | 6'0 | 175 | 2/14/1997 | 20 | Premjee, Armaan  2718 Kenwood Ave, Los Angeles, CA, 90007 |
| | | | | | | | | | ACTION TAKEN   DA Filed: 1Cnt 261(a)(3), 1Cnt289E PC   ☐ MNU# ☒ CII# ☐ BKG#   A35812276 |
| S-2 | SEX | DESC | HAIR | EYES | HEIGHT | WEIGHT | DOB | AGE | NAME & ADDRESS (OR NAME & CHARGE, IF ARRESTED) |
| | | | | | | | | | ACTION TAKEN   ☐ MNU# ☐ CII# ☐ BKG# |
| S-3 | SEX | DESC | HAIR | EYES | HEIGHT | WEIGHT | DOB | AGE | NAME & ADDRESS (OR NAME & CHARGE, IF ARRESTED) |
| | | | | | | | | | ACTION TAKEN   ☐ MNU# ☐ CII# ☐ BKG# |

**NARRATIVE (USE BELOW COLUMNS FOR MULTIPLE REPORTS ONLY)**

| P/T/D | MULTIPLE RPT. DR NOS. | TYPE OF CRIME | RD | VICTIM'S NAME | DATE ORIG. RPT. | VALUE |
|---|---|---|---|---|---|---|
| | | | | | | |

Pursuant to Section 6254 of the Government Code, victims of sexual assault offenses as defined in Penal Code Section 261, 261.5, may keep their identity confidential.  The victim in this case chooses to remain confidential and will be referred to by her first name.

<u>Case Status</u>

Cleared by arrest.  On May 2, 2017, Deputy District Attorney Lana Kim filed one count of 261(a)(3), and one count of 289(e) PC against Premjee.

| WAS PROPERTY BOOKED IN CONJUNCTION WITH THIS REPORT OR INCIDENT? | ☐ NO  ☒ YES | IF YES, HAS 10.06.00 BEEN COMPLETED? | ☐ NO  ☒ YES |
|---|---|---|---|
| SUPERVISOR APPROVING   D-S.C. Senda   SERIAL NO.   25634 | DATE & TIME REPRODUCED   DIVISION   CLERK | REPORTING OFFICER(S)   DET. GAMINO   SERIAL NO.   31053   DIVISION   RHD/SAS |
| | | REPORTING OFFICER(S)   SERIAL NO.   DIVISION |

14

LOS ANGELES POLICE DEPARTMENT
**FOLLOW-UP INVESTIGATION**

| | CORONER CASE NUMBER | | MULTIPLE |
|---|---|---|---|

| DATE THIS REPORT | DATE ORIGINAL RPT. | SPECIFIC TYPE OF ORIGINAL RPT. (ADW, TFV, EVID., ARREST/BURG., ETC.) | RD | DR NO. |
|---|---|---|---|---|
| 5/31/2017 | 4/1/2017 | Rape | 0358 | 17-0300655 |

| VICTIM BOOKED TO / ARRESTEE (AS ON ORIGINAL REPORT) | IF RECLASSIFYING TO HOMICIDE SEX / DESCENT / AGE | BKG NO. (SUPPL TO ARREST) | WORK FOLDER PERIOD ORIG. RPT / INDEX NO. |
|---|---|---|---|
| Arshia S. (Confidential) | VICT'S | | 1704 35M15 001 |

| CASE STATUS | 1 ☒ CLEARED BY ARREST | 2 ☐ CLEARED OTHER | 3 ☐ REPORT UNFOUNDED | 4 ☐ INVESTIGATION CONTINUED |
|---|---|---|---|---|

Use this section only to add or correct info - do not repeat info from previous reports.  Exception:  Complete entire suspect info if making final disposition.

| DATE OCCURRED | CHANGE TO - ON OR BETWEEN MO DAY YEAR TIME | & | MO DAY YEAR TIME | TYPE ORIGINAL REPORT – CHANGE TO | RD- CHG. TO | DR NO. CHG. TO | INV DIV CHG TO |
|---|---|---|---|---|---|---|---|
| | | | | | | | RHD |

| PROPERTY VALUE: | ADDITIONAL LOSS | PARTIAL RECOVERY | TOTAL RECOVERY | DELETED FROM ORIG. RPT. | DESCRIPTION CHANGE ☐ | ITEM NOS. RECOVERED/DELETED (ON MULTI. RPTS. USE NARRATIVE) |
|---|---|---|---|---|---|---|

| | SEX | DESC | HAIR | EYES | HEIGHT | WEIGHT | DOB | AGE | NAME & ADDRESS (OR NAME & CHARGE, IF ARRESTED) | |
|---|---|---|---|---|---|---|---|---|---|---|
| S-1 | M | IND | BLK | BRN | 6'0 | 175 | 2/14/1997 | 20 | Premjee, Armaan 2718 Kenwood Ave, Los Angeles, CA, 90007 | ☐ MNU# ☒ CII# ☐ BKG# |
| | | | | | | | | | ACTION TAKEN CBA DA filed 1 Cnt 261(a)(3), 289E PC | A35812276 |
| S-2 | SEX | DESC | HAIR | EYES | HEIGHT | WEIGHT | DOB | AGE | NAME & ADDRESS (OR NAME & CHARGE, IF ARRESTED) | ☐ MNU# ☐ CII# ☐ BKG# |
| | | | | | | | | | ACTION TAKEN | |
| S-3 | SEX | DESC | HAIR | EYES | HEIGHT | WEIGHT | DOB | AGE | NAME & ADDRESS (OR NAME & CHARGE, IF ARRESTED) | ☐ MNU# ☐ CII# ☐ BKG# |
| | | | | | | | | | ACTION TAKEN | |

NARRATIVE  (USE BELOW COLUMNS FOR MULTIPLE REPORTS ONLY)

| P/T/D | MULTIPLE RPT: DR NOS. | TYPE OF CRIME | RD | VICTIM'S NAME | DATE ORIG. RPT. | VALUE |
|---|---|---|---|---|---|---|

**Pursuant to Section 6254 of the Government Code, victims of sexual assault offenses as defined in Penal Code Section 261, 261.5, may keep their identity confidential.  The victim in this case chooses to remain confidential and will be referred to by her first name.**

<u>Investigation</u>

On April 3, 2017, at approximately 1900 hours, I checked Premjee's Uber application on his cellular phone for the Uber trip details for April 1, 2017.

During my check, I discovered that Premjee requested an Uber on April 1, 2017, sometime after midnight from Banditos Bar.  An Uber described only as a Mercedes Benz S-Class with California license plate 7JJK134 arrived at approximately 0037 hours and parked on the southwest corner of Menlo and Martin Luther King Jr. Boulevard.  The driver of the Uber was identified only as Jimothy.  The trip details indicate the pickup location was 4025 Menlo Avenue, Los Angeles, California, 90037.  The drop off location was 928 - 938 West 28th Street, Los Angeles, California, 90007.

Video surveillance cameras from Banditos Bar (Camera 5) shows Premjee and the victim enter a white Mercedes Benz S-Class by approximately 0039 hours.

On April 1, 2017, at approximately 0057 hours, Premjee requested an Uber from his fraternity at 928 West 28th Street.  An Uber described only as a Toyota Corolla with California license plate 7FYE744 arrived at approximately 0057 hours.  The trip details indicate the pickup location between 920 - 928 West 28th Street, Los Angeles, California, 90007.  The drop off location was 3410 - 3416 McClintock Avenue, Los Angeles, California, 90007.  The driver was identified only as Dennis.

On April 17, 2017, I queried California license plate 7JJK134 using department resources and discovered that the vehicle was registered to Ani Kazaryan with a residence address of 600 W. Stocker Street, #109, in the City Glendale, California.

| WAS PROPERTY BOOKED IN CONJUNCTION WITH THIS REPORT OR INCIDENT? | ☐ NO  ☒ YES | IF YES, HAS 10.06.00 BEEN COMPLETED? | ☐ NO  ☒ YES |
|---|---|---|---|

| SUPERVISOR APPROVING | SERIAL NO. 306 45 | REPORTING OFFICER(S) DET. GAMINO | SERIAL NO. 31053 | DIVISION RHD/SAS |
|---|---|---|---|---|
| DATE & TIME REPRODUCED | DIVISION | CLERK | REPORTING OFFICER(S) | SERIAL NO. | DIVISION |

Ix# 2

Case 2:18-cv-04998-AB-RAO   Document 29-5   Filed 08/02/19   Page 19 of 29   Page ID #:364

I then queried California license plate 7FYE744 and discovered the vehicle registered to Dennis Alcala with a residence address of 14620 Biola Avenue, La Mirada, California, 90638.

On April 17, 2017, at approximately 1135 hours, my partner Detective Reyes, Serial No. 30444, and I, conducted a follow-up to 600 W. Stocker Street, Apartment No. 109, and knocked on the front door. A female answered the door and identified herself as Ani Kazaryan. I advised Ani why I was there and asked her if she remembered picking up Premjee on April 1, 2017, at approximately 0037 hours, from the Banditos Bar. Ani stated she worked as an Uber driver but had no recollection of working that night or picking anyone up from the bar.

As I was speaking to Ani, Arthur Kazaryan came to the door. He stated he worked as an Uber driver as well. I asked Arthur if he worked for Uber and he stated he did. Arthur stated he used the name Jimothy. Arthur stated he remembered picking up Premjee and the victim from Banditos Bar. When he arrived, he noticed Premjee and the victim standing on the sidewalk. He stated the victim appeared drunk to him because she could not walk straight. Before they entered his vehicle, he saw Premjee take a photograph of the victim and a girlfriend of hers.

The victim and Premjee entered his vehicle and he drove off. After driving away, the victim and suspect began kissing in the back seat. Arthur stated the victim seemed way more intoxicated than Premjee. The victim's speech was slurred and she smelled of alcohol. Arthur stated Premjee didn't seem as drunk to him. During the trip, a female White who also requested an Uber, entered the backseat of Arthur's vehicle. Arthur stated the female appeared to be uncomfortable sitting in the backseat together with Premjee and the victim because they were kissing each other aggressively.

rthur stated at one point that the victim straddled Premjee as she kissed him in the back seat. After driving just a few blocks and when Arthur came to a stop, the female White passenger, requested to sit in the front seat. She opened the rear door and came around to the front passenger door, opened the door and sat in the front seat. A few minutes later, Arthur dropped the female White at her drop off location. He could not remember who she was or the drop off location.

When Arthur dropped off Premjee and the victim, Premjee got out and opened the door for the victim. He remembered Premjee helping the victim out of the car and helping her walk. This interview was digitally recorded.

Note: The interview began at approximately 1140 hours and unbeknownst to detectives, the recorder stopped and did not record. Still unknown to detectives we conducted a second interview of Arthur to ask him a follow-up question. It was after the second interview that detectives discovered that the entire first interview did not record.

Arthur stated he would research his Uber trip records to identify the female passenger who got into his vehicle and saw the victim and Premjee kissing in the back seat.

My partner and I, then conducted a follow-up to 14620 Biola Avenue, in the City of La Mirada. When we arrived, we met with Fernando Borja. Borja stated he lived with Dennis Alcala but stated that Alcala was not home. Borja provided me with a phone number for Alcala.

alled Alcala and scheduled a date to meet with and interview him.

On April 18, 2017, at approximately 1030 hours, I met with Dennis Alcala at the McDonald's located at 28th and Figueroa. I advised Alcala why I wanted to interview him, however Alcala stated he could not remember any details from that night. Alcala stated he picked up many people from the USC area. Alcala did not provide me with any further information.

**FOLLOW-UP INVESTIGATION**

**RHD - SAS HANDLING**

| DATE THIS REPORT | DATE ORIGINAL | SPECIFIC TYPE OF CRIME (PC, ADW, TFV, EVID, ARREST/BURG, ETC.) | | RD | DR NO. |
|---|---|---|---|---|---|
| 7/19/2017 | 4/1/2017 | Rape | | 0358 | 17-0300655 |

| VICTIM BOOKED TO / ARRESTEE (AS ON ORIGINAL REPORT) | IF RECLASSIFIED TO HOMICIDE SEX / DESCENT / AGE | BKG NO. (SUPPL TO ARREST) | WORK FOLDER PERIOD ORIG. RPT I INDEX NO. |
|---|---|---|---|
| Arshia S. (Confidential) | VICT'S | | 1704 35M15 001 |

**SE STATUS** 1 ☒ CLEARED BY ARREST   2 ☐ CLEARED OTHER   3 ☐ REPORT UNFOUNDED   4 ☐ INVESTIGATION CONTINUED

Use this section only to add or correct info - do not repeat info from previous reports. Exception: Complete entire suspect info if making final disposition.

| DATE OCCURRED | CHANGE TO - ON OR BETWEEN MO DAY YEAR TIME | & | MO DAY YEAR TIME | TYPE ORIGINAL REPORT - CHANGE TO | RD- CHG. TO | DR NO. CHG. TO | INV DIV CHG TO RHD |
|---|---|---|---|---|---|---|---|

| PROPERTY VALUE: | ADDITIONAL LOSS | PARTIAL RECOVERY | TOTAL RECOVERY | DELETED FROM ORIG. RPT. | DESCRIPTION CHANGE ☐ | ITEM NOS. RECOVERED/DELETED (ON MULTI. RPTS. USE NARRATIVE) |
|---|---|---|---|---|---|---|

| | SEX | DESC | HAIR | EYES | HEIGHT | WEIGHT | DOB | AGE | NAME & ADDRESS (OR NAME & CHARGE, IF ARRESTED) |
|---|---|---|---|---|---|---|---|---|---|
| S-1 | M | IND | BLK | BRN | 6'0 | 175 | 2/14/1997 | 20 | Premjee, Armaan 2718 Kenwood Ave, Los Angeles, CA 90007 ACTION TAKEN DA Filed: 1 Cnt 261(a)(3), 1 Cnt 289E PC    ☐ MNU# ☒ CII# ☐ BKG# A35812276 |
| S-2 | | | | | | | | | NAME & ADDRESS (OR NAME & CHARGE, IF ARRESTED) ACTION TAKEN ☐ MNU# ☐ CII# ☐ BKG# |
| S-3 | | | | | | | | | NAME & ADDRESS (OR NAME & CHARGE, IF ARRESTED) ACTION TAKEN ☐ MNU# ☐ CII# ☐ BKG# |

**NARRATIVE (USE BELOW COLUMNS FOR MULTIPLE REPORTS ONLY)**

| P/T/D | MULTIPLE RPT: DR NOS. | TYPE OF CRIME | RD | VICTIM'S NAME | DATE ORIG. RPT | VALUE |
|---|---|---|---|---|---|---|

Pursuant to Section 6254 of the Government Code, victims of sexual assault offenses as defined in Penal Code Section 261, 261.5, may keep their identity confidential. The victim in this case chooses to remain confidential and will be referred to by her first name.

# SUPPLEMENTAL

This is a supplemental follow-up report to a Follow-Up Investigation report dated May 31, 2017.

<u>Investigation</u>

On Wednesday, July 19, 2017, at approximately 0848 hours, my partner, Detective Carla Zuniga, Serial No. 25634, and I, Detective Oscar Gamino, Serial No. 31053, assigned to Robbery Homicide Division, Special Assault Section, conducted a webcam interview of victim Arshia S. using the web application Skype. The interview was digitally recorded.

The purpose of the interview was to allow Arshia to view security video from Banditos Bar, from April 1, 2017. The video we showed Arshia was from Camera 14, Video 629, timestamped 00:38:05. In this video, Arshia is standing outside of Banditos with Premjee and witness Nayar. During a moment when Premjee turned his back to Arshia, she gestured to Nayar with both her hands. In the gesture, Arshia used her right index finger and placed it through a circle she made with her left thumb and left index finger, a common gesture for "sexual intercourse". After Arshia viewed the video, she stated she had no memory of making the gesture, and felt embarrassed after seeing the video.

As we spoke with Arshia, Mrs. _____ joined the webcam interview. Mrs. _____ talked to us about being approached by her neighbor in early July about the case. Mrs. _____ stated she was at a wedding with her husband when their neighbor approached them. The neighbor told both Mr. and Mrs. _____ that they were approached by Armaan's father.

| WAS PROPERTY BOOKED IN CONJUNCTION WITH THIS REPORT OR INCIDENT? | ☐ NO ☒ YES | IF YES, HAS 10.06.00 BEEN COMPLETED? | ☐ NO ☒ YES |
|---|---|---|---|
| SUPERVISOR APPROVING D-MENIFEE | SERIAL NO. | REPORTING OFFICER(S) DET. GAMINO | SERIAL NO. 31053 | DIVISION RHD/SAS |
| DATE & TIME REPRODUCED | DIVISION | CLERK | REPORTING OFFICER(S) | SERIAL NO. | DIVISION |

03.14.00 (10/13) FOLLOW-UP INVESTIGATION   INC# 170401000799

Apparently Armaan's father told the neighbors that Armaan's attorney had evidence that could ruin Arshia's life.

Mrs. _____. feels threatened by the neighbor's comments and by Armaan's father, who also told her neighbors that Arshia would never marry because her reputation would be ruined behind evidence possessed by Armaan's attorney, and if they didn't cooperate with the attorney.

LOS ANGELES POLICE DEPARTMENT

| FOLLOW-UP INVESTIGATION | | CORONER CASE NUMBER | | |
|---|---|---|---|---|

| DATE THIS REPORT | DATE ORIGINAL RPT. | SPECIFIC TYPE OF ORIGINAL RPT. (ADW, TFV, EVID., ARREST/BURG., ETC.) | RD | DR NO. |
|---|---|---|---|---|
| 10/16/2017 | 4/1/2017 | RHD - SAS HANDLING Rape | 0358 | 17-0300655 |

| VICTIM BOOKED TO / ARRESTEE (AS ON ORIGINAL REPORT) | IF RECLASSIFYING TO HOMICIDE SEX / DESCENT / AGE | BKG NO. (SUPPL. TO ARREST) | WORK FOLDER PERIOD ORIG. RPT.) INDEX NO. |
|---|---|---|---|
| Arshia S. (Confidential) | VICT'S | | 1704 35M15 001 |

| SE STATUS | 1 ☒ CLEARED BY ARREST | 2 ☐ CLEARED OTHER | 3 ☐ REPORT UNFOUNDED | 4 ☐ INVESTIGATION CONTINUED |
|---|---|---|---|---|

Use this section only to add or correct info - do not repeat info from previous reports. Exception: Complete entire suspect info if making final disposition.

| DATE OCCURRED | CHANGE TO - ON OR BETWEEN MO DAY YEAR TIME | & | MO DAY YEAR TIME | TYPE ORIGINAL REPORT – CHANGE TO | RD- CHG. TO | DR NO. CHG. TO | INV DIV CHG TO |
|---|---|---|---|---|---|---|---|
| | | | | | | | RHD |

| PROPERTY VALUE: | ADDITIONAL LOSS | PARTIAL RECOVERY | TOTAL RECOVERY | DELETED FROM ORIG. RPT. | DESCRIPTION CHANGE | ITEM NOS. RECOVERED/DELETED (ON MULTI. RPTS. USE NARRATIVE) |
|---|---|---|---|---|---|---|

| | SEX | DESC | HAIR | EYES | HEIGHT | WEIGHT | DOB | AGE | NAME & ADDRESS (OR NAME & CHARGE, IF ARRESTED) |
|---|---|---|---|---|---|---|---|---|---|
| S-1 | M | IND | BLK | BRN | 6'0 | 175 | 2/14/1997 | 20 | Premjee, Armaan 2718 Kenwood Ave, Los Angeles, CA 90007 |
| | | | | | | | | | ACTION TAKEN Case resubmitted for re-filing consideration. ☐ MNU# ☒ CII# ☐ BKG# A35812276 |
| S-2 | SEX | DESC | HAIR | EYES | HEIGHT | WEIGHT | DOB | | NAME & ADDRESS (OR NAME & CHARGE, IF ARRESTED) |
| | | | | | | | | | ACTION TAKEN ☐ MNU# ☐ CII# ☐ BKG# |
| S-3 | SEX | DESC | HAIR | EYES | HEIGHT | WEIGHT | DOB | AGE | NAME & ADDRESS (OR NAME & CHARGE, IF ARRESTED) |
| | | | | | | | | | ACTION TAKEN ☐ MNU# ☐ CII# ☐ BKG# |

| NARRATIVE (USE BELOW COLUMNS FOR MULTIPLE REPORTS ONLY) | | | | | | |
|---|---|---|---|---|---|---|
| P/T/D | MULTIPLE RPT: DR NOS. | TYPE OF CRIME | RD | VICTIM'S NAME | DATE ORIG. RPT. | VALUE |

Pursuant to Section 6254 of the Government Code, victims of sexual assault offenses as defined in Penal Code Section 261, 261.5, may keep their identity confidential. The victim in this case chooses to remain confidential and will be referred to by her first name.

# SUPPLEMENTAL

This is a supplemental report to a Follow-Up Investigation report dated July 19, 2017.

## Investigation

On August 14, 2017, at approximately 0900 hours, Robbery - Homicide Division, Special Assault Section, Detective Carla Zuniga, Serial No. 25634, completed a search warrant for a copy of the Title IX investigation completed by University of Southern California (USC) Title IX Director Gretchen Means. At 0937 hours, the search warrant was signed by the Honorable Judge Christopher K. Lui, Judge of the Superior Court, Department 48, Clara Shortridge Foltz criminal courthouse.

At approximately 1310 hours, I called LAFD EMS Records Unit and submitted a request for paramedic reports for their response to the residence of victim Arshia S. on April 1, 2017, located at 1027 W. 34th Street, Fluor Tower, Los Angeles. I was advised that RA15, with Paramedics Westley Yoshimura and John Trump, were the paramedics that responded to the Fluor tower and transported the victim to California Hospital.

I was advised that I was required to complete an Authorization for Release of Protected Health Information form via email for a copy of any reports. I completed the form and submitted it. I was advised it would take up to 5 weeks to obtain a copy of the report.

| WAS PROPERTY BOOKED IN CONJUNCTION WITH THIS REPORT OR INCIDENT? | ☐ NO ☒ YES | IF YES, HAS 10.06.00 BEEN COMPLETED? | ☐ NO ☒ YES | | |
|---|---|---|---|---|---|
| SUPERVISOR APPROVING D. Menifee | SERIAL NO. 26891 | REPORTING OFFICER(S) DET. GAMINO | SERIAL NO. 31053 | DIVISION RHD/SAS |
| DATE & TIME REPRODUCED | DIVISION CLERK | REPORTING OFFICER(S) DET. ZUNIGA | SERIAL NO. 25634 | DIVISION RHD/SAS |

03.14.00 (10/13)     FOLLOW-UP INVESTIGATION     INC# 170401000799

Case 2:18-cv-04998-AB-RAO   Document 29-5   Filed 06/02/19   Page 23 of 29   Page ID #:1368 00655

On August 15, 2017, at approximately 1120 hours, my partner, Detective Carla Zuniga, Serial No. 25634, and I, Detective Oscar Gamino, Serial No. 31053, conducted a follow-up investigation to the USC Title IX Director's Office, to serve a search warrant for a copy of their investigation into USC student Armaan Premjee. At the Office, we met with Kegan Allee, the Assistant Director, Title IX.

We provided Allee with a copy of the search warrant for their investigation. Allee provided us with an external thumb drive that contained the investigation conducted on Armaan Premjee.

At RHD, Detective Zuniga reviewed portions of the investigation by the USC Title IX Office. During the review, Detective Zuniga identified Vanessa Pangbourne as a witness. Pangbourne was identified as a passenger in an Uber that Arshia and Premjee took on April 1, 2017.

On August 16, 2017, at approximately 0615 hours, Detective Zuniga vaulted the USC Title IX investigation on a thumb drive at TID Electronics and submitted a request for a copy of the drive.

At 1109 hours, I emailed LAFD Arson Unit a request to interview Paramedics John Trump and Westley Yoshimura.

At approximately 1116 hours, Detective Zuniga completed a Return to Search Warrant for the evidence obtained from the USC Title IX Office. The Honorable Judge Michael D. Abzug, Judge of the Superior Court, Department 112, Clara Shortridge Foltz criminal courthouse, signed the search warrant return.

At 1200 hours, my partner and I, met with Deputy District Attorney Lana Kim to review the case.

On August 17, 2017, at approximately 0830 hours, I conducted a follow-up to TID Electronics where I picked up the USC Title IX thumb drive and copy. At approximately 1000 hours, at RHD, I completed a Property Report and booked the drive into evidence.

At 1230 hours, my partner, and I, and DDA Lana Kim, conducted a follow-up to meet with Arshia and her mother. When we met, we discussed the decision by Judge Pastor and advised them of our plans for possibly refiling the case. Arshia signed a medical release form so we can obtain a copy of her medical records from California Hospital.

On August 21, 2017, Detective Zuniga, and Detective Esther Reyes, Serial No. 30444, conducted a follow-up to California Hospital, Medical Records Office, and submitted Arshia's signed medical release form for her medical records.

On August 22, 2017, at approximately 1030 hours, my partner, and I, conducted a follow-up to California Hospital, Medical Records Office and obtained a copy of Arshia's medical records from April 1 through April 2, 2017.

At approximately 1100 hours, we conducted a follow-up to the Risk Management Office for the hospital. We met with Tracy Bennett, RN, MSN, NEA-BC, Director, Quality and Risk Management, for California Hospital. We requested her assistance in identifying the doctor, nurse, and laboratory technician who worked on Arshia when she was admitted into the emergency room on April 1, 2017. Bennett requested Emergency Room Nurse Sandra Marquez to assist us.

Marquez reviewed Arshia's medical reports and utilized the hospitals records to identify the doctor who treated Arshia in the emergency room. Doctor Peter Keenan was the attending physician who treated Arshia. At 0346 hours, Keenan ordered blood work be completed on Arshia.

At 0351 hours, RN Jennifer Im drew blood from Arshia. At 0359 hours, Daisy Chavez took custody of the blood sample from Im and gave it to Clinical Laboratory Scientist (CLS) Lyka Villegas, who submitted the blood work for analysis. At 0426 hours, Villegas released the results of the analysis on Arshia's blood work.

At approximately 1155 hours, my partner, and I, conducted a follow-up to 3000 S. Hoover Street, Los Angeles Fire Department, Station 15. We met with and interviewed Firefighter Westley Yoshimura, Firefighter ID# 362411. Yoshimura and his partner John Trump were identified as the paramedics who responded to the Fluor Tower on April 1, 2017.

Yoshimura stated he responded to the 7th floor and found a girl on the floor naked, in the common room. The victim's friends were worried about her. Yoshimura and his partner covered her up and treated her. The victim was unconscious and completely "out of it." Yoshimura did his normal checks however the victim did not respond. The victim could not talk or say anything. The victim responded to painful stimuli, described as interdigital and nail break pressure. The victim had low blood pressure and displayed signs of shock which prompted them to transport her to California Hospital. Yoshimura remembered the victim's friends state that they heard noises, possible sex, and a guy leaving the scene.

On August 23, 2017, at approximately 1400 hours, my partners, Detective Zuniga, Detective Reyes, Serial No. 30444, and I, met with and interviewed witness Vanessa Pangbourne. On April 1, 2017, Pangbourne took an Uber from a friend's residence, back to her apartment on Severance Street. The following is a summary of her statement. The interview was digitally recorded.

Pangbourne stated she used a USC Uber carpool after leaving a friend's residence. Pangbourne sat in the back seat behind the driver. Next to her was a male and female. An unknown person was sitting in the front seat. The couple were kissing and making out which made her feel very uncomfortable. Both were clearly drunk. When the front passenger was dropped off, Pangbourne moved to the front seat to distance herself from the couple in the back. She believes the Uber then stopped at Sigma Ka fraternity where the male and female got out. Pangbourne noticed it took a long time for the female to get out of the back seat. The female was struggling to put on her shoes and get out. The male helped her out and held her up by holding onto her waist. Pangbourne stated the male was not as drunk as the female was. She felt the female was not making the best decision by going with the male because she was clearly drunk. Pangbourne debated whether to say something to the female as she struggled with her shoes, but didn't. When she got to her apartment, Pangbourne told her roommate about the drunk female. They thought about going back to the fraternity to check on her but didn't because they didn't know anyone there. Pangbourne contacted Title IX at USC after she read an article in the L.A. Times about a sexual assault that occurred the same night she took an Uber. The article mentioned the name of the fraternity where the victim of the assault got out of the Uber. When Pangbourne heard of the location, she knew it was the female who was in the back seat of the Uber that she took on April 1, 2017.

On August 28, 2017, at approximately 0700 hours, my partner Detective Zuniga, and I, met with and interviewed California Hospital Emergency Room RN Jennifer Im. Im was identified as the nurse who drew blood from Arshia when she was treated in the emergency room on April 1, 2017. Im reviewed hospital records via a hospital computer and stated that RN Eva Kelley input that blood was drawn from Arshia at 0242 hours. Im was not sure if Kelley was the actual nurse who drew Arshia's blood since Kelley made the entry. Im stated it was common for nurses to input information for other nurses. Im advised us that the hospital laboratory also had records for patients.

At the laboratory, we met with Clinical Laboratory Scientist, Laboratory Supervisor Jovita Velasco. Velasco verified through her lab records that Im was identified as the nurse who drew Arshia's blood on April 1, 2017. In addition, Velasco stated that Im gave the blood sample taken from Arshia to laboratory scientist Lyka Villegas to analyze for blood alcohol content.

At 0730 hours, we interviewed Clinical Laboratory Scientist Lyka Villegas in Velasco's office. Villegas stated she received a sample of Arshia's blood for analysis at 0351 hours. The blood was also marked with patient MRN# 10285043. Villegas then submitted the blood into a centrifuge for ten minutes, where a serum sample is then used to check for the blood alcohol content in the blood. The result of the analysis indicated a blood alcohol content of 325.30. The blood sample was kept for seven days before being destroyed.

On August 31, 2017 at approximately 0718 hours, my partner Detective Zuniga, and I, conducted a follow-up to the University of Southern California (USC). We responded to the offices of the Public Safety Police for USC and interviewed USC Public Safety Officer Frank Trevino.

Officer Trevino stated that on April 1, 2017, he responded to a call at the Fluor Tower for a female that was unconscious but breathing. Trevino asked roommates what happened and observed a female Indian on the ground unconscious, unresponsive and covered with a sleeping bag. He was told the victim had been unconscious for 30 to 40 minutes already. He looked around and observed the victim's pants were on a couch. The pants looked like someone grabbed them and pulled them off. The pants were inside out with the underwear exposed. The couch was in the common room a few feet from the air mattress. A sister of one of the roommates was visiting and the air mattress was being used for the visiting family member.

Trevino stated the victim was laying on the ground next to the mattress. He stated the victim's underwear and bra were up there too but did not indicate if he was referring to the couch or air mattress. When Sergeant Rivera and Officer Reynolds arrived, he told them a possible rape had occurred. Trevino stated that based on his training and experience, the pants indicated to him they were pulled off the victim. In addition to that, the victim's state of unconsciousness, not being responsive, were all examples from past experiences that a sexual assault likely occurred. When the ambulance arrived, paramedics tried to wake up the victim but were unsuccessful. It appeared to Trevino the victim was naked under the sleeping bag. The paramedics covered the victim with a blanket, placed her on a gurney and transported her to a hospital. Trevino briefly interviewed the victim's roommates and asked them if the victim was having sex. An Indian roommate of the victim, stated she walked in and just saw a guy on top of the victim. This roommate could not tell who the girl was. Scared, she ran into her room and woke up another roommate of the victim. Trevino described this roommate as a female White from the United Kingdom (UK). The girls sat in their room and were afraid to go out and confront what was going on. When another one of their roommates walked out to use the restroom, they texted her and asked her if she recognized who the girl was and what was happening. Trevino was then told the guy in question, walked into the restroom to urinate. The Indian roommate and the roommate from the UK, walked out and confronted the girl but she was unresponsive. The roommates then confronted the guy and asked him what he was doing. They asked him if he didn't realize that the victim was drunk and intoxicated. The guy made a remark and left. Based on the brief statement he was given by the victim's roommates and his observations, he called his supervisor Sergeant Rivera and requested that he respond to the scene and have LAPD notified so a thorough investigation could be conducted. When Trevino observed the victim and her condition, he didn't believe the victim could have given consent. The victim could not be woken up by her roommates or the paramedics. Southwest Area Patrol Officer Meraz, Serial No. 41745, and his partner, responded to the scene, however the victim had already been transported by the ambulance to a hospital. The officer took photographs of the scene. Trevin stated he noticed water on the floor and a water bottle in the room. One of the roommates told him they used the water on the victim to wake her up. Trevino's interview was digitally recorded.

At approximately 0736 hours, my partner and I, interviewed USC Public Safety Officer Michael Reynolds regarding his response to the Fluor Tower on April 1, 2017. Officer Reynolds stated he walked into the common room area of the call and observed a female partially clothed under a blanket. Per Reynolds, roommates of the victim called because the victim had been drinking. An ambulance arrived a few minutes after he arrived and transported the victim to a hospital. The paramedics covered the victim in a blanket because she was naked. Reynolds stated that Officer Trevino arrived on scene first. Reynolds described the victim as a female with black hair who was unresponsive. He stated that Officer Trevino tried to ask the victim questions but didn't say anything.

Officer Reynolds conducted a follow-up to California Hospital to obtain a statement from the victim, but was told by Doctor Keenan the victim would not be able to speak for 48 to 72 hours. Reynolds interview was digitally recorded.

At approximately 0745 hours, my partner and I, interviewed USC Public Safety Police Sergeant Jose Rivera. On April 1, 2017, Sergeant Rivera responded to a radio call of an intoxicated woman in need of medical attention at the Fluor Tower located on the USC campus. When he arrived, Rivera met with Officer Trevino who was first to arrive at the scene. In the living room, Rivera observed an air mattress and a young lady who was unconscious but breathing. The lady was laying on the floor next to the mattress. Rivera looked at the young lady and it appeared she was naked. It looked like she was not wearing a blouse. Her hair was messy, wet, and as if she may have thrown up on herself. There was water on the floor and wasn't sure what to make of it. Based on his observations and what the roommates were reported, he was concerned for her safety. Paramedics responded and tried to speak with the victim but her eyes were closed. Her head bobbled back and forth like dead weight. He observed the paramedics struggle to lift her and strap her into the gurney. Rivera then directed Officer Reynolds to conduct a follow-up to the hospital to see if a statement from the victim could be obtained. Rivera stated he later received a call from Reynolds from the hospital. Reynolds told Rivera that a doctor observed the victim and in the doctor's opinion, the victim could not have consented to sex based on the severity of her condition. Rivera then called LAPD to report a possible sexual assault investigation.

During the interview, Rivera stated that he observed the lady's pants off to the side. They were straight legged and appeared to have been thrown aside across the room. He wasn't sure if the pants were inside out or remember seeing underwear. He thought it to be awkward and doesn't believe she took off her own pants. He felt more than casual sex had occurred from observing the position of the clothing.

On September 14, 2017, at approximately 1315 hours, Detective Carla Zuniga, Serial No. 25634, and Detective Esther MyaPe Reyes, Serial No. 30444, assigned to Robbery-Homicide Division, Special Assault Section, conducted a follow up to interview Dr. Peter Keenan. Keenan, was the doctor who attended to Arshia . on April 1, 2017. The interview was recorded and vaulted under number 708548.

They interviewed Dr. Peter Keenan at Lakewood Medical Center located at 3700 E. South Street, in the City of Lakewood. Dr. Keenan has been a physician for approximately 6 years. He is currently assigned as an Emergency Room physician. He usually practices at California Hospital, located at 1401 S. Grand Ave, in the City of Los Angeles, but mostly practices at the Lakewood Medical Center. He's been employed by California Hospital for approximately 7 months.

On April 1, 2017, at approximately 0300 hours, Dr. Keenan recalled attending to a young lady, Arshia  . He described Arshia to be in an altered state when she arrived in the Emergency Room. He was told by paramedics that she had consumed a lot of alcohol and had smoked marijuana. The paramedics also told Dr. Keenan that Arshia vomited several times on the way to the hospital. Dr. Keenan formed the opinion she needed to be intubated because she was so intoxicated she risked asphyxiation. When Dr. Keenan first approached Arshia, he described her as almost unconscious, but clothed. She could not speak or answer any of his questions. She only moaned.

Dr. Keenan ordered a blood alcohol and urine toxicology tests on Arshia. The results confirmed her blood alcohol level was 325.30 and the toxicology report confirmed both alcohol and cannabis in her system.

Dr. Keenan opined that in the altered state he observed Arshia to be in, she could not have consented to any sexual acts, including sexual intercourse.

During the investigation, several efforts were made to locate witness Chat Thanyadhorn. Thanyadhorn was identified as the Resident Assist (RA) for the Fluor Tower on the night of April 1, 2017. The following statement was provided by Thanyadhorn to Kegan Allee, Assistant Title IX Director at the University of Southern California.

4-21-17
Meeting with: Thanyadhorn Chat (TC)
Investigator: Kegan Allee (KA)
- Amnesty Policy
- Retaliation is prohibited
- KA said, "Do you know why I asked to speak to you?" TC said, "I guess it would have something to do with the fact that I was involved when they called the RA on duty. Then I was the one who first called my supervisor and then DPS. Me and my senior staff were there the entire night."
- KA said, "Ok, so let's start from the beginning. How did you get involved?" TC said, "As RAs we have 3 duty walks. I think I finished my final one which is supposed to be around 2 am. I got a call probably around 2:30 in the morning. It was one of the suitemates. I think it is noted in the IR (Incident report)."
- KA said, "What did she tell you?" TC said, "I don't remember her exact wording, but it was something along the lines that her suitemate was not responding and unconscious. I think I asked a few questions like 'is she breathing?' In the end I decided I would just go down because it seemed like it was really serious."
- KA said, "What did you find when you got to the room?" TC said, "They had kind of alerted me to the situation during the phone call like she wasn't wearing any clothes and she's on the ground. I walked in and its suite style, but when you walk in through the front door you have a hallway. If you keep walking down you'll come into the common area which has a couch and a little sink area, a big window. The suitemate who called, her sister was supposed to be sleeping over so they had a huge inflatable mattress there for her. The girl was on the ground. They had kind of covered her with a sheet."
- KA said, "Ok, she was on the ground, not on the mattress?" TC said, "No, they explained to us first and then to DPS and then to LAPD. I heard she was on the ground, but she was originally on the mattress. Her suitemates had originally tried to get her up to splash water on her. They couldn't get her there because she wasn't responsive."
- KA said, "Did the girl have any injuries you could see?" TC said, "There was one thing the suitemates pointed out. She had a tiny nick on her forehead. Like a pencil mark. They said she was bleeding. She seemed disheveled."
- KA said, "Had she fallen?" TC said, "Not while I was there. But I'm not really sure what happened prior to when I was there."
- KA said, "How was she laying on the ground?" TC said, "I think while I was on the call with them actually. When we go through our training we are told to put people on their side in case they end up vomiting. She was lying on her side when I got there. I was trying to speak with her and saying 'hi I'm the RA on duty. Are you ok? Can you respond? Can you say something?' She wasn't really giving any indication that any of us were there. She was breathing, but it seemed like she didn't want to talk to anyone. I first called the senior staff on duty. I called Erin Ash the RCC for Park Side International. Erin advised me to, because I wasn't sure if I should call DPS. Erin thought it might be a good idea to call DPS because the situation didn't sound safe. Then she told me she would call the RCC for Fluor Tower because they were secondary senior staff. So she said she would contact Gabriel Loredo since he was a lot closer than her. So Gabriel came up to the suite but he didn't come inside because she was naked."
- KA said, "When did you call DPS?" TC said, "Right after I called Erin. I came in for a minute or two and then went back out to call DPS. I'm not exactly sure whether Gabe showed up first or DPS, but they both eventually came. Gabe was standing with me, and I was holding the door open to the suite for an extensive amount of time for DPS and the emergency, like fire people, for the transport. They came with the stretcher. Once DPS came they were talking to the two suitemates, and I think another two were sleeping, but I'm not really sure. The two there were present the entire time."

Case 2:18-cv-04998-AB-RAO   Document 29-5   Filed 08/02/19   Page 28 of 29   Page ID #:373

- KA said, "What was Arshia doing when DPS arrived?" TC said, "She was just the same. A couple of times throughout, which is why I was confused if she was ok or not, she would roll a little bit, kind of like what you do while you're sleeping. At one point before I called DPS she sat up for a little bit and then laid back down. But when she did that it wasn't like she woke up or anything. She just sat up."
- KA said, "Was she any more responsive?" TC said, "No."
- KA said, "Was anyone doing anything to her to try to get a reaction?" TC said, "Yeah, her two suitemates the entire time were trying all sorts of things to get her attention. They yelled her name. Before I got there they had tried to splash water on her so there was water on the floor. They would smack her face to try to get her up. They would try to lift her, but she just wasn't responding the entire time."
- KA said, "Did they smack her face hard?" TC said, "No. It wouldn't have been enough to injure her. It would have just been enough to startle someone. Not like a smack, more like a hard tap or something. It wasn't like they hit her. It was more trying to get her attention. Kind of like when you tap someone on the shoulder, but on her face."
- KA said, "Did that still seem like she was just sleeping? Is that usual for someone to get splashed with water and not wake up?" TC said, "No. I think if you're just sleeping they would wake. But the fact that she wouldn't wake up after they tried all these things indicated something was wrong. When I was on the phone I thought maybe she was just annoyed or didn't want to wake up, but as I saw them try more things I realized she probably would have woken up. When the emergency people showed up they tried talking to her but as soon as she didn't respond they just took her."
- KA said, "Did she seem to have any understanding of what was going on when they were transporting her?" TC said, "No."
- KA said, "Did she help them put her on the stretcher in any way?" TC said, "No, they lifted her up and put her on the stretcher. The entire time she seemed like she was sleeping, but didn't respond to anyone who tried to wake her up or talk to her. Most people if you tell them you're going to call DPS they'll be like 'no, no, no' but her suitemates told her repeatedly they would call DPS and she never responded. She never responded to DPS officers when they arrived. She wasn't responding to anyone."
- KA said, "Did it become more serious to you when you saw her?" TC said, "Yes, because on the phone it just sounded like a drunk student coming back from a party."
- KA said, "When did your sense of concern change?" TC said, "I think it was when I came to the suite and the suitemates were telling me they tried all these things and she wouldn't wake up. I was trying to talk to her and she wasn't responding. That's when I realized she wasn't just drunk. Usually people will respond to you or talk to you even if they are drunk."
- KA said, "Was this different?" TC said, "It was because she just wasn't responding to anyone, and they were doing things and speaking at a volume that would usually garner a response."
- KA said, "So the emergency folks came and transported her, what happened next?" TC said, "I think at that point, I think there were DPS officers who went with her to the hospital. One officer stayed behind and then his sergeant came a little while later. The DPS officer explained the situation to him, and then after a while, a significant amount of time, then LAPD came."
- KA said, "What did LAPD do when they arrived?" TC said, "The first things they did was they had cards on each person who was involved in the situation with their name, address, etc. DPS gave those cards to LAPD. The LAPD officers came in and started interviewing the friend who didn't live there but who came later. They asked questions about what she did with Arshia that night. They talked to the rest of the suitemates. At the end they filled out an information card for me, but they didn't ask me any particular questions."
- KA said, "Then what happened?" TC said, "They were taking photos. They collected the sheets. The clothes that she had been wearing. The condom from the trash can. After that point I think they just left."
- KA said, "Then what happened?" TC said, "I think Gabe talked to the suitemates. I don't remember what exactly about. I just know we talked to them a little bit and then we left. We were the last to leave."
- KA said, "Then what?" TC said, "Then we went down to Gabe's office and we wrote the IR."
- KA said, "Then what?" TC said, "Then after we finished the IR I went back to my room and went to sleep."

Case 2:18-cv-04998-AB-RAO    Document 29-5    Filed 08/02/19    Page 29 of 29    Page ID #:374

- KA said, "Did you have any further involvement in this incident?" TC said, "I think I received a call the next day from, I don't remember if it was DPS. Oh I think it was around 8 am, so I'd been asleep for probably an hour. They informed me that they had asked everyone to leave the suite. They were asking to be in contact with the RA on the 7th floor. So I didn't have any involvement after that phone call."
- KA said, "Ok, is there anything else you think I should know?" TC said, "I think that's it."
- KA said, "Ok, I'm going to read you back my notes to confirm that they are accurate. Let me know if there is anything inaccurate or that you forgot to mention."
- KA reads back
- KA said, "Are they accurate?" TC said, "Yes."
- KA said, "Is there anything else you think I should know?" TC said, "No, in terms of my involvement that was everything."

## Case Status

Cleared by Arrest. This supplemental follow-up report is being submitted to the District Attorney's Office for refiling consideration.