LAW OFFICES OF VICKI I. SARMIENTO
A Professional Corporation
VICKI  I. SARMIENTO (SBN 134047)
333 North Garfield Avenue
Alhambra, California 91801
vsarmiento@vis-law.com
Tel: (626) 308-1171
Fax: (626) 308-1101

LAW OFFICES OF DALE K. GALIPO
DALE K. GALIPO (SBN 144074)
Tanya Sukhija (SBN 295589)
E-mail: tsukhija@galipolaw.com
21800 Burbank Blvd., Suite 310
Woodland Hills, CA  91367
dalekgalipo@yahoo.com
Tel: (818) 347-3333
Fax: (818) 347-4118

Attorneys for Plaintiff
ARMAAN KARIM PREMJEE

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARMAAN KARIM PREMJEE,<br><br>                 Plaintiff,<br><br>v.<br><br>CITY OF LOS ANGELES; CHIEF CHARLIE BECK,  DETECTIVE OSCAR GAMINO, DETECTIVE CARLA ZUNIGA, and DOES 1-10, Inclusive,<br><br>                 Defendants. | **Case No. 2:18-CV-04998-ab-(raoX)**<br><br>[*Hon. Andre Birotte, Jr*]<br><br>**PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**<br><br>Pre-Trial Conf.: November 8, 2019<br>Time: 11:00 a.m.<br><br>Trial Date: December 3, 2019<br>Time: 8:30 a.m. |

Pursuant to Local Rule 16-4, Plaintiff hereby submits the following Memorandum of Contentions of Fact and Law.

## I.     FACTUAL SUMMARY

### 1.     Banditos Bar.

On March 31, 2017, Mr. Premjee, a 20-year old business major at USC, decided to go to Banditos to meet a friend.  Around midnight, as Mr. Premjee was enjoying the music and company of his friends, Arshia approached him and they started talking.  They were from the same town, Mumbai, India.  Within minutes of meeting, she put her arms around him and started kissing his neck.  They "made out" for a while at which time they both agreed to go to his place and have consensual sex.  Video footage shows Arshia kissing Mr. Premjee at the bar counter and then leading him out of the bar pulling him by the hand. Outside of the bar, Arshia signaled to her friend, "Kavya," that she was leaving with Mr. Premjee.  Mr. Premjee took a photo of the two girls with Arshia's cell phone. Arshia edited the photo and put it on Snapchat which has a time stamp of 12:39 a.m. Waiting for the Uber outside of the bar, Arshia was standing behind Mr. Premjee and motioned to her friend Kavya with a sexual intercourse gesture (she made a circle with her left index finger and thumb, then put her right index finger inside the circle and moved her finger in and out of it) - she did this twice.  In an interview, Arshia told GAMINO that it was "obvious" what she was doing when she made the gesture and that she was not "that drunk."  Kavya told GAMINO outside the bar Arshia was "tipsy" not "drunk" and she "never saw her…falling."  Video cameras captured the above interactions.

### 2.     Uber Ride to Mr. Premjee's residence.

When the Uber arrived, Mr. Premjee and Arshia got in the back seat.  During the ride, Arshia got on Mr. Premjee's lap and started aggressively kissing him on the

mouth and neck.  She also bit Mr. Premjee.  Her behavior was sexually aggressive, and Mr. Premjee told her to take it easy and to stop.  The Uber driver observed Arshia's conduct toward Mr. Premjee and was interviewed early in the investigation by GAMINO, however, he claims the recording of it malfunctioned and no recording was ever given to Mr. Premjee's defense attorney.

### 3.    Mr. Premjee's Residence at Kappa Sigma.

When they arrived at Mr. Premjee's fraternity house, Arshia was not allowed to stay.  Arshia told Mr. Premjee where she lived and he called another Uber and they waited in his room until it arrived.

### 4.    Uber from Kappa Sigma to Arshia's Residence at Fluor Dormitory.

Arshia sat in the back seat, and he sat in the front seat.  Mr. Premjee wanted to maintain distance from Arshia's aggressive public sexual behavior with him. This Uber took them to her dormitory, the Fluor Dormitory on USC campus.

### 5.    Fluor Tower – Arshia Dormitory.

Before having sex, Mr. Premjee hesitated because of their conservative Indian culture and wanted to make sure Arshia wanted to have sex, and she said, "Why are you being such a good boy, be a bad boy." The Fluor guard who checked in residents and guests described them to police as a "happy couple," Arshia was "flirting" with Mr. Premjee, and they "even had a pleasant conversation." Arshia helped Mr. Premjee register which required that he leave his I.D. in exchange for a guest pass.  Arshia walked to the elevator ahead of Mr. Premjee and then extended her arm towards him to come to her and she hugged him.  Video cameras captured this interaction.  Mr. Premjee and Arshia then took the elevator up to her suite around 1:04 a.m.  As Mr. Premjee did not know where she lived, Arshia led him to her suite in a one-minute walk with several turns along the way.  Once inside the

four-bedroom suite she led him to her bedroom, but her roommate was there asleep, so Arshia led Mr. Premjee to the living room.

### 6.   The Sexual Encounter.

Standing by the light switch, Arshia kept turning the lights OFF, but Mr. Premjee would turn them back ON because it was completely dark, and he could not see.  The lights remained ON the entire time Mr. Premjee remained in the dorm suite.  Mr. Premjee attempted to dissuade her from having sex and tried to leave, she told him "no, no, stay don't go anywhere," and grabbed him by the shirt and pulled him onto an air mattress which was on the floor in the living room.  They started kissing and Mr. Premjee asked Arshia if she had ever had sex.  She said "yes." They took each other's clothes off.  She unbuttoned her jeans and Mr. Premjee helped her take them off.   He penetrated her and she moaned with pleasure.  They started in missionary position, then doggie style, and switched back because doggie was "uncomfortable given the air mattress."  Finding it uncomfortable, they went back to missionary.  When they finished, he asked her if she came and she said "yes."  The sex lasted about 10 minutes.  Mr. Premjee got up, threw the condom in a trashcan, went to the restroom.  When he finished in the restroom, he peered out the door, as he was naked, and two female roommates were in the living room (Tanika, Celine).  He was polite, apologized for waking them, dressed, and left.  Arshia was asleep on the air mattress as described by her roommate Tanaka.

Mr. Premjee left Arshia's building around 1:28 a.m., about 20 minutes after he checked in.  His total time with Arshia the entire night was about one hour.  It is undisputed Mr. Premjee never bought her or gave her a drink, and Arshia never drank anything in front of him during that time.  Nor was there any drug use during the time they were together.  At no time did Arshia lose consciousness in front of Mr. Premjee before or during sex, nor did she revoke her consent to sex at any time by words or actions.

1

2     **7.**     **Witnesses to the Sexual Encounter.**

3     While Mr. Premjee and Arshia were having sex, roommate Tanaka arrived to

4 the suite. She said in her initial police interview that night, the lights were ON and

5 she observed a "big brown butt" on a mattress in the middle of the living room. She

6 was surprised by it and immediately ran into her room which she shares with

7 roommate Celine whom she woke up. They both listened to the "moaning noises

8 coming from the living room." The moaning was both male and female and they

9 stated in their initial police interview that night that they interpreted it as the "sound

10 of a man and a woman enjoying sex." [GAMINO and ZUNIGA later re-interviewed

11 these roommates to have them change their initial witness account on this specific

12 point]. Celine also stated in her police interview that night that Tanaka woke her up,

13 and she opened their bedroom door so that Celine could see into the living room,

14 and she saw the couple having sex. Tanaka closed the door and they both listened to

15 the moaning which Celine also interpreted as a "man and a woman enjoying sex."

16 Madison, another roommate, had just arrived home and left her bedroom to go to the

17 restroom. She passed the living room and observed Mr. Premjee and Arshia having

18 sex on the air mattress. In her police interview that night, she described the scene as

19 a man with dark complexion kneeling on the bed with a woman's "legs wrapped

20 around his back." [GAMINO later re-interviewed her to have her change her initial

21 witness account on this specific point]. She said the woman's legs were also a dark

22 complexion.

23     **8.**     **After the Sexual Encounter.**

24     When Mr. Premjee left the dorm, he sent a text message to his friend to ask

25 his opinion. He was embarrassed by the situation with the roommates and

26 concerned that they might judge him and Arshia without knowing the circumstances

27 of everything leading up to their sex, and asked his friend if a third-party looking at

28

    2:18-cv-04998-AB (RAOx)

1  the situation might misconstrue it as "sexual assault."  Meanwhile, back at the dorm
2  at 2:46 a.m., more than an hour after the sexual intercourse, Celine called an
3  ambulance because they could not wake up Arshia.

4  **9.    The Investigation – Officer Meraz.**

5   In the early morning hours after the sexual encounter, Officer Meraz was
6  assigned to interview Arshia's roommates.  He testified that he was there to
7  investigate a possible sexual assault and therefore it was important to know what
8  was the perception of the witnesses about the sex.  Did the moaning sounds cause
9  them to worry about what was occurring in the next room?  He was well-trained in
10 the taking of witness statements, he was neutral.

11      Officer Meraz testified Celine and Tanika stated they heard the moaning
12 sounds of "a man and a woman enjoying sex."  He also took the statement of
13 Madison who stated she observed "a man with dark complexion, kneeling on the
14 bed with a woman's legs wrapped around his back" and "her legs were also dark
15 complexion."  He testified that in assault cases it is important to get the description
16 of body positions, so when "Madison starts giving details like that, that's definitely
17 pertinent" to establish if a person was "unconscious or not." Officer Meraz also
18 interviewed Kavya who stated Arshia seemed "happy and was socializing" at
19 Banditos.  None of the witnesses told him that their roommate was sexually
20 assaulted, nor did they give any indication of such.  They described Mr. Premjee as
21 "polite" and apologetic for disturbing them.  They seemed more embarrassed, and
22 angry at Arshia for her "partying nonstop."

23  **10.   Mr. Premjee's Arrests**

24      Mr. Premjee was arrested on April 1, 2017 at around 7:00 a.m. He was
25 handcuffed and taken to the police station.  He spent several hours at the station, he
26 was not free to leave, detained in a cell, and handcuffed any time he was moved
27 outside of the cell, with no food or water for hours. He was re-arrested on April 11,

28

1   2017 and booked on the charge of rape of an unconscious person (Penal Code

2   261(a)(4)), which was later changed to rape of a person too intoxicated to legally

3   consent to sex (Penal Code 261(a)(3)).  On April 12, the LAPD sent out a Press

4   Release identifying Mr. Premjee and his date of birth, describing the charges, and

5   asking for any other "victims" to come forward.

6   **11.    The Investigation – Gamino and Zuniga**

7        On April 1, 2017, GAMINO and ZUNIGA interviewed Arshia at the hospital

8   at around 11 a.m. and she stated that she remembered going on Friday March 31 to

9   "The Row" with her friend Kavya at 11:30 p.m., they got bored, and then went to

10  Banditos.  She remembers having "two shots" at the bar, and claims she could not

11  remember anything else except waking up at the hospital. GAMINO wrote in his

12  case log that he and ZUNIGA "were advised by nursing staff that" Arshia's "BAC

13  was .3, possibly .325 or .328" and the BAC was taken at "3:51 a.m."  They then

14  interviewed Mr. Premjee who relayed the events of the prior evening and gave his

15  consent to keep his cell phone for a forensic examination.  They soon thereafter

16  found the text message they viewed as an "admission" and from that point on

17  proceeded in earnest to frame the evidence around a rape charge against Mr.

18  Premjee.  The detectives never reviewed the surveillance video from Fluor or

19  Banditos before charges were filed even though they had them in their possession

20  before charges were filed against Mr. Premjee.  GAMINO and ZUNIGA re-

21  interviewed Tanika on April 4 and asked her about her statement that she heard

22  moaning sounds of a "a man and a woman enjoying sex."  Now, Tanika stated she

23  could not know what it sounds like to enjoy sex because she had never had sex and

24  did not watch porn, but knew it was Arshia's voice.  On their re-interview of

25  roommate Madison on April 10, she recanted her original exculpatory statement that

26  Arshia's legs were wrapped around Mr. Premjee's back while having sex.  The re-

27  interview was not done in an objective manner.  Contrary to acceptable training on

28

taking a statement in a neutral manner, GAMINO's interview of Madison was done in an overly suggestive manner and was designed to "cue" her into what he deemed important.  He improperly responded to her statements with words like "correct" or "that's right" (with emphasis in his voice) to steer her in the desired direction. As a result, she now said that, given what she knew now, she never said the legs were wrapped around Mr. Premjee's back because that would indicate some kind of "consciousness," and instead, she now said, the woman's legs were laying flat on the mattress.  GAMINO agreed emphatically, "Correct."  She also stated that, in hindsight knowing the circumstances now, the "moaning" sounds might just be "noise" instead of her initial reaction which was "pleasure."  GAMINO wholeheartedly agreed with her, "That's right," and even asked her age and whether she had ever even heard what sex sounds like.

GAMINO and ZUNIGA had a pattern of not matching the recorded audio interviews with what they wrote in their written summaries. For example, in their interview of Austin Ridgeway, the written report stated that he believed she was drunk because she was incoherent and fumbling with a closet door in the hallway. What he actually said was that she was "a little pesty" which means "a little agitated" and mistook the closet in the hallway with a restroom (which would be natural since she had never been there).  GAMINO tried to feed him the words he wanted to hear, asking him if Arshia was "drunk, intoxicated, or coherent" to which Austin responded that she was "incoherent" in the hallway, but more "coherent" later in Mr. Premjee's bedroom.  GAMINO pressed, "When you talked to her, was her speech slurred?"  Austin responded, "only in the hallway."  None of this exchange made it into GAMINO's written report.  With respect to Kavya GAMINO asked if Arshia "seemed like she was drunk, buzzed, incoherent?"  Kavya responded "tipsy."  Several minutes later, he asked her again, "Did she seem tipsy or drunk?"  Kavya responded again, "tipsy, yes, from what I remember tipsy, I never saw her

like falling anywhere."  From this point on, Kavya would be referred to as an "uncooperative witness."  GAMINO interviewed Arshia on July 19, just a few days before the criminal preliminary hearing, about the sexual gesture she made outside of Banditos.  Again, the audio interview was quite different from the written report of that interview:  GAMINO's written report stated "Arshia viewed the video, she stated she had no memory of making the gesture, and felt embarrassed after seeing the video."  In fact, the audio reveals what Arshia actually said, "it's obvious" what she was doing when she made the gesture and "[she] was not that drunk."  GAMINO and ZUNIGA never showed Arshia the entirety of the Banditos video showing her kissing Mr. Premee and their interactions, only the portion with the sexual gesture.

GAMINO's and ZUNIGA's re-interviews were an attempt to influence eyewitnesses to modify their original statements, undermining, glossing over, and omitting facts which evidenced a consensual sexual encounter.  They did not interview the Uber drivers until after the arrest, around April 17.

### 12.   The Dep. District Attorney's Role.

Lana Kim was the prosecutor who filed the charges against Mr. Premjee. She testified that at the time she filed initial charges against Mr. Premjee, the only information she had were (1) the oral summary provided to her by GAMINO (2) Mr. Premjee's text message (3) Tanaka's statements to the original police officer [Meraz], to the detectives, and herself (not recorded anywhere), and (4) Arshia's alleged BAC of .32 at the time she was at the hospital.  She did not review the videos prior to filing charges.  D.A. Kim's belated claim, now, that none of the other information the detectives had but did not give her at the time of filing would have changed her opinion about filing charges against Mr. Premjee is inconsistent with the independent judgment that a reasonable D.A. is required to exercise.  Any reasonable D.A. would expect detectives to give him or her all of the information

and evidence, not a one-sided and biased version of the evidence as occurred here. D.A. Kim could not remember receiving the information about Arshia's "legs being wrapped" around Mr. Premjee's "back during the sex" before charges were filed, and when asked if she would expect detectives to tell her such a fact, and about witnesses who heard "moans of a man and a woman enjoying sex," Lana Kim responded half-heartedly, "I guess so." As for Kavya's statements, Kim described her as an "uncooperative witness" even though she was interviewed twice. She said one of the detectives told her she was uncooperative. Lana Kim agreed that being intoxicated does not mean you cannot consent to sex. She also agreed "Black out drunk" did not mean "unconscious" or "lack of awareness" when Mr. Premjee used it in his text. Lana Kim formally charged Mr. Premjee on May 2, 2017, and the same day the D.A.'s office sent out a Press Release to the media describing the charges of "rape by use of drugs and sexual penetration by a foreign object," and identifying Mr. Premjee.

## II. CLAIMS AND DEFENSES

**PLAINTIFF'S CLAIMS:**

**(a)    At trial, Plaintiffs plan to pursue the following claims against the following defendants:**

**Claim 1**:    **Arrest without probable cause (Fourth Amendment).**

The defendant Detectives arrested Plaintiff without probable cause in violation of his Fourth Amendment rights and 42 U.S.C. § 1983. This resulted in his wrongful arrest and wrongful charge.

Elements:

1.    The Detectives acted under color of law;

2.    The Detectives lacked probable cause to arrest the Plaintiff;

3.    Plaintiff was arrested;

4.    The arrest caused injury or harm to the Plaintiff

1  *See* Ninth Circuit Manual of Model Jury Instructions No. 9.2

2      **Claim 2:**    **Fabrication and Concealment of Evidence**

3        The defendant Detectives deprived Plaintiff of his right to due process of law

4  by fabricating and/or manipulating evidence during their investigation of Plaintiff in

5  violation of his Fourteenth Amendment rights and 42 U.S.C. §1983.

6  Elements:

7      1.    The Detectives acted under color of law;

8      2.    The Detectives fabricated and/or concealed evidence that was used to

9          criminally charge the Plaintiff;

10      3.    The Detectives continued their investigation of Plaintiff despite the fact

11          they knew that the Plaintiff was innocent, or were deliberately

12          indifferent to Plaintiff's innocence, and the results of the investigation

13          were used to criminally prosecute the Plaintiff;

14      4.    The Detectives used techniques that were abusive, or were deliberately

15          indifferent that those techniques would yield false information that was

16          used to criminally prosecute the Plaintiff;

17      5.    The Detectives' actions were a cause of Plaintiff's continued wrongful

18          arrest and charge.

19  *See* Ninth Circuit Manual of Model Jury Instructions Nos. 9.3, 9.33; *Devereaux v.*

20  *Abbey*, 263 F.3d 1070 (9th Cir. 2001).

21      **Claim 3:**    Deprivation of Civil Rights – *Brady* Violations

22        The defendant Detectives failed to provide exculpatory and impeachment

23  evidence to the Los Angeles County District Attorney's Office when they presented

24  the case for filing in violation of Plaintiff's Fourteenth Amendment rights and 42

25  U.S.C. §1983, which resulted in his criminal prosecution.

26  Elements:

27      1.    The Detectives acted under color of law;

28

2.    The Detectives suppressed or attempted to suppress evidence;

3.    The evidence was exculpatory;

4.    The evidence was material;

5.    The Detectives' acts or omissions deprived the Plaintiff of his rights and resulted in his harm or prejudiced the Plaintiff.

*See* Ninth Circuit Manual of Model Jury Instructions No. 9.3; *Brady v. Maryland*, 373 U.S. 83 (1963); *Giglio v. U.S.*, 405 U.S. 150 (1972); *Strickler v. Greene*, 527 U.S. 263, 263 (1999).  Evidence is "exculpatory" when it is favorable to the accused, whether because it tends in any way to negate guilt, or because it is impeaching.  *United States v. Bagley*, 473 U.S. 667, 676 (1985); *Strickler v. Greene*, 527 U.S. at 263.

**Claim 4:    Malicious Prosecution (Fourteenth Amendment)**

The defendant Detectives used false or misleading evidence in their investigation of, and to charge Plaintiff for, the alleged rape of Arshia in violation of Plaintiff's Fourteenth Amendment rights and 42 U.S.C. §1983.  This resulted in Plaintiff's wrongful arrest and wrongful charge.

Elements:

1.    The Detectives acted under color of law;

2.    The evidence used by the Detectives was false or misleading;

3.    Defendants knew or should have known the evidence was false or misleading;

4.    The evidence was material;

5.    Defendants' actions were the cause of Plaintiff's wrongful prosecution.

*See Awabdy v. City of Adelanto*, 368 F.3d 1062, 1067 (9th Cir. 2004).  *Newman v. County of Orange,* 457 F.3d 991, 994–95 (9th Cir. 2006).

**Claim 5:    Monell Violations**

*Monell* liability may also attach based on a policy of inaction that

demonstrates deliberate indifference to constitutional rights. "[A] local governmental body may be liable if it has a policy of inaction and such inaction amounts to a failure to protect constitutional rights." *Oviatt v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992) (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). The Defendant Detectives failed to conform their conduct to basic law enforcement standards. Well-trained Detectives do not engage in unduly suggestive questioning of witnesses, or omit material information in their reports that are favorable to criminal defendants, nor do well-trained Detectives fail to provide evidence and information to prosecutors when they present the case for filing.

Elements of Plaintiff's Claim for Monell Liability—Failure to Train:

1. The acts of the Defendants deprived the Plaintiff of his constitutional rights;

2. The Defendants acted under color of state law;

3. The training policies of Defendant City of Los Angeles were not adequate to train its police officers to handle the usual and recurring situations with which they must deal;

4. Defendant City of Los Angeles was deliberately indifferent to the obvious consequences of its failure to train its police officers adequately; and

5. The failure of Defendant City of Los Angeles to provide adequate training caused the deprivation of Plaintiff's rights; that is, Defendant City's failure to train is so closely related to the deprivation of the Plaintiff's rights as to be the moving force that caused the ultimate injury.

*Monell*, 436 U.S. at 691; *Oviatt*, 954 F.2d at 1474; *Larez*, 946 F.2d at 646; Ninth Circuit Model Jury Instruction 9.8—Section 1983 Claim Against Local Governing Body Defendants Based on a Failure to Train—Elements and Burden of Proof.

1

**Claim 6:      Negligence**

2

The Defendant Detectives have a duty to use reasonable care to prevent harm

3

or injury to others.  Defendants breached this duty of care. This resulted in injury or

4

harm to Plaintiff.  The City is vicariously liable for the Defendants' conduct.

5

Elements:

6

      1.      That Defendant Detectives had a duty to use reasonable care;

7

      2.      Defendant Detectives breached that duty;

8

      3.      Plaintiff was harmed; and

9

      4.      That Defendant's negligence was a substantial factor in causing

10

Plaintiff's harm.

11

*See* Cal. Government Code 815.2, CACI 400, Negligence

12

**Claim 7:      Bane Act Violation-Civil Code 51, 52.1**

13

The City is vicariously liable pursuant to Cal. Gov. Code § 815.2(a).

14

The Ninth Circuit in *Reese v. County of Sacramento*, 888 F.3d 1030 (9th Cir.

15

2018) stated, "it is not necessary for the defendants to have been 'thinking in

16

constitutional *or legal terms* at the time of the incidents, because a reckless

17

disregard for a person's constitutional rights is evidence of a specific intent to

18

deprive that person of those rights.'" 888 F.3d 1030 (9th Cir. 2018) (quoting *United*

19

*States v. Reese*, 2 F. 3d 870 (9th Cir. 1993).

20

Elements of Plaintiffs' Claim under Cal. Civil Code § 52.1:

21

      1.  The Defendants acted under color of law;

22

      2.  The Defendants interfered with Plaintiff's constitutional rights to be free

23

          from unreasonable seizure;

24

      3.  The Defendants intended to deprive Plaintiff of his enjoyment of the right

25

          to be free from unreasonable seizure;

26

      4.  That Plaintiff Premjee was harmed; and

27

28

1    5.    That Defendants' conduct was a substantial factor in causing Plaintiff

2    Premjee's harm.

3    *See* Cal. Government Code 815.2, Civil Code § 51, 52.1.

4    **Claim 8:    False Arrest/ False Imprisonment**

5    Elements:

6    1.   The Defendants intentionally deprived the Plaintiff of his freedom of

7         movement by use of force, menace, and unreasonable duress;

8    2.   The restraint, confinement, or detention compelled Plaintiff to stay or go

9         somewhere for some appreciable time;

10   3.   The Plaintiff did not knowingly or voluntarily consent;

11   4.   The conduct of the Defendants was a substantial factor in causing harm to

12        Plaintiff; and

13   5.   The Plaintiff suffered harm.

14   *See* CACI 1400, 1401, 1402.  The City is vicariously liable for the Defendants'

15   conduct.

16   **Claim 9:    Intentional Infliction of Emotional Distress**

17   Elements:

18   1.    That Defendants' conduct was outrageous;

19   2.    That Defendants intended to cause Plaintiff Premjee emotional distress;

20   or

21   3.    That Defendants acted with reckless disregard of the probability that

22         Plaintiff would suffer emotional distress;

23   4.    That Plaintiff suffered severe emotional distress; and

24   5.    That Defendants' conduct was a substantial factor in causing Plaintiff's

25         severe emotional distress.

26   *See* Cal. Government Code 815.2 (a), CACI 1600.  The City is vicariously liable

27   for the Defendants' conduct.

28

**(b)** **In brief, the key evidence Plaintiff relies on for each of the claims is:**

1. Testimony of Plaintiff Armaan Premjee;

2. Testimony of Sophia Premjee

3. Testimony of Sonia Premjee

4. Testimony of Defendant Oscar Gamino;

5. Testimony of Defendant Carla Zuniga;

6. Testimony of Hiram Meraz;

7. Testimony of Julio Quintanilla (formerly Julio Zamora);

8. Testimony of Arshia Saxena;

9. Testimony of Kavya Nayar;

10. Testimony of Madison Seeley;

11. Testimony of Tanika Mehra;

12. Testimony of Celine Wilbert;

13. Testimony of Ronniecia Stringfellow;

14. Testimony of Arthur Kazaryan;

15. Testimony of Plaintiff's Expert Steven Levine;

16. Testimony of Plaintiff's Expert in Police Practices Roger Clark;

17. Testimony of Plaintiff's Non-Retained Expert Harland Braun;

18. Testimony of Judge Michael Pastor

19. Plaintiff will also rely on additional witnesses who will be listed in Plaintiff's Witness List and documentary evidence to be filed in the Joint Exhibit List

**DEFENDANTS' CLAIMS:**

**(c)** **Counterclaims and Defenses**

Plaintiffs anticipate that Defendants may assert some or all of the following defenses on behalf of Defendants Gamino and Zuniga:

1. Plaintiff was not arrested without probable cause;

2.      Defendants are entitled to qualified immunity;

3.      Plaintiff was not maliciously prosecuted;

4.      Defendants did not engage in wrongdoing or in any constitutional violations.

### III.  ANTICIPATED EVIDENTIARY ISSUES

The following motions in limine were filed by Plaintiff and are pending:

1.      Motion in Limine No.1 to exclude the entire USC Title IX investigation, including witness interviews, findings and conclusions.

2.      Motion in Limine No. 2 to exclude Arshia's BAC results without proper foundation, including Det. Gamino's hearsay statements in this regard, Dr. Keaton's testimony in this regard; and to exclude Dr. Keaton's opinions that her BAC was "decreasing" and was "higher" at the time of the sex.

3.      Motion in Limine No. 3 to exclude DDA Lana Kim's opinions as follows: (1) that Detectives did nothing wrong; (2) that she would have filed the case irrespective of the information/evidence not given to her at the time the case was presented for filing; and (3) opinions that Judge Pastor misunderstood or misapplied the law.

4.      Motion in Limine No. 4 to exclude and/or limit the text messaging between Plaintiff and Harsh Godhwani, and Godhwani's opinions.

### IV.  ANTICIPATED ISSUES OF LAW

See, the issues of law identified in Defendants' Memorandum of Contentions of Law and Fact.  (Dkt#62, page 8)

### V.  BIFURCATION

Defendants seek to bifurcate liability and *Monell* and punitive damages. Plaintiff opposes bifurcation but does not oppose bifurcation of the amount of punitive damages.

## VI.   JURY TRIAL

The parties agree that this shall be a trial by jury.

## VII.   PRAYER FOR RELIEF

On each of his claims for relief, Plaintiff seeks special and general damages, and punitive damages (except on his negligence claim) according to proof at trial, and reasonable costs of suit.  If Plaintiff prevails on a federal claim, reasonable attorney fees are recoverable pursuant to 42 U.S.C. §1988 and Cal. Code Civ. Proc. § 1021.5.  Under the provisions of Cal. Civ. Code §52(b), Defendants are also liable for reasonable attorney's fees and a civil penalty of $25,000 on Plaintiffs' Bane Act claim.

## VIII.  ABANDONED CLAIMS AND DISMISSED PARTIES

Plaintiff voluntarily dismissed his negligent training and supervision from his sixth claim for relief and dismissed Chief Beck as a named defendant.

Dated:  October 18, 2019                LAW OFFICES OF VICKI I. SARMIENTO
                                        LAW OFFICES OF DALE K. GALIPO


                              By:  _____/s/ *Vicki I. Sarmiento*_____
                                        Vicki I. Sarmiento
                                        *Attorneys for Plaintiff*