1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10  ARMAAN KARIM PREMJEE,              Case No. CV 18-04998-AB (RAOx)

11                    Plaintiff,       **ORDER GRANTING IN PART AND
                                       DENYING IN PART DEFENDANTS'**
12                                     **MOTION FOR SUMMARY**
                                       **JUDGMENT [DKT. NO. 37]**
13  v.

14  CITY OF LOS ANGELES, et al.,

15                    Defendants.

16

17        Before the Court is a Motion for Summary Judgment ("Motion," Dkt. No. 37)

18  filed by Defendants City of Los Angeles ("City"), Chief Charlie Beck, Detective

19  Oscar Gamino, and Detective Carla Zuniga (collectively, "Defendants"). Plaintiff

20  Armaan Karim Premjee ("Plaintiff") filed an opposition and Defendants filed a reply.

21  The Court heard oral argument on September 27, 2019. For the following reasons, the

22  Motion is **GRANTED** in part and **DENIED** in part.

23  **I.    BACKGROUND**

24        Plaintiff asserts claims under 42 U.S.C. § 1983 for violation of his civil rights

25  and corresponding state law claims arising out of his arrest for violating Cal. Penal

26  Code § 261(a)(4) (rape of an unconscious person) after a sexual encounter with a

27  fellow college student, and his subsequent prosecution for violating Cal. Penal Code §

28  261(a)(3) (rape of an intoxicated person).

                                        1.

The basic facts are as follows. Sometime shortly after midnight on April 1, 2017, Plaintiff and the alleged victim, Arshia, met at the Banditos bar near the USC campus. They did not know each other prior. Arshia had consumed some amount of alcohol. After a short time, by around 12:38 a.m., they decided to have sex. Plaintiff ordered an Uber to take them to his fraternity house where he lived. Plaintiff's fraternity brothers told him that Arshia could not stay at the fraternity house because she was too intoxicated, so Plaintiff called another Uber to take Arshia back to her dorm at Fluor Tower, and Plaintiff accompanied her. After they reached Arshia's dorm suite, Plaintiff and Arshia had sex on an air mattress in the common area (or living room) of the suite. Subsequently, two or three of Arshia's roommates, who were in their own rooms, realized Arshia was having sex with someone in the common area. Moments after it was over, at least two of the roommates went into the common area and saw Arshia on the air mattress, and chided Plaintiff for having sex with her because she was intoxicated. Plaintiff left the building shortly thereafter, at about 1:28. a.m. The roommates tried to rouse Arshia, but she was not responding to them. They called the resident assistant for help, and then called an ambulance, which took Arshia to the hospital. Arshia was diagnosed with alcohol poisoning.

Thereafter, Plaintiff was arrested and ultimately charged with violating Cal. Penal Code § 261(a)(3) (rape of an intoxicated person). At the preliminary hearing, the judge dismissed the case for lack of probable cause.

Plaintiff's First Amended Complaint ("FAC," Dkt. No. 9) asserts the following claims against the City, Chief of Police Charlie Beck, Detective Oscar Gamino, and Detective Carla Zuniga: (1) a § 1983 claim for arrest without probable cause in violation of the Fourth Amendment; (2) a § 1983 claim for fabrication/concealment of evidence in violation of the Fourteenth Amendment right to due process; (3) a § 1983 claim for *Brady* violations; (4) *Monell* claims against the City; (5) a § 1983 claim and state common law claim for malicious prosecution; (6) negligence; (7) Bane Act violations; (8) false arrest/false imprisonment; and (9) intentional infliction of

emotional distress. Plaintiff agrees to dismiss the claims against Chief Beck, and the negligence claim, so the Court will dismiss them on that basis and not address them further. Defendants move for summary judgment.

## II.   UNDISPUTED FACTS

In light of the claims and defenses in this case, many of which turn on whether the Detectives had probable cause, many of the material facts are what the Defendants learned in their investigation, and when. Such facts are reflected in the Police Reports ("Police Reports") (Young Decl. (Dkt. No. 37-3) Ex. D ("Ex. D"). Although both sides describe certain aspects of the investigation in detail, neither side clearly sets out the chronology of the investigation on that first day. The Court discerned the missing portions of the chronology from the Police Reports. The undisputed facts, based on these reports, establish that the investigation proceeded as follows.

### A. Witness Statements Gathered In The Investigation

On April 1, at around 4:15 a.m., the Los Angeles Police Department was called to investigate a possible sexual assault. Shortly thereafter, Officers Meraz and Zamora interviewed 5 people at Arshia's dorm, including her friend Kavya who went to Banditos with her; the dorm security guard Ronniecia Stringfrilow; and Arshia's roommates Tamika, Ceci, and Madison. (Ex. D, pp. 109-110.) Kavya said that Arshia seemed happy and was socializing while at Banditos, but she and Arshia parted at Banditos so she did not know what happened thereafter. Stringfrilow said Arshia was flirting with Plaintiff and hanging onto him and hugging him, that they seemed like a happy couple, and that she had a pleasant conversation with them. Tanika had just come home and saw a "big brown butt" on the mattress in the middle of the room, so she went immediately into her bedroom which she shared with Ceci. Tanika and Ceci both described hearing moaning sounds of a man and woman enjoying sex. When the sounds stopped, they went into the living room and saw Arshia laying nude on the mattress. They tried to wake her but she was not responding. Plaintiff came from the restroom, and they asked him what happened, and he said "I'm sorry, we didn't mean

3.

to wake anybody" (Tanika's account) and "We are wasted and she was all over me last night" (Ceci's account). Plaintiff put on his pants and shoes and left. Madison also saw Plaintiff and Arshia having sex as she went to use the restroom. She observed seeing a man kneeling on the bed with a woman's legs around his back. Then Plaintiff came into the restroom, using a different stall. Madison felt uncomfortable and waited for him to leave. When Madison left the restroom, she saw Arshia unconscious with Tanika and Ceci trying to wake her without success. Officers Meraz and Zamora also collected evidence from the scene including bed sheets, pillow cases, a used condom and wrapper from the trash, and Arshia's clothes. Meraz and Zamora are not defendants in this case.

Thereafter, the investigation was assigned to defendants Detectives Gamino and Zuniga.

On April 1 at around 7:00 a.m., the Gamino and Zuniga went to Plaintiff's residence and took him into custody.[1] (Ex. D, p. 111.) He had been asleep in his room, but was handcuffed and placed in a police car. (Pl.'s Fact No. 33.) He was transported to a police station and locked in a cell without explanation, then was taken in handcuffs to a hospital in Santa Monica where he underwent an invasive medical examination, and was then transported back to jail and placed in a cell. (Pl.'s Fact No. 33, 34.)

On April 1 at around 11 a.m.—after the officers took Plaintiff into custody but before they interviewed him—Gamino and Zuniga went to hospital where the ICU nurse advised them that Arshia was sedated and intubated, that she had a blood alcohol level of 0.325 and tested positive for cannabinoids, and that her diagnosis was

---

[1] Plaintiff's account of his arrest is taken from his declaration. *See* Pl.'s Additional Facts Nos. 33-47. Defendants purport to dispute all of these facts on the ground that Plaintiff relies solely on his own declaration and did not question the detectives about these events at deposition. This is not a valid ground for disputing the proffered facts so the Court deems them undisputed.

4.

alcohol poisoning.  Then they interviewed Arshia at the hospital. (Ex. D, pp. 114-115.) Arshia explained that she and Kavya went to Banditos, she drank two shots, and that was all she could remember. The officers told her what they learned through the investigation, and when questioned, she responded that she did not know the suspect by name. She cried and said, "It was unfair that someone would do that to me when I was in that state," said that nothing like that had happened to her before, and described having no memory at all—a "complete black-out." (Ex. D 115.)

On April 1 at around 1:40 p.m., Plaintiff was taken to a different room, his handcuffs were removed, and he was interviewed by Gamino and Zuniga for about an hour. (Pl.'s Fact No. 35.) Plaintiff was Mirandized and agreed to talk with the officers, giving his account of the events of the evening for about 45 minutes. The bottom line of Plaintiff's account was that Arshia kept insisting that they have sex, that he was reluctant because he did not want her to regret it considering their conservative upbringing, but she insisted. Plaintiff said that Arshia continuously gave consent and was insistent, and that he was the one who had to be persuaded. Plaintiff also provided the officers his phone, which showed that he sent the following WhatsApp messages to a friend starting at 1:29 a.m., right after he left Arshia's apartment: "Bro I fucked up. Or at least I think I did . . . I don't know if this qualifies as sexual assault or not: this girl was blackout drunk but really wanted me to fuck her. Initially I said no way because she was so drunk and I didn't want her to make a decision she would regret the next day. After constant persuasion by her I finally agreed. And eve during sex, she was sloppy and all over the place But I did it anyways. And I feel so bad When she met me she was blackout drunk, when we had sex she was still blackout drunk. She could not walk straight . . ." (Ex. D, pp. 115-118.)

On April 1, at about 2:45 p.m., Gamino and Zuniga returned to the ICU and met Tanika there. She showed them a picture from Arshia's Snapchat account showing Arshia and Kavya at Bandito's at 12:39 a.m. Tanika said she was very concerned about Arshia's health because she said she smoked marijuana every day and often

1    cross-faded, meaning she smoked marijuana and drank alcohol at the same time.

2        On April 4, the officers conducted a follow-up interview with roommate Tanika

3    where she gave a few more details, including that once she found Arshia on the

4    mattress after she and Plaintiff had sex, she yelled at Arshia "what the fuck are you

5    doing? Are you drunk" but that Arshia did not respond and was completely

6    unresponsive, that she yelled at Plaintiff "can't you see that she's fuckin drunk?" and

7    he responded that they were both wasted. After Plaintiff left, Tanika covered Arshia

8    with a blanket, tried to shake her and wake her, including by pouring water on her

9    face, but nothing worked and she remained nonresponsive. At some point Arshia

10   stood up but then collapsed face first on the floor. After trying for a while to wake her,

11   they called the resident assistant then an ambulance. (Ex. D, pp. 119-120.)

12       On April 5, the officers interviewed Plaintiff's frat brothers Austin Ridgway

13   and Frank Aimetti. They stated that they saw Arshia stumble out of the Uber, that she

14   had to leave because she was intoxicated and they did not want her to be in Plaintiff's

15   room, that it looked like Plaintiff had pretended to call an Uber for her but really

16   didn't and instead was taking her back to his room, that Arshia was drunk and

17   bumping into the walls, that she was incoherent and it appeared she could not

18   understand anything said to her, and that they reported the incident to the Title IX

19   coordinator the next day. (Ex. D, p. 120.)

20       On April 6, Gamino conducted follow-up phone interviews of Kavya and Ceci.

21   Kavya did not provide much additional information. Ceci added that Arshia had "lazy

22   and darting eyes," that she smiled and then passed out. She said at first she thought

23   Arshia was having "conscious sex" but then noticed that Arshia could not tell that

24   Ceci was yelling at her, that she had "drunk eyes" and was visibly "not with it"

25   before she passed out, that she would not respond verbally and it appeared she could

26   not understand at all what she was saying. She says her first reaction was to get Arshia

27   medical attention because she was drunk, and she didn't realize Arshia had been

28   sexually assaulted. (Ex. D, p. 120.)

6.

On April 10, Gamino conducted a follow-up phone interview of Madison. Madison added that when she saw Arshia, she appeared to be asleep but also "dead," and she believed she was excessively intoxicated. Madison also said that contrary to the officer's notes, she did not say at the first interview that Arshia's legs were wrapped around Plaintiff. Also, she reconsidered her opinion about what the moans meant, saying that was a hard judgment to make. However, knowing the situation better, she thought the moans were less pleasure moans and more like just noise, but she really thought this was not a judgment she could make. (Ex. D, pp. 120-121.)

On April 11, Arshia was interviewed and did not add anything material to her statement. (Ex. D, p. 122.)

On April 11, the Officers took Arshia and Taneka for a pre-filing interview with Deputy District Attorney Lana Kim who interviewed them separately. (Ex. D, p. 122.)

On April 11, the officers arrested Plaintiff for violation of Penal Code §261(a)(4), rape of an unconscious person, but the police report notes that the correct booking code is Penal Code. § 261(a)(3), rape of an intoxicated person, which is what Plaintiff was charged with.

On April 17, Gamino interviewed the Uber driver who drove Plaintiff and Arshiua to the frat house. (Ex. D, pp. 124-125.) As relevant, he said Arshia looked drunk and seemed way more intoxicated than Plaintiff, that her speech was slurred and she smelled of alcohol, that another passenger in the back seat appeared uncomfortable because Arshia and Plaintiff were kissing each other aggressively so she moved to the front seat, that Arshia straddled Plaintiff, and that when he left them off, Plaintiff helped Arshia out of the car and helped her to walk. On April 18, Gamino met with the Uber driver who took them from the frat house to Fluor Tower, but he could not remember anything. These interviews of the Uber drivers were memorialized in a May 31 report.

On July 19, Gamino and Zuniga interviewed Arshia over Skype. They showed her the video of herself making a gesture behind Plaintiff's back suggesting sexual

intercourse (see below). Arshia said she didn't remember making the gesture but felt embarrassed. (Ex. D, p. 126.)

The Police Reports also include notes of interviews with a number of other witnesses, such as the paramedics who transported Arshia from Fluor Tower to the hospital, the other passenger in the first Uber from Bandito's, the Nurse who drew Arshia's blood, the USC Public Safety Officers who responded to Arshia's dorm on April 1, and the doctor who treat Arshia at the hospital. (Ex. D, p. 128-132.) For example, the doctor stated that Arshia had been so intoxicated that she needed to be intubated because she risked asphyxiation, that she was almost unconscious when he first saw her, and that based on the altered state he saw Arshia in, she could not have consented to any sexual acts. (Ex. D, pp. 132.) The detectives also obtained notes of a statement given by the resident assistant at Fluor Tower to USC's Title IX coordinator. (Ex. D., pp. 133-135.) The parties' briefs do not incorporate these statements, however, so the Court will not address them in its analysis.

**B. Videos Gathered In The Investigation**

At some point that is difficult to identify from the papers, Gamino and Zuniga obtained and viewed videos of Plaintiff and Arshia at Banditos and in the lobby of Arshia's dorm. Unfortunately and inexplicably, although both sides argued that these videos were important, neither side provided them to the Court with the motion papers but apparently expected the Court to rely on their differing characterizations of the videos. Months later, while the Motion was under submission, Plaintiff sought leave to lodge two short videos in a supplemental filing. The Court accepted the filing over Defendants' objection. The Court will describe the videos.

First, there is a 1 minute and 20 second video showing Plaintiff, Arshia, and Kavya at the corner outside Bandito's waiting for an Uber. Plaintiff and Arshia are goofing off, flirting, using their phones and taking pictures, and Arshia makes a gesture behind Plaintiff's back apparently suggesting she and Plaintiff were going to have sex. At the end, Arshia and Plaintiff leave in an Uber.

The second video is 28 seconds long and shows Plaintiff and Arshia entering the lobby of Fluor Tower, checking in with the guard, then entering an elevator. Arshia is smiling and is a little wobbly and unsteady on her feet. She appears to have a little trouble pressing the elevator button then gestures for Plaintiff to come towards her. After Plaintiff checks in with the guard, he goes over to Arshia at the elevator. Arshia is not entirely visible because Plaintiff is between her and the camera, but she seems to put her arms around Plaintiff's waist and apparently leans on to him, and when the elevator arrives he has to prod her to move into it, and she does so. This may be the portion that Detective Zuniga describes as showing that Plaintiff had to hold Arshia up. The elevator door closes and the video ends.

At his deposition Detective Gamino refers to a third video showing Arshia and Plaintiff inside Bandito's. *See* Reply Ex. 1. This video was not provided to the Court. Only Plaintiff's brief describes this video. Based on Plaintiff's description and the brief excerpt of Gamino's deposition, it shows in relevant part Arshia consuming several drinks, coming on to Plaintiff and kissing him, and then leading him by the hand out of the bar.

The prosecutor viewed these videos before the preliminary hearing. (Defs' Fact No. 27.)

**C. Plaintiff's Prosecution and Dismissal of the Charge**

On April 13, the detectives submitted the case to the district attorney's office for filing consideration.

On May 2, the prosecutor charged Plaintiff with violating § 261(a)(3) and § 289(e); the § 289(e) charge was later dropped and is not in issue.

On July 24-26, the preliminary hearing took place. The judge dismissed the § 261(a)(3) charge, finding that the prosecution had not established penetration (although that was not contested) and that Arshia gave consent and never withdrew it.

## III.   LEGAL STANDARD

A motion for summary judgment must be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party bears the initial burden of identifying the elements of the claim or defense and evidence that it believes demonstrates the absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the nonmoving party will have the burden of proof at trial, the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case. *Id*. The nonmoving party then "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248.

"Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must draw all reasonable inferences in the nonmoving party's favor. *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Anderson,* 477 U.S. at 255). Nevertheless, inferences are not drawn out of thin air, and it is the nonmoving party's obligation to produce a factual predicate from which the inference may be drawn. *Richards v. Nielsen Freight Lines,* 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), *aff'd,* 810 F.2d 898 (9th Cir. 1987). "[M]ere disagreement or the bald assertion that a genuine issue of material fact exists" does not preclude summary judgment. *Harper v. Wallingford*, 877 F.2d 728, 731 (9th Cir. 1989).

## IV.   DISCUSSION

### A. Defendants Are Entitled To Summary Judgment as to Plaintiff's Wrongful Arrest Claims (Counts 1 and 8) Based on the April 11, 2017 Arrest Only.

Plaintiff alleges that his arrest on April 1 and his re-arrest on April 11 were without probable cause in violation of the Fourth Amendment (count 1, a §1983

10.

claim) and state law (count 8, under California common law).

Defendants' motion does not address the April 1 arrest at all. At oral argument defense counsel stated that the wrongful arrest claims were not based on the April 1 arrest but only on the April 11 arrest. This is incorrect: the FAC plainly alleges within the section pleading the first claim, "When Defendants caused Plaintiff to be arrested on April 1, 2017, and on April 11, 2017, without probable cause, they violated his right. . ." FAC ¶ 60. Also, Plaintiff's opposition expressly references the April 1 arrest as a basis for this claim, yet Defendants entirely failed to address it in their reply. Plaintiff plainly based some of his claims on the April 1 arrest, but such claims were simply not a subject of this motion, so they survive. Defendants herein, like any litigants, must make all necessary arguments in their motions and meet the applicable burdens, and it is certainly not the Court's place to shore up such omissions.

The Court turns to the April 11 arrest. On that date, Plaintiff was arrested for violating Cal. Penal Code § 261(a)(4), rape of an unconscious person; the charge was later changed to § 261(a)(3), rape of an intoxicated person. These charges are similar and both sides frame the key issue as whether there was probable cause to arrest Plaintiff for violating § 261(a)(3). Therefore, the Court will address the issue as framed by the parties.

Section 261(a)(3) states that rape occurs "where a person is prevented from resisting by any intoxicating or anesthetic substance, or any controlled substance, and this condition was known, or reasonably should have been known by the accused." Under this statute, consent given by an intoxicated person under those circumstances is deemed ineffective. Constructive knowledge, based on a reasonable person standard, that the victim's condition prevented them from resisting satisfies the knowledge requirement of § 261(a)(3). *People v. Linwood*, 105 Cal.App.4th 59, 68-72 (2003). "[C]ommonly recognizable indications of a person's intoxication, including an odor of alcohol, slurring of speech and unsteadiness, [can] enable one to reasonably determine if another no longer has the ability to resist." *Id.* at 70. By the same token,

an "honest and reasonable but mistaken belief that a sexual partner is not too intoxicated to give legal consent to sexual intercourse is a defense to rape by intoxication." *People v. Giardino*, 82 Cal. App. 4th 454, 472 (2000).

Defendants contend, first, that there was probable cause to arrest Plaintiff for violating § 261(a)(3), and second, if there was no probable cause, then they are entitled to qualified immunity. Having considered the entire record regarding this claim, the Court finds that Defendants are entitled to qualified immunity.[2]

### 1. Legal Standard for Qualified Immunity

"[O]fficers are entitled to qualified immunity under § 1983 *unless* (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *D.C. v. Wesby*, 138 S. Ct. 577, 589 (2018) (citing *Reichle v. Howards*, 566 U.S. 658, 664, (2012)) (emphasis added). "Clearly established" means that, at the time of the officer's conduct, the law was "'sufficiently clear' that every 'reasonable official would understand that what he is doing'" is unlawful, placing the unconstitutionality of the officer's conduct "beyond debate." *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). This standard protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). In the context of an allegedly unlawful arrest, the second prong may be phrased as "whether it is *reasonably arguable* that there was probable cause for arrest—that is, whether reasonable officers could disagree as to the legality of the arrest such that the arresting officer is entitled to qualified immunity." *Rosenbaum v. Washoe Cty.*, 663 F.3d 1071, 1076 (9th Cir. 2011) (emphasis in original).

---

[2] The Court declines to address whether probable cause exists here for several reasons, including the complicating factor of the judge's finding at the preliminary hearing that there was no probable cause to charge Plaintiff based in part on a fact that was not contested (whether there was penetration). Neither party adequately addressed the impact that determination should have on this court's analysis.

To be clearly established, a rule must be "settled law," *Hunter v. Bryant,* 502 U.S. 224, 228, (1991) (*per curiam*), which means it is dictated by "controlling authority" or "a robust 'consensus of cases of persuasive authority,'" *al–Kidd, supra,* at 741–742 (quoting *Wilson v. Layne,* 526 U.S. 603, 617 (1999)). The rule must also define the unlawful conduct with a degree of specificity sufficient so that it is "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz,* 533 U.S. 194, 202 (2001). A rule is too general if the unlawfulness of the officer's conduct "does not follow immediately from the conclusion that [the rule] was firmly established." *Anderson, supra,* at 641.

In recent cases, the Supreme Court has repeatedly stressed the importance of the specificity of the rule. In *D.C. v. Wesby*, 138 S. Ct. 577 (2018), the Court synthesized some of those decisions as follows:

> We have stressed that the "specificity" of the rule is "especially important in the Fourth Amendment context." *Mullenix [v. Luna,* 126 S.Ct. 305, 308 (2015) (*per curiam*)]. Probable cause "turn[s] on the assessment of probabilities in particular factual contexts" and cannot be "reduced to a neat set of legal rules." [*Illinois v. Gates,* 462 U.S. 213, 232 (1983).] It is "incapable of precise definition or quantification into percentages." [*Maryland v. Pringle,* 540 U.S. 366, 371 (2003).] Given its imprecise nature, officers will often find it difficult to know how the general standard of probable cause applies in "the precise situation encountered." *Ziglar v. Abbasi,* 582 U.S. ——, ——, 137 S.Ct. 1843, 1866, 198 L.Ed.2d 290 (2017). Thus, we have stressed the need to "identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment." *White v. Pauly,* 580 U.S. ——, ——, 137 S.Ct. 548, 552, 196 L.Ed.2d 463 (2017) (*per curiam* ); *e.g., Plumhoff [v. Rickard*, 572 U.S. ——, 134 S.Ct. 2012, at 2023 (2014)]. While there does not have to be "a case directly on point," existing precedent must place the lawfulness of the particular arrest "beyond debate." *al–Kidd, supra,* at 741, 131

S.Ct. 2074. Of course, there can be the rare "obvious case," where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances. *Brosseau v. Haugen,* 543 U.S. 194, 199, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (*per curiam* ). But "a body of relevant case law" is usually necessary to " 'clearly establish' the answer" with respect to probable cause. *Ibid.*

*Wesby*, 138 S. Ct. at 590.

### 2.  Legal Standard for Probable Cause

An arrest is supported by probable cause if, under the totality of the circumstances, a prudent person would have concluded that there was a fair probability the suspect had committed a crime. *Beck v. Ohio*, 379 U.S. 89, 91 (1964). The evidence need support only the probability, and not a prima facie showing, of criminal activity. *Franklin v. Fox*, 312 F.3d 423, 438 (9th Cir. 2002). "While conclusive evidence of guilt is of course not necessary under this standard to establish probable cause, '[m]ere suspicion, common rumor, or even strong reason to suspect are not enough.'" *United States v. Lopez,* 482 F.3d 1067, 1072 (9th Cir. 2007) (citation omitted). Under the collective knowledge doctrine, in determining whether probable cause exists for arrest, courts look to "the collective knowledge of all the officers involved in the criminal investigation." *United States v. Ramirez,* 473 F.3d 1026, 1032 (9th Cir. 2007) (citation and quotation marks omitted).

### 3.  The Officers Are Entitled to Qualified Immunity As To The § 1983 Wrongful Arrest Claim (Count 1)  Based On The April 11 Arrest.

In light of the foregoing, Detectives Zuniga and Gamino are entitled to qualified immunity as to the § 1983 wrongful arrest claim for Plaintiff's April 11 arrest. As in *Wesby*, the court starts by defining "'the circumstances with which [the officers] w[ere] confronted.'" *Wesby*, 138 S. Ct. at 590-591 (citing *Anderson*, 483 U.S., at 640). When they arrested Plaintiff on April 11, Gamino and Zuniga had inculpatory evidence including the witness statements stating that shortly after Plaintiff and Arshia

14.

had sex, Arshia was nonresponsive and ultimately an ambulance had to be called. They also had statements from Arshia that she could not remember anything that happened after they left Banditos, and that she had a "complete blackout," likely indicating some significant degree of intoxication. The detectives also had Plaintiff's own statements that he was reluctant to have sex with Arshia because she was very drunk. The detectives also had Plaintiff's WhatsApp messages saying, in essence, that he was reluctant to have sex with Arshia because she was too drunk, but he did so anyway and feels bad because she was blackout drunk before and during and couldn't walk straight, and he is concerned he committed a sexual assault. The detectives (and, later, the prosecutor) interpreted these messages to show that Plaintiff believed Arshia was too intoxicated to give legal consent, yet had sex with her anyway—conduct that clearly violates § 261(a)(3). The detectives also had the statements of Plaintiff's fraternity brothers that Arshia was too drunk to be at the house and needed to be taken home. Plaintiff argues that the detectives' interpretation of his text messages was "erroneous," but the possible existence of a self-serving contrary interpretation does not establish that the detectives' interpretation was clearly wrong and could not contribute to probable cause. As stated above, the standard for probable cause is low. Furthermore, "[o]nce probable cause to arrest someone is established [] a law enforcement officer is not 'required by the Constitution to investigate independently every claim of innocence, whether the claim is based on mistaken identity or a defense such as lack of requisite intent.' " *Broam v. Bogan*, 320 F.3d 1023, 1032 (9th Cir. 2003) (citation omitted). *See also Yousefian v. City of Glendale*, 779 F.3d 1010, 1014 (9th Cir. 2015) (officer entitled to make credibility determinations). Plaintiff points to other evidence that is arguably exculpatory, including the roommates' initial statements that the moaning seemed to indicate someone enjoying sex, Madison's original statement (which she denied making) that Arshia's legs were around Plaintiff while they were having sex, and the videos that show Arshia initiating contact with Plaintiff and being generally functional (and, by inference, capable of giving consent)

15.

all the way from Bandito's to the dorm lobby. Thus, the detectives were confronted with a combination of inculpatory and exculpatory evidence.

To show that the arrest was unlawful under clearly established law, Plaintiff merely states, "At the time of Mr. Premjee's arrests, the law was clearly established that an arrest without probable cause violates the Constitution. See, *McKenzie v. Lamb*, 738 F.2d 1005, 1007 (9th Cir.1984)," then goes on to cite the general standard for probable cause. *See* Opp'n 16:19-24. Plaintiff does not address the circumstances here with any greater specificity. For example, he points to no case holding that a combination of inculpatory and exculpatory evidence comparable (in any way) to that presented here does not give rise to probable cause. Based on this lack of authority, under Supreme Court precedent, the Court cannot find that it was clearly established at the time of Plaintiff's April 11 arrest that the evidence the detectives relied upon was insufficient to establish probable cause. And, this is not an "obvious case" where the arrest was clearly unlawful, obviating the need for greater specificity as to what law was clearly established. To the contrary, "it is *reasonably arguable* that there was probable cause for arrest." *Rosenbaum,* 663 F.3d at 1076. The Court therefore finds that, even if the April 11 arrest was unlawful, Plaintiff has not shown that any such law was clearly established, so the detectives are entitled to qualified immunity on this claim.

### 4. The Detectives Are Entitled to Immunity Against the State Law False Arrest Claim (Count 8) Based On The April 11 Arrest.

Under Cal. Penal Code § 847, a police officer cannot be held liable for false arrest or false imprisonment where "[t]he arrest was lawful, or the peace officer, at the time of the arrest, had reasonable cause to believe the arrest was lawful." Cal. Penal Code § 847(b)(1). Here, Defendants argue they are entitled to this protection because there was at least reasonable cause to believe the arrest was lawful. This standard appears to be similar to the qualified immunity analysis, which grants immunity if it was "reasonably arguable" that there was probable cause. In fact, regarding the

16.

applicability of § 847(b)(1) to the state law false arrest claim, both sides rely entirely on their probable cause and qualified immunity analysis regarding the § 1983 wrongful arrest claim without expressly addressing whether these standards are the same. In other words, the parties apparently agree that Defendants' § 847(b)(1) defense to the state law claim should be resolved the same way as their qualified immunity defense to the § 1983 claim. Therefore, for the reasons stated above, the detectives had at least reasonable cause to believe the April 11 arrest was lawful, so under § 847(b)(1) they are entitled to immunity as to the state law claim. Defendants are granted summary judgment as to this claim.

**B. Defendants Are Entitled to Judgment On The Malicious Prosecution Claim (Count 5) Under § 1983 and State Law.**

In order to prevail on a § 1983 claim of malicious prosecution, a plaintiff "must show that the defendants prosecuted [him] [1] with malice and [2] without probable cause, and [3] that they did so for the purpose of denying [him] equal protection or another specific constitutional right." *Freeman v. City of Santa Ana,* 68 F.3d 1180, 1189 (9th Cir. 1995).[3] It is presumed that a prosecutor exercises independent judgment in filing charges, and this precludes liability for those who participated in the investigation or filed a report that resulted in the initiation of proceedings. *Smiddy v. Varney,* 665 F.2d 261, 266–68 (9th Cir.1981). "However, the presumption of

---

[3] Defendants cite *Usher v. City of Los Angeles*, 882 F.2d 556 (9th Cir. 1987) (erroneously cited as F.3d) for the proposition that a malicious prosecution claim under § 1983 *incorporates* state law, and *Conrad v. United States*, 447 F.3d 760 (9th Cir. 2006) for the 3 elements of the California tort of malicious prosecution. *See* Mot. 11:12-17. These citations are off the mark. *Usher* does not hold that a § 1983 malicious prosecution claim *incorporates* state law. Rather, *Usher* states that a malicious prosecution claim is not cognizable under § 1983 if the state judicial system provides a remedy, unless a malicious prosecution is conducted with the intent to deprive someone of equal protection or otherwise deny their constitutional rights. Thus, malicious prosecution under § 1983 does not "incorporate" state law but instead requires an additional element: the intent to deprive someone of equal protection or constitutional rights. It follows that Defendants' citation to *Conrad* for the elements under § 1983 is off-point because it recites the elements of the California tort.

17.

prosecutorial independence does not bar a § 1983 claim against state or local officials who improperly exerted pressure on the prosecutor, knowingly provided misinformation to him, concealed exculpatory evidence, or otherwise engaged in wrongful or bad faith conduct that was actively instrumental in causing the initiation of legal proceedings." *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1067 (9th Cir. 2004). Thus, where the presumption of prosecutorial independence is rebutted, suit may be brought against other persons who wrongfully caused the charges to be filed. *Galbraith v. County of Santa Clara,* 307 F.3d 1119, 1126–27 (9th Cir. 2002). However, to overcome the presumption, a plaintiff must present "'ample evidence from which a reasonable jury could conclude that the arresting officers, through false statements and material omissions in their reports, prevented the prosecutor from exercising independent judgment.'" *Newman v. Cty. of Orange*, 457 F.3d 991, 996 (9th Cir. 2006) (citing *Barlow v. Ground,* 943 F.2d 1132, 1137 (9th Cir. 1991).

Here, Plaintiff alleges that Gamino and Zuniga interfered with the prosecutor's independent judgment by withholding and fabricating evidence. Upon review of Plaintiff's claims, the Court finds there is no triable issue.

First, the Court declines to consider the declaration of Plaintiff's expert Steven Levine (Dkt. No. 45) in connection with this Motion. Mr. Levine opines as to whether the Detectives' investigation was adequate and whether the prosecutor exercised independent judgment. The declaration is not sufficient to create a triable issue because it simply fails to grapple with the incriminating evidence upon which the Defendants and the prosecutor relied in arresting, investigating, and prosecuting Plaintiff, and therefore would not help the trier of fact resolve the material issues in this case.

Otherwise, Plaintiff's opposition in defense of this claim[4] focuses on the videos,

---

[4] Elsewhere in the opposition and in connection with other claims, Plaintiff refers to other evidence that the detectives allegedly did not disclose or fabricated, but Plaintiff does not expressly rely on this evidence to support his malicious prosecution claim.

18.

arguing that Gamino and Zuniga interfered with the prosecutor by failing to timely obtain, review, and present to the prosecutor the videos from Banditos and Fluor Tower. As stated above, it is not clear when and whether Gamino and Zuniga viewed the videos and disclosed them to the prosecutor. Gamino testified at the preliminary hearing that he viewed the Bandito's videos in portions sometime between April 6 and April 27 (Young Decl. Ex. C, pp. 81-83) and he testified at deposition that he made a report about it in July, which disclosed it to the prosecutor. (Young Decl. Ex. E, 145:21-23.) Gamino said he viewed the video from Fluor tower on April 20. (Young Decl. Ex. A., p. 33.) The prosecutor did not view the video outside Bandito's until after she filed charges, but she did view it before the preliminary hearing, and she viewed the Fluor Tower video before the preliminary hearing. *See* Young Decl. Ex. G 171:11-22; (Defs' Fact No. 27.). Regardless, the prosecutor stated that even if she had viewed these videos before filing charges, her decision would have been the same. Indeed, she did view all of the videos before the preliminary hearing and continued with the prelim anyway, so apparently the videos did not change her mind. *Id.* pp. 169, 171.

The Court has reviewed the videos and finds that they were simply not material to the prosecutor's decision. Plaintiff characterizes the videos as strongly exculpatory because they show Arshia consented to the encounter with Plaintiff. Defendants characterize the videos as strongly inculpatory because they show that Arshia had been drinking and was visibly intoxicated just before she and Plaintiff had sex. The Court has reviewed the videos (described above) and they are simply inconclusive: while they show Arshia willingly engaged with Plaintiff, they also showed that just

---

The Court will not assume that Plaintiff's malicious prosecution claim is based on this un-discussed evidence, nor would it be appropriate for the Court to supply such arguments for Plaintiff. Accordingly, the Court limits its analysis of the malicious prosecution claim to the basis Plaintiff argues in the opposition—the untimely disclosure of the videos—and will not address the other evidence discussed in relation to other claims.

prior to having sex with Plaintiff, she was intoxicated to some degree and thus she may or may not have had the capacity to consent. In short, the videos are equivocal and inconclusive on the key issues (e.g., Arshia's capacity), and otherwise redundant of the rest of the evidence. Furthermore, while Plaintiff argues that the videos are exculpatory because they show Arshia's consent, that is not the issue under § 261(a)(3); the issue is whether Arshia was too intoxicated to resist such that she lacked capacity to consent such that any consent that she apparently gave was not legally effective. The videos shed little light on the question of Arshia's capacity. In an ideal world, investigators would obtain, view, and share all of the evidence in short order, but that is not how investigations proceed, nor is that how they are they required to proceed. To the extent there was some delay in providing these videos to the prosecutor, it is not sufficient to establish a claim for concealment as these videos add little to nothing to the evidence already before the prosecutor. In addition, the prosecutor viewed the videos before the preliminary hearing, and proceeded with the hearing anyway, showing they did not sway her. This is not the "ample evidence" required to prove that the detectives withheld evidence and prevented the prosecutor for exercising independent judgment.

As with the wrongful arrest claims, both sides again indicate that the § 1983 and the state law malicious prosecution claims should be resolved the same way.[5] Accordingly, for the reasons stated above, Defendants are entitled to judgment on the state law malicious prosecution claim.

## C. Defendants Are Entitled to Judgment On The Fabrication/Concealment Claim (Count 2).

Plaintiff's second claim, under § 1983, is that Gamino and Zuniga violated his right to due process by fabricating and/or concealing evidence from the district

---

[5] The only additional argument relating to the state law claim concerns whether immunity under Cal. Gov. Code § 821.6 applies, but the Court need not address that argument since the claim fails.

1  attorney that set his wrongful arrest and prosecution in motion.

2        Plaintiff points to the detectives' late disclosure of the videos, but for at least

3  the reasons discussed above, and because the detectives did in fact disclose them, the

4  late-disclosed videos do not support a claim of concealment.

5        Plaintiff also states in a conclusory manner that the detectives failed to disclose

6  the Uber drivers' statements, Arshia's history of memory loss after drinking, and the

7  witness statements taken by Officers Meraz and Zamora on April 1 that Plaintiff says

8  negate elements of the § 261(a)(3) charge. But the Uber driver's statements were

9  recorded on a May 31 report, and Plaintiff has not established that this was not

10  provided to the prosecutor. More importantly, the Uber drivers' statements were not

11  exculpatory: one couldn't remember anything, and the other stated that Arshia seemed

12  way more intoxicated than Plaintiff, that her speech was slurred and she smelled of

13  alcohol, and that they were both kissing each other aggressively. Arshia did tell the

14  officers that she had at least one instance of memory loss after drinking, and his was

15  reflected in an April 12 report that was given to the prosecutor. Last, the witness

16  statements taken by Meraz and Zamora were recorded in their police report, which

17  was provided to the prosecutor before she filed charges.

18        Finally, Plaintiff argues that Gamino and Zuniga reinterviewed the witnesses in

19  a leading and suggestive way to get them to recant their statements. While the

20  introductory fact section of the opposition purports to identify instances in which

21  Gamino and Zuniga did this, the argument section of the brief is conclusory, with no

22  citations to legal authority as to what creates a triable issue for such a theory. Plaintiff

23  relies primarily on the declaration of their expert Roger Clark who listened to

24  recordings of the reinterviews of Tanika and Madison, and opines that they were too

25  leading. *See* Clark Decl. (Dkt. No. 44) and Exhibits thereto.

26        Defendants object to the Clark Declaration on the ground that it is conclusory

27  and not based on knowledge of specific facts. The Court sustains the objection. As

28  relevant, Clark opines about the professional standards for interviewing witnesses on

which detectives are trained, but does not identify the source of such standards at all. The Court has also reviewed the interview excerpts that Clark opines are suggestive or that cue witnesses and that he claims were intended to get the witnesses to "recant" their initial statements. The Court has reviewed all of the pages provided (which are not the entire transcripts) and finds that Clark's opinion that the detectives tried to get the witnesses to recant simply is not sufficiently supported by the transcripts as a whole to create a triable issue. Fairly read, the officers appear following up on the witnesses' prior statements. One way in which they did this is by reminding them what they said before and asking follow-up questions. To infer from this that the detectives were trying to get the witnesses to recant their prior statements is speculative. The Court therefore finds that Plaintiff has not presented sufficient evidence to create a triable issue that the detectives fabricated evidence by their witness-interviewing techniques.

**D. Defendants Are Entitled To Judgment On The *Brady* Claim (Count 3).**

Plaintiff also asserts a claim that the detectives failed to disclose exculpatory evidence as required by *Brady v. Maryland*, 373 U.S. 83 (1963). Defendants argue that this claim fails because Plaintiff was not convicted. The Ninth Circuit has addressed this only in an unpublished opinion, affirming the dismissal of a *Brady* claim "because the plaintiffs' criminal charges were dismissed, [so] the plaintiffs cannot show that any suppressed evidence could have produced a different result at trial," and stating that the same reasoning of other circuits was persuasive. *Puccetti v. Spencer*, 476 F. App'x 658, 660 (9th Cir. 2011). Indeed, most circuits have held that a conviction is required to support a § 1983 claim based on a Brady violation. *See, e.g., Jean v. Collins*, 221 F.3d 656, 663 (4th Cir. 2000); *McCune v. City of Grand Rapids*, 842 F.2d 903, 907 (6th Cir. 1988); *Morgan v. Gertz*, 166 F.3d 1307, 1310 (10th Cir. 1999); *Flores v. Satz*, 137 F.3d 1275, 1278 (11th Cir. 1998). Plaintiff has not presented a convincing argument that the Ninth Circuit would rule otherwise. The Court therefore finds that Plaintiff's *Brady* claim fails because he was not convicted.

**E. Defendants Are Entitled To Judgment On The *Monell* Claim (Count 4)**
***Except* Insofar As It Is Based On The April 1 Arrest.**

Defendants seek judgment on the *Monell* claim on the ground that there is no § 1983 violation. The Court grants this motion as to all of the § 1983 claims, except the wrongful arrest claim based on the April 1 arrest as to which Defendants failed to move for summary judgment.

**A. Defendants Are Entitled To Judgment On The Bane Act Claim (Count 7)**
***Except* Insofar As It Is Based On The April 1 Arrest.**

Defendants seek judgment on the Bane Act claim on the ground that the underlying conduct—the arrest and the prosecution—were not unlawful and therefore cannot be the basis of a Bane Act claim. The Court agrees, but again, Defendants did not move as to the April 1 arrest, so the Bane Act claim survives insofar as it is based on that arrest.

**B. Defendants Are Entitled To Judgment On The Claim For Intentional**
**Infliction Of Emotional Distress (Count 9).**

To recover on a claim for intentional infliction of emotional distress, a plaintiff must prove that: (1) the defendant committed extreme and outrageous conduct with the intention of causing, or with the reckless disregard for the probability of causing, emotional distress; (2) the plaintiff suffers from severe or extreme emotional distress; and (3) the defendant's conduct actually and proximately caused the distress. *Potter v. Firestone Tire & Rubber Co.*, 6 Cal.4th 965, 1001 (1993). Defendants seek judgment on the ground that, in light of the failure of all of the other claims and the legality of Defendants' conduct, Plaintiff cannot prove his theory that the detectives engaged in "outrageous conduct" that was "designed to ensure that [Plaintiff would] be prosecuted for crimes he did not commit." FAC ¶ 121.

Defendants are entitled to judgment on this claim in its entirety for at least two reasons. First, this claim is expressly premised on the unlawfulness of the entire course of conduct leading up to Plaintiff's prosecution. Because, as discussed above,

23.

the only conduct that remains actionable is the initial April 1 arrest, Plaintiff's theory based on the whole course of conduct necessarily fails. Second, to establish that the Defendants' conduct was outrageous, Plaintiff must show that it was "so extreme as to exceed all bounds of that usually tolerated in a civilized community" and that defendants "engaged in conduct intended to inflict injury or engaged in with the realization that injury will result." *Potter*, 6 Cal. 4th at 1001 (citation omitted). No reasonable jury could find that Defendants' conduct in connection with the April 1 arrest satisfies this demanding standard.

## V.   CONCLUSION

The Court rules as follows:

The Court **DISMISSES** Chief Charlie Beck and Count 6 (negligence) from the action based on Plaintiffs' consent.

The Court **GRANTS** Defendants' Motion for Summary Judgment as to Count 2 (fabrication/concealment of evidence), Count 3 (*Brady* claim), Count 5 (malicious prosecution under § 1983 and state law), and Count 9 (intentional infliction of emotional distress) **in their entirety**.

The Court **GRANTS** the Motion as to Count 1 (wrongful arrest under § 1983), Count 4 (*Monell* claim), Count 7 (Bane Act), and Count 8 (wrongful arrest under state law) **only** insofar as they are based on the April 11, 2017 arrest.

The Court **DENIES** the Motion insofar as Counts 1, 4, 7, and 8 **only** insofar as they are based on the alleged April 1, 2017 arrest, as Defendants' Motion did not address that basis for these claims.

**IT IS SO ORDERED.**

Dated: January 31, 2020    _____

HONORABLE ANDRÉ BIROTTE JR.
UNITED STATES DISTRICT COURT JUDGE